No. 23-2204

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

WILLIAM D. GLOVER, LINDA K. GLOVER, his wife, RICHARD A. GLOVER, CHRISTY L. GLOVER, his wife; GOSHORN RIDGE, LLC, Individually, and on Behalf of All Others Similarly Situated,

*Plaintiffs-Appellees*

v.

EQT CORPORATION, a Pennsylvania corporation, EQT PRODUCTION COMPANY, a Pennsylvania corporation, EQT ENERGY, LLC, a Delaware limited liability company,

*Defendants-Appellants*

On Appeal
from the United States District Court for the Northern District of West Virginia,
No. 5:19-cv-223 (Bailey, J.)

## OPENING BRIEF OF DEFENDANTS-APPELLANTS
## EQT CORPORATION, EQT PRODUCTION COMPANY,
## AND EQT ENERGY, LLC

David R. Dehoney
**Michelman & Robinson, LLP**
605 Third Avenue, 30th Floor
New York, New York 10158
(212) 730-7700

Lauren W. Varnado
**Michelman & Robinson, LLP**
717 Texas Avenue, 31st Floor
Houston, Texas 77002
(713) 422-2121

Jennifer J. Hicks
**Babst, Calland, Clements and Zomnir, P.C.**
300 Summers Street, Suite 1000
Charleston, West Virginia 25301
(681) 205-8888

*Counsel for Defendants-Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-2204__      Caption: __William D. Glover, et al. v. EQT Corporation, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__EQT Corporation__
(name of party/amicus)

_____

who is _____Defendant-Apellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☑ YES ☐ NO

2.   Does party/amicus have any parent corporations?   ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☑ YES ☐ NO
     If yes, identify all such owners:
     T. Rowe Price Associates, Inc.

12/01/2019 SCC                                    - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David R. Dehoney                    Date: 01/08/2024

Counsel for: EQT Corporation

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-2204      Caption: William D. Glover, et al. v. EQT Corporation, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

EQT Energy, LLC
(name of party/amicus)

who is _____ Defendant-Apellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.  Does party/amicus have any parent corporations? ☑YES ☐NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    EQT Energy, LLC is owned 100% by EQT Production Company, which is owned 100% by EQT Investments Holdings, LLC, which is owned 100% by EQT Corporation.

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☑YES ☐NO
    If yes, identify all such owners:

    EQT Energy, LLC is owned 100% by EQT Production Company, which is owned 100% by EQT Investments Holdings, LLC, which is owned 100% by EQT Corporation, a publicly traded company.

12/01/2019 SCC                                    - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David R. Dehoney          Date:   01/08/2024

Counsel for: EQT Energy, LLC

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-2204      Caption: William D. Glover, et al. v. EQT Corporation, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

EQT Production Company
(name of party/amicus)

who is _____Defendant-Apellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2. Does party/amicus have any parent corporations?  ☑ YES ☐ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

   EQT Production Company is owned 100% by EQT Investments Holdings, LLC, which is owned 100% by EQT Corporation.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☑ YES ☐ NO
   If yes, identify all such owners:

   EQT Production Company is owned 100% by EQT Investments Holdings, LLC, which is owned 100% by EQT Corporation, a publicly traded company.

12/01/2019 SCC                               - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David R. Dehoney          Date:          01/08/2024

Counsel for: EQT Production Company

- 2 -

Print to PDF for Filing

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 4

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................... 5

STATEMENT OF THE CASE .................................................................. 5

    A. STATEMENT OF FACTS ............................................................. 5

    B. PROCEDURAL HISTORY ......................................................... 10

SUMMARY OF THE ARGUMENT ....................................................... 14

STANDARD OF REVIEW ...................................................................... 15

ARGUMENT ........................................................................................... 16

I.    Fraudulent Concealment Cannot Be Determined Classwide. ........ 16

II.    A Class Cannot Be Certified When There Are Material Variations in Lease Terms. ............................................................................................ 19

    A. The Over 3,700 Leases in the Class Do Not Impose A Common Obligation to Pay NGL Royalties in The Same Way. ....................... 19

    B. A Common Payment Method Does Not Justify Class Treatment Where There Are Varying Lease Terms and Ambiguous Leases. ................. 29

    C. The District Court's "Clarifying" Order on Class Certification Created Additional Errors Warranting Vacatur. ............................................... 35

    D. Plaintiffs' Alter Ego Allegations Cannot Save Their Demand for Class Certification. .................................................................................... 38

    E. Typicality and Adequacy Cannot Be Satisfied Because of the Material Variations in Lease Language. ........................................................... 39

III.    The Class Cannot Be Ascertained Consistent With Rule 23. ........ 41

    A. Plaintiffs Admitted They Cannot Ascertain The Class. ............. 41

B. The Class Is Not Ascertainable Because of Differing Lease Language. ............................................................45

C. The Classes Are Not Ascertainable Because of Prior Class Litigation. ..46

IV.  Individual Damages Issues and Failure to Show Article III Standing Preclude Certification of the Class. ..............................................................47

CONCLUSION ........................................................................................52

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alig v. Rocket Mortg., LLC*,
  52 F.4th 167 (4th Cir. 2022) ...........................................................................51

*Allstate Ins. Co. v. Adkins*,
  932 F.2d 963 (4th Cir. 1991) ..........................................................................50

*Avritt v. Reliastar Life Ins. Co.*,
  615 F.3d 1023 (8th Cir. 2010) ...................................................................22, 50

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
  155 F.3d 331 (4th Cir. 1998) ...........................................................16, 17, 19, 22

*Cather v. EQT Prod. Co.*,
  No. 1:17-CV-208, 2019 WL 3806629 (N.D.W. Va. Aug. 13, 2019)..................24

*Chevron USA, Inc. v. Vermilion Par. Sch. Bd.*,
  377 F.3d 459 (5th Cir. 2004) ..........................................................................40

*Chieftain Royalty Co. v. XTO Energy, Inc.*,
  No. 12-7047, 2013 WL 3388629 (10th Cir. July 9, 2013) .................................40

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013).................................................................................*passim*

*Corder v. Antero Res. Corp.*,
  57 F.4th 384 (4th Cir. 2023) .....................................................................21, 27

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ...........................................................................50

*Energy Dev. Corp. v. Moss*,
  591 S.E.2d 135 (2003) ...............................................................................22, 28

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) ...................................................................*passim*

*Fontenot v. Taser Int'l, Inc.*,
  736 F.3d 318 (4th Cir. 2013) .....................................................................31, 33

*Foster v. Merit Energy Co.*,
  282 F.R.D. 541 (W.D. Okla. 2012) .................................................................48

*Gariety v. Grant Thornton, LLP*,
  368 F.3d 356 (4th Cir. 2004) ...............................................................15, 43

*Gomez v. Trump*,
  No. 20-CV-01419, 2020 WL 3429786 (D.D.C. June 23, 2020) .......................51

*Gunnells v. Healthplan Servs., Inc.*,
  348 F.3d 417 (4th Cir. 2003) .............................................................................17

*Harrell v. Cain*,
  832 S.E.2d 120 (W. Va. 2019) ...........................................................................27

*Highmark W. Virginia, Inc. v. Jamie*,
  655 S.E.2d 509 (W. Va. 2007) ..........................................................................17

*Hopper v. Jay-Bee Oil & Gas, Inc.*,
  No. 5:20-CV-101, 2023 WL 3695608 (N.D.W. Va. Apr. 4, 2023) ..................33

*Kay Co., LLC v. EQT Prod. Co.*,
  No. 1:13-CV-151, 2017 WL 10436074 (N.D.W. Va. Sept. 6, 2017).....24, 33, 47

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
  571 F.3d 672 (7th Cir. 2009) ............................................................................50

*Krakauer v. Dish Network, L.L.C.*,
  925 F.3d 643 (4th Cir. 2019) ............................................................................50

*Leggett v. EQT Prod. Co.*,
  No. 1:13-cv-4, 2016 WL 297714 (N.D.W. Va. Jan. 22, 2016) .........................39

*Leggett v. EQT Prod. Co.*,
  800 S.E.2d 850 (2017) ......................................................................................39

*Lienhart v. Dryvit Sys., Inc.*,
  255 F.3d 138 (4th Cir. 2001) ........................................................................4, 49

*Martin v. Mountain State Univ., Inc.*,
  No. 5:12-03937, 2014 WL 1333251 (S.D.W. Va. Mar. 31, 2014)....................49

*Pocahontas Mining Co. Ltd. Partnership v. Oxy USA, Inc.*,
    503 S.E.2d 258 (W. Va. 1998)......................................................................17, 18

*Richards v. EQT Prod. Co.*,
    No. 1:17-cv-50, 2018 WL 3321441 (N.D.W. Va. July 5, 2018)........................39

*Romeo v. Antero Res. Corp.*,
    No. 1:17CV88, 2020 WL 1430468 (N.D.W. Va. Mar. 23, 2020)......................33

*Slamon v. Carrizo LLC*,
    No. 3:16-CV-2187, 2020 WL 2525961 (M.D. Pa. May 18, 2020) ...................34

*Sneberger v. Morrison*,
    776 S.E.2d 156 (W. Va. 2015)..........................................................................49

*St. Paul Fire & Marine Ins. Co. v. Jacobson*,
    48 F.3d 778 (4th Cir. 1995)....................................................................25, 31, 33

*SWN Prod. Co., LLC v. Kellam*,
    875 S.E.2d 216 (W. Va. 2022)....................................................................*passim*

*Estate of Tawney v. Columbia Nat. Res., L.L.C.*,
    219 W. Va. 266 (2006) ...............................................................................*passim*

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006) .........................................................15, 16, 26, 37

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).................................................................................4, 50, 51

*W.W. McDonald Land Co. v. EQT Prod. Co.*,
    983 F. Supp. 2d 790 (S.D.W. Va. 2013)............................................................24

*Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*,
    725 F.3d 1213 (10th Cir. 2013) ........................................................................25

*Wilson v. Eagle Nat'l Bank*,
    No. 8:20-CV-01344-JRR, 2023 WL 2478933 (D. Md. Mar. 13,
    2023) .................................................................................................................51

*Zimmerman v. Bell*,
    800 F.2d 386 (4th Cir. 1986) ...........................................................................16

-v-

**Statutes**

28 U.S.C. § 1292(e) ................................................................4

28 U.S.C. § 1332 ...................................................................4

**Other Authorities**

1 MCLAUGHLIN ON CLASS ACTIONS § 5:56 (19th ed.)..................................22

Federal Rule of Civil Procedure 23 ...............................................*passim*

Federal Rule of Civil Procedure 34 .......................................................41

## **INTRODUCTION**

This appeal concerns certification of breach of contract and fraud claims arising from alleged underpayment of royalties on natural gas liquids ("NGLs") under thousands of gas leases with widely varying language that Plaintiffs themselves argued are ambiguous as to NGLs. Plaintiffs failed to carry their burden to satisfy Rule 23 on any of their claims. The certification order should be reversed.

There is no credible dispute that the district court improperly certified a class on Plaintiffs' fraud claims. Fraud is an inherently individualized inquiry, and many class plaintiffs will be unable to show reliance because of their individual communications and knowledge. This was demonstrated by the district court's summary judgment order dismissing the named Plaintiffs' fraud claims for failure to establish reliance.

Certification must also be reversed on Plaintiffs' breach of contract claims. The over 3,700 leases in the class were made at different times by different parties. Some of the leases were negotiated by EQT Production; some were negotiated by other companies and later acquired by EQT Production. There is no one lease form or type of royalty provision, but many different types of leases with varying royalty language, and even more with additional terms that greatly impact the lessors' claims, not to mention differences in individual circumstances and intent of the parties who originally entered into each lease.

Plaintiffs' theory is that, regardless of the actual lease language, EQT Production is obligated to pay royalties on NGLs based on the sale NGLs after they have been extracted from the gas stream and fractionated into purity products, and that EQT Production was prohibited from paying for NGLs based on their contribution to the value of the gas. Plaintiffs admit that class leases are "ambiguous" as to NGLs, but the district court held that the actual lease language and extrinsic evidence are irrelevant based on its speculation as to how the implied duty of marketability described in the *Tawney* line of cases should be applied to the valuation of NGLs.

There is no West Virginia case that remotely suggests that *Tawney* overrides the parties' intent in determining how to pay royalties on NGLs. Instead, *Tawney* holds that a party cannot deduct post-production costs unless the lease language provides the requisite level of specificity, and the West Virginia Supreme Court recently held that "[t]he answer to this question necessarily involves the exploration of contractual language, the possible need for interpretation of said language, and the development of facts to assist either the court or the factfinder, as appropriate." *SWN Prod. Co., LLC v. Kellam*, 875 S.E.2d 216, 219 (W. Va. 2022). Thus, even if *Tawney* applies to the methodology for calculating NGL royalties, it raises individualized questions that are not suitable for class certification.

In addition, the named Plaintiffs hold two leases—both of which were negotiated by other operators—that contain unique language that is not representative of the proposed class. In its class certification order, the district court itself acknowledged that the lease held by Goshorn Ridge, LLC ("Goshorn") contains one-of-a-kind language that would likely require exclusion from the class. But then the district court issued a "clarifying" order that included the Goshorn lease in the class without any explanation as to how a class member with that unique lease language could have suffered any injury at all, let alone satisfy the requirements for typicality and adequacy to be a named Plaintiff.

Worse, the district court simply glossed over Plaintiffs' admission that they could not ascertain the class because it would require them to "spend countless hours reviewing thousands of lease files and transactions" to link royalty payments to leases and then to class members over many years. According to the district court, this was no impediment to certification because the district court ordered Defendants to "reconstruct" this information for Plaintiffs, despite declarations explaining that to do so would require independent research, including a review of public records for ownership changes. Not only did the district court's order impermissibly shift the burden of satisfying Rule 23 to Defendants, but it also ignores that the class is not ascertainable because it cannot be "readily identified" by objective criteria. Just as in *Adair*, "the proposed classes raise serious ascertainability issues because they are

defined to include both former and current gas estate owners." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 359 (4th Cir. 2014).

Finally, the district court erred in ignoring Plaintiffs' failure to show that each class member actually suffered damages. Class certification is not proper where, as here, individual damages issues must be resolved to determine if there is even liability. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 147 (4th Cir. 2001). The Supreme Court of the United States has recently confirmed that a class cannot be certified where, as here, Plaintiffs fail to demonstrate that every class member suffered "concrete harm" to establish standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021). Plaintiffs never produced a uniform damages model, falling far short of the fundamental requirement that a class cannot be certified before Plaintiffs prove that "damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332. EQT timely filed a petition under Federal Rule of Civil Procedure 23(f) on September 14, 2023, which this Court granted. This Court's jurisdiction is proper under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the district court erred by certifying a class on fraudulent concealment when the class plaintiffs have individual knowledge and reliance issues, and the class representatives' fraudulent concealment claims have been dismissed on summary judgment.

2.      Whether the district court erred by certifying a class on claims for underpayment of royalties on NGLs when there are material variations in lease terms, well quality, and processing and marketing arrangements, and Plaintiffs admitted that the leases are ambiguous as to NGLs.

3.      Whether the district court erred by certifying a class where Plaintiffs admitted that they cannot ascertain the class, and ascertaining class membership will require extensive individualized review of wells, leases, and owners over the entirety of the class period.

4.      Whether the district court erred by certifying a class when Plaintiffs have not produced a uniform damages model or demonstrated that every class member suffered concrete harm.

## STATEMENT OF THE CASE

### A.      STATEMENT OF FACTS

Goshorn and the Glover Plaintiffs seek to represent a class of royalty owners who were allegedly underpaid royalties on NGLs. JA0696. The class includes over 3,700 leases entered into by different parties over decades. JA3912. Some of the

leases were negotiated by EQT Production, using various lease forms over time and individually negotiated royalty language. Other leases were acquired from other companies who negotiated their own lease language. JA3902-3903; JA3836-3837.

There is no single form lease or type of royalty provision, but instead leases with widely varying lease terms and different royalty obligations. For example, some leases provide for royalties based on the value of gas "at the well," some leases say based on "proceeds realized" by lessee, and others say "wholesale market value" of gas. JA3901-3902; *see* JA4026-4045. Some leases define "gas" to mean gas in its natural state, while others define "gas" to include gas components, among innumerable other variations that impact the lessors' claims, not to mention the differences in the individual circumstances and intent of the parties who originally entered into those leases. *Id.*; JA6909-6935; JA5062-5071.

Significantly, ***both*** of the leases held by the named Plaintiffs were acquired from ***other*** lessees. Plaintiff Goshorn negotiated its one-of-a-kind lease with Republic Energy and Trans Energy, with the assistance of counsel and oil and gas industry experts. JA0691; JA3915. The Glover Plaintiffs negotiated their lease with Stone Energy Corporation, with the assistance of counsel,[1] as part of a settlement

---

[1] Notably, Rocky Fitzsimmons, class counsel, represented the Glover Plaintiffs in the negotiation of the Glover Lease. JA3917-3918.

agreement. JA0690; JA3915. EQT Production acquired both leases as part of separate corporate acquisitions in early 2017. JA3898-3899.

Because they were acquired from other companies and individually negotiated, the Goshorn lease and Glover lease contain unique language that is not representative of other class leases. For example, the Goshorn lease includes a one-of-a-kind royalty provision that specifies "a royalty of twenty percent (20%) market value of oil (in barrels) and gas (as defined in dekatherms ((1,000 btu per mcf)) both as measured at the wellhead" and states that royalty reports shall be governed by Texas law. JA0719.

The Glover lease, which differs significantly from the Goshorn lease, provides for a royalty of 18.75% royalty on "the gross proceeds received from the sale of Oil and Gas produced, saved and sold from the Leased Premises, or lands pooled therewith" where "gross proceeds" is defined as "the gross amount realized from a sale of the Oil and Gas or its components to a *bona fide* third party purchaser, without deducting gathering, transportation, compression, processing, fuel and other services for Lessor's Oil and Gas[.]" JA0718 (emphasis in original).

Among the over 3,700 leases ultimately included in the class, there are at least 70 different types of express royalty clauses. Merely by way of example:

- Some leases contemplate sales of gas "at the well," "at the wellhead," or "at the mouth of the well," while other leases contemplate sales at other points downstream, and still others expressly identify a price or market for royalty valuation;

-7-

- Some leases define "gas" to mean gas in its natural state produced at the well, while other leases contain unique definitions of "gas," and others do not define "gas" at all;

- Some leases provide for a royalty on gas "components" while others do not;

- Some leases expressly contemplate or refer to affiliate sales, while others do not.

JA3901-3903; JA4026-4045; JA6909-6935; JA4428-4431.

The class leases contain other important differences, such as: (1) lease modifications, including addenda or amendments that strike all or a portion of the original royalty clause; (2) lease language specifying the valuation location and/or the product to be valued; (3) lease language that addresses marketing obligations and inform whether the lessee has an implied obligation to process gas for the recovery of NGLs; (4) lease language regarding affiliate sales; (5) market enhancement clauses; and (6) express disclaimers or waivers of implied covenants, including, specifically, the implied duty to market. JA3902-3903; JA5062-5071.

Many of the leases acquired from other oil and gas operators also contain notice and cure provisions that provide that the lessee cannot be deemed in breach of its royalty obligations unless the lessor has delivered written notice of default, and the lessee has failed to cure the default. JA3903; JA4023-4024.

The class leases do not provide a uniform method of royalty payment, which often depends on the quality of gas and marketing arrangements pertaining to a well. For example, the class wells produce gas with varying quality and composition,

which are subject to different gathering, processing, and other agreements. Some of these agreements were negotiated by EQT Energy, but some were negotiated by prior owners of the wells. Variations in quality and flow path, the economic assessment of the degree of gas processing required to meet quality specifications for transport on transmission pipelines is unique to the gas produced from each class well. Notably, the named Plaintiffs' wells are not representative of the class based on their well quality and the processor and processing contracts that apply to them.

Additionally, different processing plants have different NGL recovery efficiencies, and under some of the applicable processing contracts, gas is not processed for the recovery of NGLs. Pricing and other terms vary by processing agreement and processor, which affect the allocation of costs and refined NGL products back to the individual wells and owners. Not only do these distinctions require that alleged damages cannot be calculated uniformly across the class, but depending on individual lease language, these distinctions can mean that Plaintiffs' claims may cause harm to certain individual class members.

Finally, EQT Production regularly communicates with royalty owners about their royalties, establishing an individualized course of conduct with individual lessors. JA3904; JA3934; *see* JA5405-6568. In granting summary judgment dismissing the named Plaintiffs' fraud claims, the district court noted that the named

Plaintiffs had individual communications with EQT Production sufficient to put them on notice of their claims long before they filed any lawsuit. JA4441; JA4461.

## B.    <u>PROCEDURAL HISTORY</u>

On February 2, 2018, Goshorn filed a civil action against Trans Energy, Republic Energy, and EQT Production, alleging breach of contract but without any mention of NGLs. On July 19, 2019, the Glover Plaintiffs filed a class action lawsuit against the EQT Defendants, alleging breach of contract but without any allegation of fraud. On February 21, 2020, the Glover Plaintiffs filed a Consolidated Complaint, merging their class action case with the one filed by Goshorn, asserting claims for breach of contract and fraudulent misrepresentation for alleged underpayment of royalties on NGLs.

After years of discovery and motion practice, the district court entered an amended scheduling order setting the deadline for the completion of discovery for June 29, 2023, and a class certification hearing on August 31, 2023. On June 9, 2023—just weeks before the close of fact discovery—Plaintiffs filed yet another amended complaint, "materially chang[ing] the proposed class" and "recasting their misrepresentation claim as a claim for 'fraudulent concealment.'" JA4441; JA4462; JA1134.

During discovery, Plaintiffs argued that they were unable to link royalty payments to wells, leases, and owners over the class period as they asserted necessary

to ascertain the members of the class. EQT Production produced the data and files it keeps in the ordinary course—including lease files, lease agreements and amendments, and correspondence—but Plaintiffs argued that it should not be Plaintiffs' burden to "spend countless hours reviewing thousands of lease files and transactions to determine the relevant lease language, royalty ownership and information concerning NGLs, and deductions." JA0341. Plaintiffs filed a motion to compel EQT Production to do this work for them, which the district court erroneously granted. In granting the motion, the district court acknowledged that this discovery order would require EQT Production to create new documents that do not already exist to respond to Plaintiffs' requests, but ruled that imposing this burden on EQT Production was acceptable because "this case is not a typical case." JA0616.

Without waiving any objections or its rights on appeal, EQT Production made every effort to comply with the district court's discovery order by assembling and producing additional information. Nevertheless, Plaintiffs were still unable to ascertain the class, later representing to the district court that they "cannot reasonably and reliably determine whether each royalty owner was paid pursuant to a Class Lease and is, therefore, entitled to recover damages." JA1133.

On July 21, 2023, despite their admitted failure to ascertain the class, Plaintiffs went ahead with their motion to certify a sprawling class encompassing thousands of leases that were entered into by different parties over decades using widely varying

royalty language, each with their own history of individual communications. In their certification motion, Plaintiffs sought to certify a class for fraudulent concealment and breach of contract.

To support their motion for class certification, Plaintiffs contemporaneously filed a "motion for partial summary judgment" seeking a declaration that, regardless of variances in lease language, all class leases must be interpreted the same to require a separate royalty on downstream sales of finished NGL products.[2] Plaintiffs admitted that class leases are "ambiguous" as to NGLs and may require reference to "extrinsic evidence," but nevertheless argued that the class leases must all be interpreted in the same way because a lessee must calculate gas royalties based on "a bona-fide sale to unaffiliated third parties" under the "marketable product rule," otherwise known as the implied duty of marketability, as set forth in the *Tawney* line of cases. JA4589-4590.

On August 31, 2023, the district court granted class certification on both the breach of contract and fraudulent concealment claims. JA4326. As to breach of contract, the district court acknowledged that class leases are ambiguous as to NGLs but accepted Plaintiffs' argument that the leases should be universally construed

---

[2] The district court denied this as moot in light of its order granting Plaintiffs' motion for class certification and its order clarifying its order granting Plaintiffs' motion for class certification.  JA4432-4433.

without regard to lease language, variations in the same, or extrinsic evidence because of the implied duty of marketability as set forth in the *Tawney* line of cases and general rules of construction. JA4302-4303. As to fraud, the district court acknowledged that Plaintiffs had individual knowledge and reliance issues, but nevertheless concluded that a class could be certified, asserting reliance could be presumed under West Virginia law. JA4325.

In its class certification order, the district court stated that it had "remaining questions" that needed to be addressed, including whether the one-of-a-kind Goshorn lease could even be included in the class given that it expressly authorized EQT Production's method of paying NGL royalties. JA4326. The district court held a conference on September 18, 2023 to discuss this and other issues. *See* JA4419. On September 22, 2023, the district court issued a "clarifying" order that included this lease in the class without any explanation as to how class members with this lease language could have suffered any injury at all, let alone satisfy the requirements for typicality and adequacy as required to be named Plaintiffs. JA4428; JA4431.

In the interim, on September 6, 2023, EQT Production moved for summary judgment on fraud on two grounds: (1) the fraud claims were barred by the statute of limitations because the named Plaintiffs learned of the salient facts as a result of individual communications before the statutory period; and (2) the fraud claims failed on the merits because the named Plaintiffs failed to adduce evidence of reliance,

-13-

causation and damages. *See* JA4341; JA4365. Then on October 16, 2023, less than one month after certifying a class on fraud, the district court granted EQT Production's motions for partial summary judgment on both grounds, dismissing all the named Plaintiffs' fraud claims from the case. *See* JA4434; JA4452.

<div align="center">**SUMMARY OF THE ARGUMENT**</div>

This Court should reverse the district court's certification order. That certification order is predicated on four legal errors, each of which requires reversal and precludes class treatment going forward.

I.     The district court erred by certifying a class on fraudulent concealment claims when the class plaintiffs have individual knowledge and reliance issues. This is confirmed by the fact that the named Plaintiffs' fraudulent concealment claims have been disposed of on summary judgment for, among other reasons, failure to provide evidence of reliance and causation. In their objection to the docketing statement, Plaintiffs argue that "any issues related to fraud and reliance are not part of this appeal" because the named Plaintiffs' fraud claims have been dismissed. Doc. 28 at 1. However, because the district court has not revised its class certification order, reversal is necessary.

II.     The district court erred by certifying a class on claims for underpayment of royalties on NGLs when there are material variations in lease terms, well quality, and processing and marketing arrangements. Plaintiffs have admitted that the class

leases, which do not follow a standard form, are "ambiguous" as to NGLs. These leases raise individualized issues that are not amenable to class treatment.

III.    The district court erred by certifying a class where Plaintiffs have admitted that they have not ascertained the class, and ascertaining class membership will require extensive individualized review.

IV.    The district court erred by certifying a class when Plaintiffs have not disclosed their damages model or shown that every class member suffered concrete harm as required to establish standing.

## STANDARD OF REVIEW

"[P]laintiffs bear the burden… of demonstrating satisfaction of the Rule 23 requirements and the district court is required to make findings on whether the plaintiffs carried their burden[.]" *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004). "Repeatedly," the Supreme Court has "emphasized that it 'may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23[] have been satisfied.'" *Comcast*, 569 U.S. at 33 (citation omitted).

This "analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim'"—because "the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the

plaintiff's cause of action.'" *Id.* at 33-34. "A district court per se abuses its discretion when it makes an error of law or clearly errs in its factual findings." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006).

## ARGUMENT

### I.    Fraudulent Concealment Cannot Be Determined Classwide.

Certification should have been denied because Plaintiffs' fraudulent concealment claims raise individual reliance issues that preclude class certification. The district court's theory that reliance may be presumed across the class is contrary to this Court's precedent, as well as the district court's own order dismissing the named Plaintiffs' fraudulent concealment claims on summary judgment. This Court should reverse the certification order.

As this Court has repeatedly explained, fraudulent concealment cannot be proven by classwide proof and thus cannot be determined on a classwide basis. *Adair*, 764 F.3d at 370 (citing *Thorn*, 445 F.3d at 321-22). The Court has made clear that "a fraud class action cannot be certified when individual reliance will be an issue." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998) (quoting *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996)); *see also Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986) ("Because the extent of knowledge of the omitted facts or reliance on misrepresented facts will vary from [class member] to [class member], the question of whether the omission was material

might require an individual inquiry for each [class member].”); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 438 (4th Cir. 2003) (“[R]egardless of other courts’ interpretations of Rule 23, we have flatly held that ‘when the defendants’ affirmative defenses... may depend on facts peculiar to each plaintiff’s case, class certification is erroneous.’”) (quoting *Broussard*, 155 F.3d at 342).

In certifying Plaintiffs’ fraud claims, the district court concluded that class members do not have to show reliance because “fraudulent concealment does not require a showing of reliance.” JA4325. That conclusion was directly contrary to this Court’s decision in *Adair* holding that in assessing fraudulent concealment, “attention **must** also be paid to the plaintiff’s knowledge and actions.” *Adair*, 764 F.3d at 370 (emphasis added). The district court’s holding also misstates West Virginia law, which requires plaintiffs alleging fraud to prove reliance, the reliance was justified, and damages as a result of that reliance. *Highmark W. Virginia, Inc. v. Jamie*, 655 S.E.2d 509, 515 (W. Va. 2007).

The district court erred as a matter of law in holding that a concurring opinion in *Pocahontas Mining Co. Ltd. Partnership v. Oxy USA, Inc.*, 503 S.E.2d 258 (W. Va. 1998) dispensed of the reliance element in fraudulent concealment cases. JA4325. That concurrence did not (and could not) overrule well-settled law that justifiable reliance is an essential element of any fraud claim but merely suggested that, under the relaxed pleading standard for claims of fraud by omission or

-17-

concealment, affirmative reliance need not be pleaded with particularity because "the pleading must not be expected to include every element of the proof." *Pocahontas*, 503 S.E.2d at 263. However, as the concurrence explained, "[t]he proof, according to established West Virginia law, ***must*** include the elements of the action for fraud," including justifiable reliance. *Id.* (emphasis added). *Pocahontas* does not stand for the proposition that the element of justifiable reliance can be ignored in certifying fraudulent concealment claims.

The district court apparently recognized this error in its summary judgment order, which dismissed the named Plaintiffs' fraud claims because they "failed to adduce evidence of reliance, causation and damages, and EQT Production cannot be liable for fraud simply because EQT Production disagreed with [Plaintiffs'] interpretation of the lease." JA4449; JA4469. The district court also recognized that the Plaintiffs' fraud claims were barred by the statute of limitations because they had notice of their alleged injury more than two years before filing an amended complaint alleging a claim for fraudulent concealment. JA4441; JA4461. The district court's summary judgment order leaves no doubt that individual issues will predominate over common ones in resolving class fraud claims, and therefore the class action mechanism cannot be used to resolve these claims.

Plaintiffs acknowledge that the district court's summary judgment order is fatal to their demand for class certification on fraud, but they bizarrely argue that

this means "any issues related to fraud and reliance are not part of this appeal." Doc. 28 at 1. Contrary to this contention, the district court has not rescinded or revised its class certification order, which improperly states that a class should be certified on fraud. Given the dismissal of the named Plaintiffs' fraud claims on summary judgment, the district court's certification of a class on fraud was unquestionably an abuse of discretion and must be reversed. *Broussard*, 155 F.3d at 341.

**II.    A Class Cannot Be Certified When There Are Material Variations in Lease Terms.**

Actions involving varying contract terms do not meet the requirements of commonality, predominance, or typicality. *Adair*, 764 F.3d at 368 ("[V]ariable terms will make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis."); *Broussard*, 155 F.3d at 343-44 (reversing class certification because variations in contracts undermined commonality and typicality). Here, the district court's uniform interpretation of over 3,700 leases by judicial fiat—with specific disregard to different royalty language in leases that were individually negotiated and entered into by different energy producers over decades—was an abuse of discretion warranting reversal.

**A.    The Over 3,700 Leases in the Class Do Not Impose A Common Obligation to Pay NGL Royalties in The Same Way.**

The district court's determination that the over 3,700 leases in the class must be uniformly interpreted, regardless of differences in lease language and extrinsic

evidence, to require a common method of paying NGL royalties based on the downstream sale of finished NGL products, rather than paying for NGLs based on their contribution to the value of the gas, was incorrect and contrary to law.

The district court held that the actual lease language does not matter because, rather than engage in the necessary lease-specific analysis, which would preclude certification, it concluded that "all Class Leases impose upon EQT the common obligation to pay NGL royalties based upon the gross proceeds received at the first point of sale to unaffiliated third-party purchasers in arm's length transactions." JA4297. In support of this "common obligation" theory, the district court ignored variations in lease language and extrinsic evidence because of: (1) purported admissions from one of Defendants' experts that the class leases do not expressly state how to pay for NGLs, JA4297-4298; (2) a novel expansion of the implied duty of marketability, JA4302; and (3) general rules of construction, JA4303. The district court's decision was manifestly erroneous on all three points and directly contradicts *SWN Prod. Co., LLC v. Kellam*, 875 S.E.2d 216, 219 (W. Va. 2022).

***First***, the district court relied on testimony from one of Defendants' experts that certain lease language from a discrete set of lease provisions shown at a deposition did not expressly permit EQT Production's NGL royalty methodology. JA4297-4298. Even if that were true of all the class leases, that would not support the district court's certification decision.

Moreover, that a gas lease is silent as to NGLs does not end the inquiry but only raises additional individualized questions. In *Kellam*, the Supreme Court of Appeals of West Virginia explained that in interpreting oil and gas lease provisions, the court must look to the individual lease at issue and other relevant evidence, and that the question is most likely one for the jury. 875 S.E.2d at 226; *see also Corder v. Antero Res. Corp*., 57 F.4th 384, 400 (4th Cir. 2023) ("When determining whether a contract is ambiguous, we must consider 'the whole instrument' and, if possible, 'give meaning to every word, phrase, and clause and also render all of its provisions consistent and harmonious.'").

In construing such a lease in the present case, the court must consider whether the royalty language addresses the valuation location or the product to be valued, how the lease defines gas, and whether the lease defines a sale as between third parties, among other things.[3] Plaintiffs themselves admitted that "Class Leases that do not expressly define a sale as between unaffiliated parties are ambiguous" and that "[a]ny royalty provision relating to proceeds received from the sale of NGLs 'at the well' or 'at the wellhead' is also ambiguous." JA3829; JA3902. Plaintiffs further admitted that "extrinsic evidence" may be necessary to determine the intent of the parties on a lease-by-lease basis. JA3829; JA3902.

---

[3] Defendants' expert pointed this out at the deposition, but the district court ignored this aspect of the deposition testimony. *See* JA4697-4699.

-21-

Plaintiffs' admissions are fatal to class certification. It is black letter law that "[c]laims arising out of contracts or leases that have ambiguous language, do not have materially similar terms, or require individualized inquiries to ascertain whether each obligation to each class member in fact was breached, are not suited to class certification." 1 MCLAUGHLIN ON CLASS ACTIONS § 5:56 (19th ed.); *see also Broussard*, 155 F.3d at 340 ("[P]laintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts."); *Avritt v. Reliastar Life Ins. Co*., 615 F.3d 1023, 1030 (8th Cir. 2010) (classwide proof cannot be established where contracts are ambiguous).

Under West Virginia law, a contract will be deemed to have a "latent ambiguity" when some collateral matter makes the intent of the parties unclear, in which case the factfinder must examine the entire contract and extrinsic evidence, including oral testimony by both parties, to determine the intent of the parties when the contract was entered into. Syl. Pt. 6, *Energy Dev. Corp. v. Moss*, 591 S.E.2d 135, 137 (W. Va. 2003). Here, there is no question that the district court would need to conduct individualized inquiries to interpret the varying lease terms, which is fatal to class certification. It would be improper to construe even one such lease simply by reference to "rules of construction" without examining the actual lease language or extrinsic evidence, let alone doing so for thousands of leases on a classwide basis.

Notably, in considering a similar issue, this Court rejected the notion that a district court could plausibly limit a class of royalty plaintiffs to leases that are silent with respect to the deduction of costs because questions would inevitably arise as to whether a given lease was in fact silent on the issue, and "the court will have to sort out these differences based on the particular lease language." *Adair*, 764 F.3d at 369. Likewise, here, the fact that several thousand leases may be silent or ambiguous as to NGLs does not warrant a uniform interpretation of those leases to require paying NGL royalties that Plaintiffs demand. Instead, the particular lease language (and applicable extrinsic evidence) must be reviewed to determine what the parties to each lease actually intended with respect to NGLs.

***Second***, the implied duty of marketability cannot be used to ignore variations in lease language in determining how to calculate NGL royalties. While Plaintiffs did not even allege a cause of action for breach of the implied duty of marketability, this implied duty became the centerpiece of the district court's certification order, which holds that the class leases must be uniformly interpreted to require a royalty on downstream sales of NGLs to unaffiliated third parties after the NGLs have been processed and fractionated into finished purity products because "[t]he case law of West Virginia makes clear that royalties are to be paid on the price paid by the first non-affiliated buyer." JA4302. The "case law of West Virginia" cited by the district

court is, in fact, three federal opinions applying the implied duty of marketability as set forth in *Tawney*.[4]

But *Tawney* says nothing about pricing, the definition of gas, or the methodology for paying royalties on NGLs, nor does it suggest a separate royalty on downstream sales of finished NGL products after processing and fractionation. To the contrary, *Tawney* states that, in calculating a royalty on gas, a lessee cannot deduct post-production costs unless the lease language satisfies the *Tawney* criteria. *See McDonald Land*, 983 F. Supp. 2d at 802 (summarizing *Tawney*). The district court does not explain how or why the *Tawney* rule concerning deductions should be applied here to create a default rule for pricing or paying NGL royalties, what the standard would be for satisfying *Tawney* if it were applied to pricing or NGLs, or why variances in lease language would be irrelevant to this inquiry.

Critically, West Virginia has **never** extended *Tawney* to address pricing or NGL royalties—let alone a class action case involving countless variations in lease language. The district court's attempt to create new state common law is an egregious

---

[4] *See W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790, 802 (S.D.W. Va. 2013) (granting summary judgment on the ground that, under *Tawney*, "lessees have an implied duty to bear all post-production costs incurred until the gas reaches the market"); *Cather v. EQT Prod. Co.*, No. 1:17-CV-208, 2019 WL 3806629, at *4 (N.D.W. Va. Aug. 13, 2019) (finding that "the implied duty to market discussed in both *Wellman* and *Tawney*" was applicable); *Kay Co., LLC v. EQT Prod. Co.*, No. 1:13-CV-151, 2017 WL 10436074, at *30 (N.D.W. Va. Sept. 6, 2017) (Bailey, J.) (following *McDonald Land* and noting that "*Tawney* and *Wellman* are premised on the implied duty to market gas").

violation of the principles of federalism. As this Court has repeatedly emphasized, **"*federal courts sitting in diversity rule upon state law as it exists and do not surmise or suggest its expansion.*"** *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 783 (4th Cir. 1995) (emphasis added) (citing cases).[5]

Even if *Tawney* could be deemed applicable to calculating NGL royalties—which it should not be—that would not justify class certification. As the West Virginia Supreme Court recently explained, the implied duty to market is a "gap filler" that can be negated by express language of the lease. *Kellam*, 875 S.E.2d at 227. Where, as here, there are variations in lease language, a court cannot certify a class unless it determines that no lease negates the implied covenant of marketability. *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1219 (10th Cir. 2013) (vacating class certification because the district court failed to make a finding "that no lease type negates the [implied duty to market].""). As this Court observed in *Adair*, "[i]t was the plaintiffs' burden to demonstrate commonality on the implied duty of marketability" but "they have made no attempt to do so." 764

---

[5] Curiously, Plaintiffs represent to this Court that "the district court's Order is **not** based upon the application of any implied covenant" and therefore the implied duty of marketability is entirely irrelevant to the claims in this case. Doc. 26 at 13 (emphasis added). Plaintiffs' representation is contradicted by their motion for summary judgment on lease language, which expressly relied on the implied duty of marketability for the proposition that the class leases must be uniformly interpreted. *See* JA4582 (relying on the implied duty of marketability as set forth in *Wellman* and *Tawney* as requiring gas royalties on unaffiliated sales and arguing this must be extended to NGL royalties).

F.3d at 368 (citing *Thorn*, 455 F.3d at 321). Similarly, Plaintiffs have made no attempt to establish the implied duty of marketability on a classwide basis.[6]

The West Virginia Supreme Court recently confirmed that determining whether a lease satisfies *Tawney* is a fact-intensive inquiry that cannot be answered as a matter of law without examining individual lease language, as it raises questions that are "tied directly to the specific language of the lease and, if ambiguous, the parties' intent in contracting." *Kellam*, 875 S.E.2d at 227. Given Plaintiffs' admission that the class leases are ambiguous as to NGLs, it was a violation of the guidance in *Kellam* and manifestly improper for the district court to construe the class leases, each with varying language, drafted and entered into at different times and by different people, as a matter of law without regard to individual lease language and extrinsic evidence.

The district court attempted to distinguish *Kellam* on the ground that ambiguities in the leases did not raise questions of fact because "[t]he interpretation of Class Leases' language is a matter of law for the Court to determine" under West Virginia law. JA4302-4303. This too is incorrect as a matter of law. West Virginia law is clear that when a contract is ambiguous, "the proper interpretation of that

---

[6] Many leases in the class expressly disclaim implied duties, but the district court nevertheless included these leases in the class and never gave a reasoned decision on Defendants' motion to exclude these leases from the class. *See* JA4330. Instead, the district court summarily denied Defendants' motion as "moot" in light of the class certification order. JA4433.

ambiguous document, when the facts are in dispute, presents a question of fact for the factfinder to resolve after considering all relevant extrinsic evidence." Syl. Pt. 4, *Harrell v. Cain*, 832 S.E.2d 120 (W. Va. 2019). Thus, as explained in *Kellam*, where a contract is ambiguous, "the question of its meaning should be left to the jury under proper hypothetical instructions." *Kellam*, 875 S.E.2d at 228 (citing cases).

Even assuming arguendo that the district court was correct in finding that lease interpretation is a matter of law for the court to decide, the district court completely ignored directives from this Court that "[w]hen determining whether a contract is ambiguous, we must consider 'the whole instrument' and, if possible, 'give meaning to every word, phrase, and clause and also render all of its provisions consistent and harmonious.'" *Corder*, 57 F.4th at 400.

**Third**, the district court's reliance on the general rule that oil and gas leases should be construed in favor of the lessor, JA4303, was misplaced.[7] That background rule is merely an aid in construction; it does not allow a court to ignore individual

---

[7] Notably, this rule derives from the *contra proferentem* doctrine, a common law rule holding that a court should construe a contract against the party who drafted it. *See Tawney*, 219 W. Va. 266, 273-74 (2006) ("Under our law, '[u]ncertainties in an intricate and involved contract should be resolved against the party who prepared it."). Before this rule of contract interpretation is applied, the court must actually determine whether the lessee EQT Production did, in fact, draft the lease. Plaintiffs and the district court disregarded the facts surrounding the negotiation and drafting of the individual class leases, including the negotiation of the Goshorn Plaintiff's one-of-a-kind lease and the negotiation of the Glover Plaintiffs' lease by Plaintiffs' counsel, Roger Cutright, Robert Fitzsimmons, and the Fitzsimmons Law Firm.

variations in lease language or disregard extrinsic evidence when interpreting ambiguous leases—let alone when interpreting thousands of leases on a classwide basis. The authority on which the district court relied held that when a lease is ambiguous, it **must** be construed according to the parties' intent at the time the lease was executed, and therefore extrinsic evidence, including oral testimony, should be considered to explain any ambiguities. Syl. Pt. 6, *Energy Dev. Corp. v. Moss*, 591 S.E.2d at 137.

In *Moss*, the lower court determined that two leases for "oil and gas" were ambiguous as to coalbed methane ("CBM") because CBMs were not widely extracted at the time the leases were entered into, and therefore the parties' intent as to CBMs was unclear. *Id.* at 140-41. To resolve the ambiguity, the lower court "heard testimony from both sides regarding the circumstances surrounding the execution of the leases and the knowledge or understanding the parties had with respect to coalbed methane at the time they entered into the leases." *Id.*

Applying that reasoning here, the district court should have permitted extrinsic evidence to determine the class members' intent with respect to NGLs. Instead, the district court prohibited discovery on absent class members, preventing the development of a record regarding their intent as to NGLs. JA0286. This is yet another abuse of discretion by the district court. Defendants' due process rights will be violated if the class certification is not reversed.

### B.   A Common Payment Method Does Not Justify Class Treatment Where There Are Varying Lease Terms and Ambiguous Leases.

The district court further erred in finding that "there is no need to conduct individual lease analysis" because EQT Production purportedly had a common royalty practice of paying for NGLs "based upon the BTU value of the raw gas with entrained NGLs" instead of paying a separate royalty on downstream sales of NGLs after they have been extracted from the gas stream and processed into finished products. JA4303; JA4313.

A common royalty payment method is not enough to satisfy the requirements for class certification where there is varying lease language. *Adair*, 764 F.3d at 367. As this Court explained in *Adair*, common practices do not result in common liability when differing contractual language is at issue. In that case, significant lease variations precluded class certification, including that some leases required royalties based on "proceeds" while others required royalties based on "market value," and some leases specified a royalty based on price "at the well, while others permit calculation at the point of sale." *Id.* at 367. This Court concluded that "these variable terms will make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis." *Id.* at 368.

The same is true here. Just as in *Adair*, some leases provide for a royalty based on "proceeds realized" by lessee, while other leases say "wholesale market value" of gas, and some leases contemplate sales of gas "at the well," while others do not.

JA3901-3902; JA4026-4045. Moreover, some lease types contemplate "sales to a bona fide third-party purchaser," while others do not. Additionally, some leases require a royalty based on the "dekatherm" value of gas at the well, and some leases require a royalty on "components" of gas, while others do not. JA3901-3902; JA4026-4045. These variations are highly relevant to Plaintiffs' allegations that EQT Production breached its contractual obligations in paying NGL royalties in the way that it did, raising individualized issues that preclude class certification.

As noted above, Plaintiffs themselves admitted that class leases that "do not expressly define a sale as between unaffiliated parties" are ambiguous, as are leases that provide for sales of gas "at the well," and extrinsic evidence will be relevant to the interpretation of these leases. JA3829; JA3902. Determining the intent of the parties to these ambiguous leases—and then determining whether EQT Production's NGL royalty method was in breach—will require individualized inquiry into the varying lease terms and extrinsic evidence, raising factual questions that "should be left to the jury under proper hypothetical instructions." *Kellam*, 875 S.E.2d at 228 (citing cases). It was an abuse of discretion for the district court to uniformly construe over 3,700 leases as a matter of law without regard to variations in lease language or extrinsic evidence.

In the class certification order, the district court acknowledged that many class leases do not require a royalty on unaffiliated sales—and therefore, by their terms,

do not require a separate royalty on downstream sales of NGL products—but concluded this was a "distinction, but not a difference" because the *Tawney* line of cases, according to the district court, override the actual lease language. JA4302 (citing cases applying the *Tawney* rule on deductions). As noted above, this is a mischaracterization of West Virginia law, which has **never** expanded *Tawney* to create a default rule for pricing issues or paying NGL royalties regardless of lease language, let alone in a class action involving thousands of varying leases. The district court abused its discretion in seeking to create new state common law. *St. Paul Fire*, 48 F.3d at 783; *Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318, 331 (4th Cir. 2013).

Finally, the district court supported its class certification order with citations to other lower court opinions (many of which are from outside the Fourth Circuit) granting certification despite variations in lease language. *See* JA4295-4298. An inspection of those cases confirms that they are either inapplicable or actually support reversal of the district court's decision.

***First***, unlike those cases, this case does not involve a single form lease or form royalty clause that can be interpreted uniformly across the class. Instead, this case involves at least 70 unique royalty provisions, and even within those categories of leases, the individual leases vary with respect to other material lease terms that may

-31-

impact the calculation of royalties, as well as the circumstances of the parties who negotiated the individual leases.

Here, the thousands of leases in the class were individually negotiated and, as in *Adair*, EQT Production "inherited a large number of leases from predecessor companies, many of which contain different royalty provisions." 764 F.3d at 369. ***Both*** of the named Plaintiffs have leases that were ***not*** signed with EQT Production but instead acquired from ***other*** energy producers; those leases are markedly different from each other and from other leases in the class, creating problems of not only commonality but also typicality and adequacy. This case is on all fours with *Adair*, not the inapplicable cases cited by the district court.

The district court sought to distinguish *Adair* on the ground that it was a case directed to "the issue of ownership of coalbed methane drilling rights" and not about royalty claims. JA4299-4300. This is incorrect. In *Adair*, the lower court certified the claims of "five classes alleging underpayment of royalties." 764 F.3d at 365. The "central issue on appeal" was "whether the district court abused its discretion when it certified the claims of the five classes alleging underpayment of royalties." *Id.* at 364-65. *Adair* was a royalty case where class certification was inappropriate because of varying *royalty* language. That holding was not limited to cases involving disputes over CBM ownership, though the ownership issues are also informative here.

*Second*, the cases cited by the district court primarily concern disputes over deductions, which are governed by *Tawney* and do not depend on a holding that thousands of leases must be uniformly construed to require one method of paying NGL royalties despite varying lease language.[8] Regardless of whether it was proper for courts in those cases to certify a class on deducts—and in light of *Kellam*, any such rulings should likely be revisited—that does not support what the district court did in this case with respect to pricing and NGLs. The West Virginia Supreme Court has never expanded *Tawney* to require a default rule for pricing or paying NGL royalties, and the district court does not have the authority to create new state common law here. *St. Paul Fire*, 48 F.3d at 783; *Fontenot*, 736 F.3d at 331.

*Third*, several of the cases cited by the district court granted certification upon a determination that the leases could be sorted into *Tawney*-compliant versus *Tawney*-non-compliant as a matter of law.[9] That proposition has been negated by the

---

[8] *See Kay Co.*, 2017 WL 10436074, at *5 (certifying class to determine "on a class wide basis whether the method by which the defendants calculate the sales price of gas and the deductions which it takes from the sales price complies with West Virginia law"); *Hopper v. Jay-Bee Oil & Gas, Inc.*, No. 5:20-CV-101, 2023 WL 3695608, at *1 (N.D.W. Va. Apr. 4, 2023) (dispute over deductions taken from certain royalty payments under certain leases); *Romeo v. Antero Res. Corp.*, No. 1:17CV88, 2020 WL 1430468, at *10 (N.D.W. Va. Mar. 23, 2020) ("[The] common question is whether the leases at issue include the specific language required by *Wellman* and *Tawney* that would allow Antero to lawfully deduct post-production expenses from the Plaintiffs' royalties.").

[9] *Kay Co.*, 2017 WL 10436074, at *13 ("Either a lease satisfies the *Tawney* standard or it does not. The issue of whether the lease satisfies *Tawney* is strictly an issue of law."); *Romeo*, 2020 WL 1430468, at *11 (same).

West Virginia Supreme Court's recent decision in *Kellam*, which holds that whether a lease is *Tawney*-compliant "can only be answered by looking to the individual lease at issue and other relevant evidence." *Kellam*, 875 S.E.2d at 227. With ambiguous leases, "the question of its meaning should be left to the jury under proper hypothetical instructions." *Id.* at 227-28 (citing cases). Thus, even if *Tawney* could be applied to the class leases, it would have to be done by the fact-finder on a lease-by-lease basis, not by the court in a classwide ruling.

**Fourth**, to the extent the cited cases are relevant, they weigh against certification of Plaintiffs' claims in this case. The district court relied heavily on the *Slamon* case—which was about deducts and not NGL pricing—for the proposition that "there is no need to examine the individualized intent and understanding of the parties given EQT's uniform treatment of the leases." JA4304. But *Slamon* involved multiple classes, and the court only certified two classes that it concluded had clear and uniform contractual language. The plaintiffs there also proposed an "Implied Duty Class" that, like the putative class here, depended on implied duties. Critically, the court rejected certification of that class, explaining that "[t]he Court cannot presume an implied duty exists in the contract without analyzing the express language of each contract to determine if express language would preclude the implied duty." *Slamon v. Carrizo LLC*, No. 3:16-CV-2187, 2020 WL 2525961, at *7 (M.D. Pa. May 18, 2020). The Court here cannot simply presume that every lease had an implied

duty to pay a separate royalty on downstream sales of finished NGL products without examining each lease to determine the parties' actual intent with respect to NGLs.[10]

***Finally***, and perhaps most importantly, the cases relied upon by the district court were decided prior to the West Virginia Supreme Court of Appeals' *Kellam* opinion, which calls into question whether, under West Virginia law, oil and gas royalty class actions regarding deductions can ever be certified. 875 S.E.2d at 227 (refusing to find that the single lease at issue was "*Tawney* compliant" and instead holding that whether a lease is *Tawney*-compliant "can only be answered by looking to the individual lease at issue and other relevant evidence," and "whether a lease agreement is 'particular' enough in listing the costs to be deducted will necessarily be different with regard to each contract.").

## C. The District Court's "Clarifying" Order on Class Certification Created Additional Errors Warranting Vacatur.

After granting class certification, the district court issued a "clarifying" order that is internally inconsistent with the original certification order and introduces subclasses that are inherently unworkable. JA4428. This supplemental order does not cure the errors in the original order but only compounds them.

---

[10] The district court also cited the *Naylor* case as supporting certification, but the court there "concluded that the commonality requirement was met when all class leases did not contain express language negating the implied duty of marketability." JA4298. The district court made no such determination, nor have Plaintiffs attempted to establish this issue. *See Adair*, 764 F.3d at 368 ("It was the plaintiffs' burden to demonstrate commonality on the implied duty of marketability.").

In its initial class certification order, the district court acknowledged that the lease held by Goshorn—one of the named Plaintiffs—would likely need to be excluded from the class. JA4326. That lease includes a royalty provision requiring "a royalty of twenty percent (20%) market value of oil (in barrels) and gas (as defined in dekatherms ((1,000 btu per mcf)) both as measured at the wellhead"—thus, by its terms, the Goshorn lease expressly **_requires_** EQT Production to pay a royalty on gas (including NGLs) based on the heat (BTU) content as measured at the wellhead. JA0719.[11] Plaintiffs' own expert and counsel admitted that the Goshorn lease requires payments on a BTU basis and therefore should not be included in the class.[12] Thus, in its initial class certification order, the district court suggested that "dekatherm" leases like the Goshorn lease would likely need to be excluded from the class.[13]

However, in an inexplicable about-face, the district court's supplemental certification order **_included_** dekatherm leases like the Goshorn lease as a subclass. JA4431. The district court's failure to set forth findings as to why it was certifying a

---

[11] A "dekatherm" is one million BTUs or one MMBTU. JA4979.

[12] JA4021 ("Q. What if a lease provides for royalty to be paid on gas at the wellhead in dekatherms? A... I believe that is something that would be excluded, although, I would defer to the analyst doing the lease analysis to determine that, so presumably they would determine that it was not part of the class and I would exclude it."); JA3942; JA3949-3950; JA0549-0550 (Colantonio: "The word 'BTU' appears in a couple leases. They're not going to be part of our class, the ones that say you can pay on a BTU basis.").

[13] JA4326 ("This Court does, however, have some remaining questions which will need to be addressed: First, certain leases provide for royalties to be based upon dekatherms. Should those lessors be included in the class[.]").

class on dekatherm leases, which present individual issues that cannot be resolved on a class-wide basis, was itself an abuse of discretion. *Thorn*, 445 F.3d at 319 ("[T]he district court must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification."); *Adair*, 764 F.3d at 365 n.18 ("Failing to specify the basis for certifying that claim was an abuse of discretion" warranting reversal.).

The district court also proposed to divide the other leases in the class into two subclasses, one for "all class members whose leases do not provide for any post production deductions" and one for "all class members whose leases do provide for post production deductions, but do not meet the requirements of *Tawney*[.]" JA4430. In addition to classifying leases in this NGL *pricing* action by *deduction* language, the district court also failed to address whether the dekatherm leases allow for deductions. As in *Kellam*, whether a lease complies with *Tawney* is an inherently individualized inquiry that "can only be answered by looking to the individual lease at issue and other relevant evidence," and the answer "will necessarily be different with regard to each contract." *Kellam*, 875 S.E.2d at 227. Where leases are ambiguous—and Plaintiffs have admitted the class leases are ambiguous—"the question of its meaning should be left to the jury under proper hypothetical instructions." *Id.* at 228 (citing cases). The district court cannot divide subclasses by whether they (allegedly) meet requirements of *Tawney*.

-37-

In addition, the proposed subclasses do not make clear how the leases in the dekatherm subclass that *do* comply with *Tawney* are to be treated, who determines if those leases do comply with *Tawney*, what damages (if any) could be attributable to those leases, and if they are excluded from the class definition. The proposed subclasses require inquiry into the individual leases—a question most likely for the jury, not a legal question to be determined in conclusory fashion by the district court.

### D.    Plaintiffs' Alter Ego Allegations Cannot Save Their Demand for Class Certification.

In their opposition to the petition for appeal, Plaintiffs curiously argue that the district court's uniform interpretation of the over 3,700 leases in the class should be sustained because "the EQT Defendants were alter egos and therefore any transaction between the EQT Defendants must be disregarded." Doc. 26 at 9-10. The question of whether Defendants are alter egos was irrelevant to the district court's certification order. The district court based its certification order on an unprecedented novel expansion of cases interpreting *Tawney* to create a default rule for NGL royalty pricing, not the alleged alter ego status of different corporate entities. The phrase "alter ego" only appears twice in the district court's certification order and it was not germane to the district court's determination that the class leases should be uniformly interpreted without regard to varying lease language or extrinsic evidence. *See* JA4297-4298; JA4302-4303.

Moreover, even if Defendants *were* properly deemed alter egos—which they should not be[14]—that would not justify overriding the varying contractual language with a default rule for NGL royalties. In short, Plaintiffs' alter ego arguments are a red herring intended to distract this Court from the reversible errors in the district court's certification order.

### E.     Typicality and Adequacy Cannot Be Satisfied Because of the Material Variations in Lease Language.

The named Plaintiffs have specific leases that make class certification impossible for additional reasons. *First*, as noted above, Goshorn has a lease that provides for a royalty based on the market value of gas (including NGLs) as defined in dekatherms at the wellhead, and therefore cannot prohibit EQT Production's

---

[14] The district court committed serious errors in its analysis of and ruling on EQT affiliate transactions. *First*, when discussing affiliate sales, the district court omitted from its order that the Supreme Court of Appeals of West Virginia has not ruled on this affiliate issue. However, when faced with a similar question, the Supreme Court blessed EQT's affiliate sale for calculating royalties pursuant to the flat-rate statute. *See Leggett v. EQT Prod. Co*., 800 S.E.2d 850 (2017). *Second*, the district court ignored federal cases wherein the courts refused to ignore lease language simply because EQT sold gas to its affiliate. *See Richards v. EQT Prod. Co*., No. 1:17-cv-50, 2018 WL 3321441, at *3-4, 6 (N.D.W. Va. July 5, 2018) (Keeley) (denying plaintiffs' motion for summary judgment premised on EQT Production's sale of raw gas to EQT Energy); *Leggett v. EQT Prod. Co*., No. 1:13-cv-4, 2016 WL 297714, *6-7 (N.D.W. Va. Jan. 22, 2016) (finding EQT affiliates were not alter egos of one another). *Third*, Plaintiffs and the district court ignored the many class leases that contemplate affiliate sales. *See, e.g.*, JA6917 (Form G). *Finally*, the district court erroneously decided the alter ego Order by improperly applying the doctrine of collateral estoppel and otherwise failing to consider EQT's voluminous evidence refuting Plaintiffs' alter ego claim. *See* JA1143-1166.

method of paying NGL royalties. The district court itself acknowledged this, stating that it had "questions" about whether this and other "dekatherm leases" should be excluded from the class. JA4326. Yet the district court nevertheless concluded that the requirements of typicality and adequacy were met because "the named Plaintiffs' claims are identical to the claims of the Class in all material respects." JA4307-4309. This finding, proven incorrect by the record, by itself is grounds for vacating the certification order.[15]

**Second**, the Glover lease requires individual, pre-suit notice of claims to the lessee, which it cannot possibly accomplish for every lessor. The Glover lease requires it to give notice of an alleged default and to provide EQT Production with an opportunity to cure prior to filing suit. *See* JA0715-0716. Even if all the notice and cure provisions in the class were alike (they are not), the Glover Plaintiffs' individual notice cannot satisfy the notice requirements on behalf of the class. *See, e.g.*, *Chevron USA, Inc. v. Vermilion Par. Sch. Bd.*, 377 F.3d 459, 464 (5th Cir. 2004) (affirming denial of class certification). The notice provisions in the class leases vary in their specific terms. Accordingly, EQT Production has the right to assert unique defenses

---

[15] *See, e.g.*, *Chieftain Royalty Co. v. XTO Energy, Inc.*, No. 12-7047, 2013 WL 3388629, at *1 (10th Cir. July 9, 2013) (vacating certification of royalty class action because the court "must address the lease language issue as it relates to Rule 23 *before* certifying the class") (emphasis in original).

that establish a lack of commonality and make this class inappropriate for certification.

### III.    <u>The Class Cannot Be Ascertained Consistent With Rule 23</u>.

This Court should additionally reverse certification because the classes are not ascertainable. The Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *Adair*, 764 F.3d at 358. Thus, "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id.* (citing cases). Applying that standard, the district court abused its discretion in certifying a class in this case.

#### A.    <u>Plaintiffs Admitted They Cannot Ascertain The Class</u>.

Class certification must be reversed because Plaintiffs admitted they cannot ascertain the class. In an unprecedented decision, the district court erroneously ***ordered Defendants to do this work for Plaintiffs***.[16] Not only did this improperly shift the burden of satisfying Rule 23 to Defendants, but regardless of who bears the burden, the need to conduct an extensive manual review to ascertain the class means that class members cannot be "readily identified" by objective criteria as required

---

[16] The district court's discovery order is not only improper under Rule 23, it violates the basic discovery tenet that a party is not required (and should not be ordered) to create business records for the other party that do not already exist in the normal course of business. *See* Fed. R. Civ. P. Rule 34.

-41-

under controlling law.

The certified class purports to include "all royalty owners who were paid royalties by EQT between January 1, 2012 and February 28, 2021" for wells located in certain counties and pursuant to leases that contain certain lease language. JA4428-4429. Linking all wells to all leases and each owner over time is not something that can be readily accomplished based on computerized records, automatically generated data, or other objective criteria. Instead, this exercise requires "extensive and individualized fact-finding" that this Court has ruled precludes class certification. *Adair*, 764 F.3d at 358.

Plaintiffs discovered this during discovery when they determined that they could not ascertain the class. Plaintiffs' solution was to make Defendants do this work for them. Plaintiffs moved to compel Defendants to do so, complaining that ascertaining the class would require "countless hours reviewing thousands of lease files and transactions to determine the relevant lease language, royalty ownership and information concerning NGLs, and deductions." JA0341.

Astoundingly, the district court granted Plaintiffs' motion to compel. JA0617. Defendants have made (and are continuing to make) every effort to comply with the district court's discovery order. EQT Production has assembled and produced additional information that is not maintained in the ordinary course of EQT Production's business, requiring EQT employees to review public title records to

create the linkage, but Defendants are unable to link every owner, lease, and well over the entire class period and Plaintiffs admit that they are still unable to ascertain the class. Plaintiffs then moved for sanctions, representing that they "cannot reasonably and reliably determine whether each royalty owner was paid pursuant to a Class Lease and is, therefore, entitled to recover damages." JA1133.

Despite Plaintiffs' admissions that they could not ascertain the class, Plaintiffs moved for class certification, which the district court granted. The district court glossed over the ascertainability problems in the certification order, stating in one conclusory paragraph that the district court had already ordered Defendants to "reconstruct" the information needed to ascertain the class and therefore ascertainability was satisfied. JA4291. The district court did not address what it means for class members to be "readily identifiable" or explain how that requirement could be satisfied given the tedious labor required to ascertain all potential class members, and their leases and wells over the decade-long class period.

The district court's ruling violates the principle that Plaintiffs bear the burden of satisfying the requirements of Rule 23—including ascertainability. *Gariety v. Grant Thorton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004); *Adair*, 764 F.3d at 358. But a far more serious problem is that—regardless of whose burden it was to link royalty payments to particular wells, leases, and owners as they change over time—performing this linkage is a laborious and time-consuming task that requires manual

review of thousands of leases files, transaction data and, in many cases, legal judgments about land records, lease agreements, transfers, and inheritances. This does not satisfy the requirement that class members be "readily identified" by objective criteria.

In *Adair*, this Court considered the same issue and concluded that "the proposed classes raise serious ascertainability issues because they are defined to include both former and current gas estate owners." *Adair*, 764 F.3d at 359. Ownership of a gas estate is not static and often changes over time. *Id.* While land records can be consulted to reconstruct an understanding of ownership rights over time, "resolving ownership based on land records can be a complicated and individualized process." *Id.* Thus, this Court concluded that the district court abused its discretion by failing to address the problems of ascertainability in that case. *Id.*

Those same problems are present here. Just as in *Adair*, Plaintiffs seek to certify a class that is defined to include both current and former owners of gas royalty rights, requiring an extensive manual review to investigate changes in ownership over the decade-long class period. The district court cannot ignore the ascertainability problems in this case by relying on a discovery order that shifts the burden of ascertaining the class to Defendants. The district court **must** engage with the question of whether the class can be "readily identified" by objective criteria or if, instead, it requires "extensive and individualized fact-finding," in which case

certification is improper. *Adair*, 764 F.3d at 358.

### B.     The Class Is Not Ascertainable Because of Differing Lease Language.

Understanding that any permissible post-production cost deductions would derail their arguments regarding a uniform damages calculation methodology, Plaintiffs first sought to avoid that issue by expressly excluding any *Tawney*-compliant leaseholders from the class, and then later changed their approach and asked the district court to instead rule that no putative class leases comply with *Tawney*. JA0701; JA3841-3844. The district court denied summary judgment on class lease language, but created additional ascertainability problems in its supplemental certification order when it created subclasses based on alleged interpretation of deduction language in leases, including (1) "class members whose leases do not provide for any post production deductions[,]" and (2) "class members whose leases do provide for post production deductions, but do not meet the requirements of *Tawney*[.]" JA4430.

While the district court purported to identify the lease categories that fall into each of these subclasses, there is no summary judgment order or other legal ruling analyzing and interpreting the lease language. The first subclass proposed by the district court is inherently unworkable because inclusion in the subclass depends on lease silence as to post-production costs. As in *Adair*, a class definition that purports "to include only those gas owners whose leases are 'silent' with respect to the

-45-

deduction of costs" will create more problems than it solves because "disputes will inevitably arise regarding the meaning of 'silence,' and the court will have to sort out these differences based on the particular lease language." *Adair*, 764 F.3d at 368-69. The same is true here.

The second subclass necessarily requires, and indeed invites, a lease-by-lease investigation into whether a lease is *Tawney*-compliant. Whether a lease is *Tawney*-compliant "can only be answered by looking to the individual lease at issue and other relevant evidence," and "whether a lease agreement is 'particular' enough in listing the costs to be deducted will necessarily be different with regard to each contract." *Kellam*, 875 S.E.2d at 227. As such, whether leases are *Tawney*-complaint or permit deductions cannot be decided without undertaking an individual review of the language and history of each lease and making a legal determination on whether deductions are allowed. Given the sheer number of leases at issue, the required lease-by-lease review is not feasible. Such an "extensive and individualized fact-finding" requirement renders the classes not ascertainable. *Adair*, 764 F.3d at 358.[17]

## C. **The Classes Are Not Ascertainable Because of Prior Class Litigation.**

The district court abused its discretion in certifying a class that excludes class members that were involved in a prior litigation because there is no reliable or

---

[17] The district court did not even attempt to answer deductions questions for the "dekatherm" subclass.

reasonable way to exclude these individuals and/or certain of their leases and wells without engaging in complex and individualized analysis.

The district court excluded from the class definition all "persons and entities who were members of the class action settlement in *Kay Company, LLC v. EQT Production Company*, Civil Action No. 1:13-CV-151 (N.D.W. Va.)." JA4429. But the district court fails to consider or discuss the ascertainability issues *Kay Company* raises. Plaintiffs fail to offer a reliable means to identify which of the owners, leases, and wells in their proposed class are excluded because of their involvement in *Kay Company*. Potentially more problematic is that some *Kay Company* class members have interests in multiple leases and multiple wells that were drilled at various times. JA3929. Thus, it will require complex analyses to determine who was a *Kay Company* class member, whether they opted out, whether they ultimately settled and on what terms, whether they have other leases and wells, and how those other leases and wells should be treated for purposes of the instant class action. Again, such inquiries defeat ascertainability under *Adair*.

**IV.** **Individual Damages Issues and Failure to Show Article III Standing Preclude Certification of the Class.**

This Court's review is additionally needed because the district court ignored individual damages issues and Plaintiffs failed to show every class member suffered any concrete harm.

Plaintiffs assert that they "are able to calculate the amount of damages

incurred by each royalty owner" without actually showing those calculations, explaining how they would be done, showing that each class member suffered damages, or attempting to show that each class member suffered damages in a way than can be determined with common proof. JA3925; JA3935-3936.

Plaintiffs' proposed damages analysis assumes that a one-size-fits-all damages model applies to all payments made by EQT Production, regardless of lease differences, well differences, and other variations related to processing. JA5002-5006; JA5060-5062. Their flawed model does not account for these differences, which precludes certification under *Comcast*. Determining damages would require identifying the owners in the class and analyzing each lease, well, expense, gathering system processing or treatment plant (and processing contract), and month of royalty payment. JA5002-5006. Deciding Plaintiffs' claims based on their instruments, wells, gas flow path, and processing contracts and sales "would merely set the stage for class member-by-class member determinations as to which class members should also be permitted to recover, on the basis of *their* facts." *Foster v. Merit Energy Co.*, 282 F.R.D. 541, 560 (W.D. Okla. 2012) (emphasis in original). Even Plaintiffs' expert concedes that variations in processing agreements would need to be considered in calculating damages. JA4016. Plaintiffs' proposed damages model is not "susceptible of measurement across the entire class," and thus class certification

-48-

is inappropriate. *Comcast*, 569 U.S. at 35.[18]

The district court did not analyze these damages issues in its opinion but simply stated generically that individual damages can be bifurcated and therefore pose no impediment to certification. JA4315-4316. That conclusion is contrary to this Court's precedential holding that "the need for individualized proof of damages may defeat predominance where proof of damages is essential to liability." *Lienhart*, 255 F.3d at 147. Damages are an essential element of Plaintiffs' breach of contract claim, and proof of damages will be essential to liability. Thus, Plaintiffs have failed to meet their burden to show that bifurcation is appropriate or feasible to address individual damages issues. *Id.*; *Martin v. Mountain State Univ., Inc.*, No. 5:12-03937, 2014 WL 1333251, at *6 (S.D.W. Va. Mar. 31, 2014) (holding bifurcation to be impractical where "proof of damages will be essential to a finding of liability").[19]

---

[18] Individualized issues, including gas quality for each well, the flow paths of the gas, processing plants' differing efficiency levels, bypass and storage practices, sold volumes, and costs, including used gas, will vary over time and for each owner. JA4974-4976. This evidence not only goes to damages, but also to the interpretation and EQT's compliance with class leases, defeating predominance and precluding class certification.

[19] Seeking to avoid *Lienhart*, Plaintiffs rely on a case from 1903 for the proposition that West Virginia law does not require a showing of damages to establish breach of contract. However, the West Virginia Supreme Court recently confirmed that "[a] claim for breach of contract requires proof of the formation of a contract, a breach of the terms of that contract, ***and resulting damages.***" *Sneberger v. Morrison*, 776 S.E.2d 156, 171 (W. Va. 2015) (emphasis added). Even if liability for breach of contract could theoretically be found without proof of any damages, that is not true

-49-

Plaintiffs' failure to provide evidence of damages is particularly problematic because, even if the class leases are uniformly interpreted in the way that Plaintiffs propose, it does not follow that each of the class plaintiffs suffered any damages. JA3936; JA4048 (noting that separate royalty on sales of refined NGL products does not necessarily result in a higher payment). The Supreme Court has held that the failure to show every class member "suffered concrete harm" for every claim that they assert precludes class certification on Article III standing grounds. *TransUnion*, 594 U.S. at 431, 442 (vacating class action judgment because plaintiffs failed to show the entire class suffered concrete harm).[20]

Defendants raised these issues in their opposition to class certification, JA3935-3936, but the district court did not address standing in its opinion, nor did it consider the question of how *TransUnion* should be applied to this case. For that reason alone, the district court's certification order must be vacated. *Allstate Ins. Co. v. Adkins*, 932 F.2d 963 (4th Cir. 1991) ("[W]ithout proper standing there would

---

in this case as Plaintiffs' cause of action for breach of contract expressly alleges actual damages "[a]s a direct and proximate result of the actions of the Defendants[.]" JA0706.

[20] *TransUnion* left open the question of whether every class member must demonstrate standing before certification, *see* 594 U.S. at 431 n.4, which remains a matter of first impression in this Circuit. *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 659 (4th Cir. 2019). In this case, it is appropriate to follow other courts that have held that "no class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006); *accord Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009).

exist no case or controversy for a court to decide."); *Alig v. Rocket Mortg., LLC*, 52 F.4th 167, 168 (4th Cir. 2022) (vacating and remanding for further consideration of *TransUnion*).

Plaintiffs have relied on a lower court case to argue that standing should be decided on the pleadings at the class certification stage. Doc. 26 at 14. The procedural posture in that case makes it plainly inapplicable here. There, the court determined the case was still in the "pleading stage" because fact discovery was ongoing and, on that basis, did not require plaintiffs to support their standing argument with evidence at that stage in the litigation. *Wilson v. Eagle Nat'l Bank*, No. 8:20-CV-01344-JRR, 2023 WL 2478933, at *4-5 (D. Md. Mar. 13, 2023).

By contrast, fact discovery closed months before the district court's certification decision in this case, and Plaintiffs supported their class certification motion with an insufficient affidavit from their damages expert. *See* JA0337. Plaintiffs cannot rely on mere pleadings to support standing, and their failure to establish standing with evidence is fatal to class certification. *See, e.g.*, *Gomez v. Trump*, No. 20-CV-01419, 2020 WL 3429786, at *6 n.7 (D.D.C. June 23, 2020) (higher burden "than 'a mere pleading standard'" applies in class actions) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

Plaintiffs argue that they carried their burden on standing because they "submitted evidence from their expert oil and gas accountant establishing a common,

classwide method for determining individual damages utilizing common proof." Doc. 26 at 15 (citing JA4692). An inspection of that "evidence" reveals that it is plainly insufficient. The expert affidavit relied on by Plaintiffs is a short summary that says a "common method" for calculating damages exists—without saying what that method is—and then asserts a damages figure for the Glover Plaintiffs, without describing the method that was used to arrive at that figure but does not calculate damages for the other named Plaintiff (Goshorn) or any absent class members. *See* JA4694. Under *Comcast*, Plaintiffs must demonstrate that their damages model is "capable of measurement on a classwide basis" for class certification. *Comcast*, 569 U.S. at 34. Because Plaintiffs have not even disclosed what their damages model is, they have plainly not met the *Comcast* test.

## **CONCLUSION**

This Court should reverse the district court's certification order.

Dated:  January 8, 2024

<div style="margin-left:40%">

Respectfully submitted,

*/s/ David R. Dehoney*
David R. Dehoney
Michelman & Robinson, LLP
605 Third Avenue, 30th Floor
New York, New York 10158
(212) 730-7700

</div>

Lauren W. Varnado
Michelman & Robinson, LLP
717 Texas Avenue, 31st Floor
Houston, Texas 77002
(713) 422-2121

Jennifer J. Hicks
Babst, Calland, Clements and Zomnir, P.C.
300 Summers Street, Suite 1000
Charleston, West Virginia 25301
(681) 205-8888

*Counsel for Defendants-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limits because, excluding the parts of the document exempted by Rule 32(f) of the Federal Rules of Appellate Procedure, this brief contains 12,902 words.

This brief complies with the typeface and type style requirements because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.

*/s/ David R. Dehoney*

## **CERTIFICATE OF SERVICE**

This is to certify that on January 8, 2024, I have electronically filed the foregoing Opening Brief of Defendants-Appellants EQT Corporation, EQT Production Company, and EQT Energy, LLC with the Clerk of Court using the CM/ECF system, and I have emailed a true and correct copy of the Opening Brief and all supporting documents to counsel listed below to the following recipients:

Bob Fitzsimmons, Esquire
Robert J. Fitzsimmons, Esquire
Mark A. Colantonio, Esquire
Clayton Fitzsimmons, Esquire
Fitzsimmons Law Firm PLLC
1609 Warwood Avenue
Wheeling, West Virginia 26003
bob@fitzsimmonsfirm.com
rocky@fitzsimmonsfirm.com
mark@fitzsimmonsfirm.com
clayton@fitzsimmonsfirm.com

Marvin W. Masters, Esquire
The Masters Law Firm LC
181 Summers Street
Charleston, West Virginia 25301
mwm@themasterslawfirm.com

*/s/ David R. Dehoney*