# NO. 23-2204

In The

# United States Court Of Appeals
## For The Fourth Circuit

**WILLIAM D. GLOVER; LINDA K. GLOVER, his wife;
RICHARD A. GLOVER; CHRISTY L. GLOVER, his wife;
GOSHORN RIDGE, LLC, Individually, and on Behalf of
All Others Similarly Situated,**

*Plaintiffs - Appellees,*

**v.**

**EQT CORPORATION, a Pennsylvania corporation;
EQT PRODUCTION COMPANY, a Pennsylvania corporation;
EQT ENERGY, LLC, a Delaware limited liability company,**

*Defendants - Appellants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT WHEELING**

––––––––––––––

### BRIEF OF APPELLEES

––––––––––––––

| | |
|---|---|
| **Robert P. Fitzsimmons** | **Marvin W. Masters** |
| **Mark A. Colantonio** | **April D. Ferrebee** |
| **Clayton J. Fitzsimmons** | **MASTERS LAW FIRM, LC** |
| **Robert J. Fitzsimmons** | **181 Summers Street** |
| **Christine Pill Fisher** | **4th Floor** |
| **FITZSIMMONS LAW FIRM PLLC** | **Charleston, WV 25301** |
| **1609 Warwood Avenue** | **(304) 342-3106** |
| **Wheeling, WV 26003** | |
| **(304) 277-1700** | |
| *Counsel for Appellees* | *Counsel for Appellees* |

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-2204__        Caption: __EQT Corporation, et al. v. William D. Glover, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__William D. Glover__
(name of party/amicus)

_____

 who is _____Appellee-Plaintiff_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?            ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Clayton J. Fitzsimmons                    Date:        11/29/2023

Counsel for: William D. Glover

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-2204__          Caption: __EQT Corporation, et al. v. William D. Glover, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Linda K. Glover__
(name of party/amicus)

_____

 who is _____Appellee-Plaintiff_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Clayton J. Fitzsimmons                    Date:  11/29/2023

Counsel for: Linda K. Glover

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __23-2204__     Caption: __EQT Corporation, et al. v. William D. Glover, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Richard A. Glover__
(name of party/amicus)

_____

who is _____Appellee-Plaintiff_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.     Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Clayton J. Fitzsimmons          Date:  11/29/2023

Counsel for: Richard A. Glover

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. ___23-2204___     Caption: ___EQT Corporation, et al. v. William D. Glover, et al.___

Pursuant to FRAP 26.1 and Local Rule 26.1,

___Christy L. Glover___
(name of party/amicus)

_____

 who is _____Appellee-Plaintiff_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Clayton J. Fitzsimmons                     Date: ___11/29/2023___

Counsel for: Christy L. Gover

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. ___23-2204___        Caption: ___EQT Corporation, et al. v. William D. Glover, et al.___

Pursuant to FRAP 26.1 and Local Rule 26.1,

___Goshorn Ridge, LLC___
(name of party/amicus)

_____

who is _____Appellee-Plaintiff_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?                    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?            ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Clayton J. Fitzsimmons                    Date:        11/29/2023

Counsel for: Goshorn Ridge, LLC

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ...........................................................................iv

I.    ISSUES PRESENTED FOR REVIEW ...........................................1

II.   STATEMENT OF THE CASE ..........................................................2

      A.    EQT's Common Scheme to Pay NGL Royalties Based Upon Lower-Priced Straw Transactions Between Alter Ego Companies and Its Uniform Treatment of All Class Leases Irrespective of Lease Language .............................................2

      B.    EQT Fraudulently Concealed Material Information Concerning its Payment of NGL Royalties from all Class Members in a Uniform Manner ..................................................................5

      C.    Plaintiffs' Claims and the District Court's Certification Order ...........5

      D.    Other Relevant Filings and Orders .........................................7

III.  SUMMARY OF ARGUMENT ..........................................................8

IV.   ARGUMENT ...................................................................................14

      STANDARD OF REVIEW .........................................................14

      DISCUSSION ..............................................................................15

            A.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CERTIFYING THE CLASS BECAUSE SUBSTANTIAL ISSUES OF FACT AND LAW PREDOMINATE IN THAT EQT OWED A COMMON ROYALTY OBLIGATION UNDER ALL CLASS LEASES AND IS ALLEGED TO HAVE BEACHED THAT OBLIGATION BY ITS STANDARDIZED ROYALTY METHODOLOGY AND UNIFORM TREATMENT OF ALL CLASS LEASES............15

i

1)    Under West Virginia law, an Oil and Gas Company Cannot Base Royalties on a Sale Between Alter Ego Companies at the Wellhead When it Later Sells to Third Parties in the Open Market for a Higher Price ...............................................................................15

2)    As Interpreted in West Virginia, the Class Leases Impose a Common Royalty Obligation on EQT to Pay NGL Royalties Based Upon the Proceeds Received from the Sale of NGLs to Third Parties in an Arm's Length Transaction .........................................19

3)    The District Court Did Not Abuse Its Discretion by Certifying the Class Because EQT's Common Royalty Obligation and Uniform Treatment of Class Members Generate Common Questions of Fact and Law That Can Be Resolved Using Common Proof and Uniform Legal Analysis...........................................25

4)    Textual Variations in the Class Leases Do Not Destroy Commonality or Predominance Because, As Evidenced by EQT's Uniform Treatment of the Class Leases, Any Such Variation Does Not Affect EQT's Common Royalty Obligation or the Resolution of Predominate Classwide Issues.................29

5)    The District Court Did Not Abuse Its Discretion in Finding Typicality and Adequacy Are Satisfied Because the Class Representatives Have Leases That Are Materially the Same as the Class Leases and Impose the Same Common Obligation on EQT......35

6)    The District Court Did Not Abuse its Discretion by Creating Sub-classes......................................................37

B.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT THE CLASS WAS ASCERTAINABLE..................................................................38

C.   PLAINTIFFS HAVE ARTICLE III STANDING AND
     ISSUES CONCERNING THE CALCULATION OF
     INDIVIDUAL DAMAGES DO NOT PREDOMINATE
     OVER THE CENTRAL, COMMON ISSUES IN THIS
     CASE................................................................................44

D.   THE DISTRICT COURT DID NOT ABUSE ITS
     DISCRETION IN CERTIFYING PLAINTIFFS'
     FRAUDULENT CONCEALMENT CLAIMS .......................49

V.   CONCLUSION...............................................................................53

VI.  CERTIFICATE OF COMPLIANCE ............................................54

VII. CERTIFICATE OF FILING AND SERVICE ..............................55

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)..................................................................26

*Baehr v. Creig Northrop Team, P.C.*,
    953 F.3d 244 (4th Cir. 2020) ..........................................44

*Beatty Lumber Co. v. W. Union Tel. Co.*,
    44 S.E. 309 (W. Va. 1903) ..............................................46

*Beer v. XTO Energy, Inc.*,
    No. CIV-07-798-L, 2009 WL 764500 (W.D. Okla. Mar. 20, 2009)............33

*Bishop v. Bartlett*,
    575 F.3d 419 (4th Cir. 2009) ..........................................45

*Broussard v. Meineke Discount Muffler Shops*,
    155 F.3d 331 (4th Cir. 1998)..........................................52

*Bruce McDonald Holding Co. v. Addington, Inc.*,
    825 S.E.2d 779 (W. Va. 2019) ........................................24

*Byrd v. Aaron's Inc.*,
    784 F.3d 154 (3d Cir. 2015) ..........................................42

*Carolina Youth Action Project; D.S. by & through Ford v. Wilson*,
    60 F.4th 770 (4th Cir. 2023)..........................................46

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)..........................................27, 47, 48

*Corder v. Antero Resources Corporation*,
    57 F.4th 384 (4th Cir. 2023)..........................................16, 23

*Cordle v. Gen. Hugh Mercer Corp.*,
  325 S.E.2d 111 (W. Va. 1984) ....................................................18

*Curtis v. Propel Prop. Tax Funding, LLC*,
  915 F.3d 234 (4th Cir. 2019) ....................................................15

*Dunnigan v. Metro. Life Ins. Co.*,
  214 F.R.D. 125 (S.D.N.Y. 2003)...............................................42

*Ealy v. Pinkerton Government Services, Inc.*,
  514 F. App'x. 299 (4th Cir. 2013)............................................26

*Eaton v. Ascent Res. - Utica, LLC*,
  No. 2:19-CV-3412, 2021 WL 3398975 (S.D. Ohio Aug. 4, 2021)..............33

*Edens v. Goodyear Tire & Rubber Co.*,
  858 F.2d 198 (4th Cir. 1988) ....................................................50

*EQT Prod. Co. v. Magnum Hunter Prod., Inc.*,
  768 F. App'x 459 (6th Cir. 2019)..............................................31

*EQT Prod. Co. v. Magnum Hunter Prod., Inc.*,
  768 F. App'x 459 (6th Cir. 2019) (No. 18-5372 & 18-5388),
  2018 WL 3311431 ....................................................................31

*EQT Production Co. v. Adair*,
  764 F .3d 347 (4th Cir. 2014) ...........................................*passim*

*Estate of Tawney v. Columbia Natural Resources, L.L.C.*,
  633 S.E.2d 22 (W. Va. 2006) ............................................*passim*

*Fankhouser v. XTO Energy, Inc.*,
  No. CIV-07-798-L, 2010 WL 5256807 (W.D. Okla. Dec. 16, 2010)..........32

*Freebird, Inc. v. Merit Energy Co.*,
  No. 10-1154-KHV-JPO, 2011 WL 13638 (D. Kan. Jan 4, 2011)................33

*Gunnells v. Healthplan Servs., Inc.*,
   348 F.3d 417 (4th Cir. 2003) ...................................................................48, 52

*Horace Mann Ins. Co. v. Gen. Star Nat. Ins. Co.*,
   514 F.3d 327 (4th Cir. 2008) .................................................................49

*In re Marriott Int'l Customer Data Sec. Breach Litig.*,
   No. 19-MD-2879, 2023 WL 8247865 (D. Md. Nov. 29, 2023)...................45

*In re Marriott Int'l, Inc.*,
   78 F.4th 677 (4th Cir. 2023) ...........................................................14, 45

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
   341 F.R.D. 128 (D. Md. 2022) .......................................................45

*Kay Co., LLC v. EQT Prod. Co.*,
   No. 1:13-CV-151, 2017 WL 10436074 (N.D. W. Va. Sept. 6, 2017)......17, 44

*Kelly v. RealPage Inc.*,
   47 F.4th 202 (3d Cir. 2022) ...........................................................42

*Kessel v. Leavitt*,
   511 S.E.2d 720 (W. Va. 1998) ......................................................49, 50

*Krakauer v. Dish Network, LLC*,
   925 F.3d 643 (4th Cir. 2019) .........................................................46

*Laya v. Erin Homes*, Inc.,
   352 S.E.2d 93 (W. Va. 1986) ........................................................22

*Leggett v. EQT Prod. Co.*,
   800 S.E.2d 850 (W. Va. 2017) ......................................................18

*Lienhart v. Dryvit Sys., Inc.*,
   255 F.3d 138 (4th Cir. 2001) .........................................................25

*Lopinsky v. Hurvitz*,
   105 S.E.2d 593 (W. Va. 1920) .......................................................51

*Martin v. Consolidated Coal & Oil Corp.*,
    133 S.E. 626 (W. Va. 1926) ...........................................................24

*Naylor Farms, Inc. v. Chaparral Energy, LLC*,
    923 F.3d 779 (10th Cir. 2019) ......................................................10

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018)....................................................47

*Pocahontas Mining Co. Ltd. Partnership v. Oxy USA, Inc.*,
    503 S.E.2d 258 (W. Va. 1998) .....................................................50

*Skipper v. Giant Food Inc.*,
    68 F. App'x 393 (4th Cir. 2003) ............................................ 14-15

*Skochin v. Genworth Fin., Inc.*,
    2020 WL 6532833 (E.D. Va. Nov. 5, 2020) ................................50

*Slamon v. Carrizo (Marcellus) LLC*,
    No. 3:16-CV-2187, 2020 WL 2525961 (M.D. Pa. May 18, 2020)... 32-33, 37

*Stillmock v. Weis Markets, Inc.*,
    385 F. App'x. 267 (4th Cir. 2010).....................................26, 27, 48

*Swearingen v. Steers*,
    38 S.E. 510 (W. Va. 1901) ...........................................................51

*SWN Prod. Co., LLC v. Kellam*,
    875 S.E.2d 216 (W. Va. 2022) .............................................*passim*

*Tara Petroleum Corp. v. Hughey*,
    630 P.2d 1269 (Okla. 1981).........................................................18

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006)........................................................52

*Torres v. S.G.E. Mgt., LLC*,
    838 F.3d 629 (5th Cir. 2016) .......................................................52

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)......................................................................46

*W.W. McDonald Land Co. v. EQT Prod. Co.*,
983 F. Supp. 2d 790 (S.D.W. Va. 2013),
*opinion clarified* (Jan. 21, 2014) ...........................................17, 20

*Wal-Mart Stores, Inc. v Dukes*,
564 U.S. 338 (2011)......................................................................26

*Wellman v. Energy Resources, Inc.*,
557 S.E.2d 254 (W. Va. 2001) .........................................15, 16, 18

*Wells v. Liddy*,
186 F.3d 505 (4th Cir. 1999) .......................................................18

*Wilson v. Eagle Nat'l Bank*,
No. 8:20-CV-01344-JRR, 2023 WL 2478933 (D. Md. Mar. 13, 2023) .......45

*Yates v. NewRez LLC*,
No. CV TDC-21-3044, 2023 WL 5108803 (D. Md. Aug. 9, 2023)..............42

*Young v. Nationwide Mut. Ins. Co.*,
693 F.3d 532 (6th Cir. 2012) .......................................................43

*Zimmerman v. Bell*,
800 F.2d 386 (4th Cir. 1986).......................................................52

**Statutes:**

W. Va. Code § 22-6-8 (a)(4) (2018) ............................................18

W. Va. Code § 37C-1-1 ...............................................................51

W. Va. Code § 37C-1-3 .................................................................5

**Rules:**

Fed. R. Civ. P. 23..........................................................47, 48, 50, 52

Advisory Committee's Note to 1966 amendment,
39 F.R.D. 69 (1966) .....................................................................50

Fed. R. Civ. P. 23(a) ....................................................................6

Fed. R. Civ. P. 23(a)(2)...........................................................25, 28

Fed. R. Civ. P. 23(b)(3) ..............................................6, 42, 48, 50

**Other Authorities:**

2 Newberg and Rubenstein on Class Actions
    § 4:55 (6th ed.)...............................................................49, 50

3 Eugene Kuntz, *Treatise on the Law of Oil and Gas*
    § 40.4 (1989)...................................................................20, 21

4 *Newberg on Class Actions*
    § 12:4 ...................................................................................27

4 *Newberg on Class Actions*
    § 12:5 ...................................................................................27

7AA Wright & Miller Fed. Prac. & Proc. Civ.
    § 1778 (3d ed.)....................................................................50

37 Am. Jur. 2d Fraud and Deceit
    § 199 .....................................................................................51

J. Thomas Lane, *et al.*, *Grounds for an "Accounting" and
Application to Specific Relationships*,
    27 E. Min. L. Found. § 8.05 (2007)...................................51

Restatement (Second) of Torts
    § 550 ...............................................................................49, 50

Restatement (Second) of Torts
    § 551 (Am. L. Inst. 1977) ...................................................51

## I.    ISSUES PRESENTED FOR REVIEW

1)    Whether the district court abused its discretion by certifying a class where common issues predominate given EQT owed a common royalty obligation under all class leases to pay NGL royalties based on EQT's sales of NGLs to third parties, which is how EQT pays under all class leases today, and is alleged to have breached that duty by its uniform payment method used during the class period for all class leases irrespective of lease language of paying on a BTU value in an alter-ego sale.

2)    Whether the district court abused its discretion by certifying a class where all class members are readily identifiable by reference to EQT's royalty payments and the EQT lease pursuant to which the royalty payment was made, which is an administratively feasible task that EQT can perform and does perform as part of its regular business operations.

3)    Whether the district court abused its discretion by certifying a class where Plaintiffs have presented a uniform damage model capable of calculating each class member's individual damages using a common methodology by calculating the difference between the royalty payment made by EQT and the amount the royalty payment would have been had EQT paid based upon its sales of NGLs to third parties and not a lesser priced inter-company alter-ego transaction.

4)      Whether the district court abused its discretion by certifying Plaintiffs'
fraudulent concealment claims under West Virginia law where EQT concealed in a
uniform way that it was paying NGL royalties based on much cheaper alter-ego sales
and not on sales to unaffiliated third parties.

## II.      STATEMENT OF THE CASE

### A.      EQT's Common Scheme to Pay NGL Royalties Based Upon Lower-Priced Straw Transactions Between Alter Ego Companies and Its Uniform Treatment of All Class Leases Irrespective of Lease Language.

Plaintiffs are the owners and lessors of natural gas and natural gas liquid
("NGLs") interests subject to leases held by EQT.[1] JA6679-6680. From 2012
through 2021 (the class period), EQT produced wet gas from all class members'
wells. JA4623-4625, JA6679-6680, JA6691. Wet gas refers to gas produced from
wells containing hydrocarbon constituents of methane and NGLs entrained in the
gas. JA4623-4624. NGLs include commercial valuable hydrocarbons such as
propane, butane, and pentane. JA4624, JA6688.

EQT sold the wet gas at the wellhead in an inter-company alter-ego[2]
transaction based upon the BTU content of the wet gas. JA4675-4676, JA4692-4695.
EQT next separated the wet gas into residue gas (primarily composed of methane,

---

[1]  "EQT" collectively refers to all Defendants.

[2]  EQT Production sold the raw gas to EQT Energy. JA4675-4676, JA4692-4695. The EQT Defendants have been legally determined to be alter egos of each other. JA4242-4278.

commonly called natural gas, used in home heating) and NGLs. EQT sold the residue gas to unaffiliated third parties for commercial use as natural gas, paying royalties on residue gas based upon the proceeds it received when it sold the residue gas to unaffiliated third parties. EQT processed the NGLs through fractionation into individual NGLs (propane, butane, and pentane) and sold these to unaffiliated third parties for use in various commercial applications. JA4675-4676, JA4692-4695, JA4242-4278. During the class period, unlike with the residue gas, EQT did not pay NGL royalties based upon the proceeds it received when it sold the NGLs to unaffiliated third parties. Instead, EQT paid royalties based on the much lower BTU-based, inter-company alter-ego transaction at the wellhead. EQT's alter-ego transaction at the wellhead valued the NGLs using a lower BTU market price for natural gas and not NGL market pricing or the proceeds EQT received from the sale of the NGLs to third parties. JA3897-3898, JA4692-4695.

During the entire class period, EQT used this common payment method and scheme to pay NGL royalties under all class leases irrespective of lease language. JA4299, JA4675-4676. EQT's uniform payment method caused the class members to receive significantly lower royalties than what was owed under the lease had EQT paid on the proceeds received from third-party sales. JA4692-4695.

In March 2021, after this lawsuit was filed, ████████████████████

████████████████████████████████████████████████████

 JA4299, JA4675-4676. But EQT did not disclose JA4675-4676. JA4675-4676. EQT also stated [3] JA4675-4676. EQT still pays royalties this way today. JA4675-4676, JA4692-4695.

Under both of its uniform payment methods, EQT treated the payment of NGL royalties as a common issue among all class leases and paid utilizing a standardized method irrespective of lease language. JA4675-4676, JA360-363. It utilized the same payment method during the class period (BTU value in an alter-ego transaction), and then implemented a different—but still common—method after this lawsuit was filed and it started paying on third party sales. JA4675-4676, JA360-363. No variation in any of the leases affected the method by which EQT paid royalties at any time during and after the class period. JA4675-4676, JA360-363.

---

[3] EQT has been unable to produce any documents or witnesses to explain why it made this switch. JA4675-4676.

**B.    EQT Fraudulently Concealed Material Information Concerning its Payment of NGL Royalties from all Class Members in a Uniform Manner.**

EQT is required to provide monthly remittance statements which account for the products removed from their property. JA4318, JA6681-6682. But during the class period, EQT uniformly provided class members with remittance statements that were the same in form and substance, but falsely omitted material information concerning its payment of NGL royalties and showed only the production of oil and gas, even though EQT was removing and later selling NGLs. JA4318. The class members were entitled to be paid on the NGL sale prices received by EQT, yet the remittance statements omitted any mention of NGLs, NGL volumes, or sale prices. Indeed, EQT failed to include any NGL information in any remittance statement until after this case was filed. JA4318.

**C.    Plaintiffs' Claims and the District Court's Certification Order.**

Plaintiffs assert three causes of action in their Amended Consolidated Class Complaint ("ACCC"): breach of contract (Count I), violation of W. Va. Code § 37C-1-3 for failing to timely pay royalty payments (Count II), and fraudulent omission (Count III).[4] JA705-707. Plaintiffs filed their Motion for Class Certification which was granted by the district court on August 31, 2023 ("Certification Order").

---

[4] On June 23, 2023, Plaintiffs filed the operative ACCC to narrow and refine the scope of the class. JA683-730.

JA4281-4327. In its 49-page order, the district court thoroughly analyzed each factor under Rule 23(a) and Rule 23(b)(3), finding each to be satisfied. JA4281-4327.

The district court found there were numerous common questions of law and fact that apply equally to the class and would generate common answers which are central to the validity of the class members' claims. JA4294. The district court determined that class treatment was particularly appropriate because EQT engaged in a common method of paying royalties for NGLs under all class leases irrespective of lease language; as such, the issue of whether EQT's uniform royalty method of paying on a BTU basis, as opposed to the higher-priced sales to unaffiliated third parties, breached EQT's common obligation under the lease is an issue that predominates. It is central to the litigation and the answer will drive resolution, whether favorably or unfavorably, for all class members. JA4294-4295. The district reviewed exemplar leases submitted by both parties, finding that any variation in these leases was a distinction without a difference given these variations did not affect EQT's common royalty obligation and because EQT treated all class leases the same irrespective of any alleged variations. JA4302. The district court also certified Plaintiffs' fraudulent omission claims upon finding that the fraudulent conduct was the same in form and substance to all class members. JA4322-4323.

**D.**   **Other Relevant Filings and Orders.**

Other filings and orders relevant to this appeal include:

• The district court denied EQT's Motion to Dismiss the Glover Plaintiffs' claims finding notice of default was not a condition precedent to filing suit in the Glover Lease. JA119-120.

• By Order dated April 25, 2023, EQT was compelled to provide sworn Interrogatory answers that linked all royalty payments made during the class period to the lease under which they were paid by May 10, 2023 ("Discovery Order"). EQT promised to provide these answers by June 12, 2023, but when it failed to do so, the district court extended its deadline to August 24, 2023. JA0610-0639, JA1131-1135, JA4486-4573, JA4540. EQT has still not complied with the Discovery Order. JA4473-4485, JA4486-4499.

• Before filing their Motion for Class Certification, Plaintiffs filed a Motion for Partial Summary Judgment Regarding Class Lease Language, which was denied as moot because the issues raised in Plaintiffs' summary judgment motion were addressed in the class certification and clarification orders. JA4574-4637, JA4330-4340, JA4432-4433.

• By Order dated August 21, 2023, the district court directed the parties to deliver copies of exemplar leases for each class lease category. JA4240-4241.

- On August 21, 2023, the district court granted Plaintiffs' Motion for Partial Summary Judgment Regarding Alter Ego and found the EQT Defendants were alter egos of each other. JA0775-1039, JA4242-4278.

## III. SUMMARY OF ARGUMENT

District courts are afforded broad discretion in determining whether to certify a class action. The district court did not abuse that discretion here.

For nearly a decade, EQT treated all class members *identically* by paying NGL royalties on a BTU basis under all class leases *without regard to lease language*. Plaintiffs' claims are straightforward: EQT breached the class leases by its uniform method of paying NGL royalties based upon an alter-ego sale utilizing a BTU price not associated with NGLs, instead of the much higher prices received from the sale of NGLs to third parties. Put differently, Plaintiffs contend EQT should have paid royalties during the class period in the same manner as it does now under those same class leases.

Under these facts, common issues predominate. The central, common issue in this case is whether EQT breached the class leases by its uniform royalty payment method. Because EQT treated all leases the same, and because the district court determined as a matter of law that EQT owed a common royalty obligation under the class leases to pay based upon the proceeds EQT received from the sale of the NGLs to unaffiliated third parties, this issue can be resolved on classwide basis using

common proof and uniform legal analysis. JA4294-4295. The resolution of this central issue will resolve liability for all class members in one stroke, materially advancing the litigation for all. Plaintiffs have also presented a reliable damage model which is capable of calculating each class member's individual damages using a common methodology. JA4692-4695. Any individual issues that may exist do not overcome the predominance of these common issues.

EQT offers a flurry of arguments against certification, but each one fails.

*First*, the district court did not abuse its discretion by finding that EQT owed a common royalty obligation. This finding is supported by well-established West Virginia law which provides that a gas company cannot calculate royalties based on a sale between subsidiaries at the wellhead when it later sells the product in an open market at a higher price. *SWN Prod. Co., LLC v. Kellam*, 875 S.E.2d 216, 229 (W. Va. 2022) (Hutchinson, J., concurring). Common sense also compels this result. The district court's ruling here merely has the effect of determining that EQT had to pay during the class period as it does now under the very same leases. JA4675-4676, JA4297-4298. Additionally, EQT has never offered any alternative interpretation of its royalty obligation other than the ██████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████ JA3821-3849, JA4263-4265, JA4270, JA4696-4706.

Nor did the district court interpret the class leases by "judicial fiat" without regard to the actual lease language as EQT claims. Opening Br. of Defs.-Appellants EQT Corporation, EQT Production Company, and EQT Energy ("Appellants' Br.") 19, ECF No. 29. Rather, the district court considered Plaintiffs' fully briefed Motion for Partial Summary Judgment Regarding Class Lease Language which discussed in detail all categories of lease royalty language (JA4574-4602), Plaintiffs' Class Lease Chart[5] which categorized each royalty provision at issue (JA6853), and an exemplar of each class lease submitted by both parties (JA4302).

**Second**, textual variations in the class leases do not preclude certification. The district court determined "while there are distinctions to be made, there are few if any differences as claimed by EQT." JA4302. Thus, the district court found no material variations within any of the class leases that negate EQT's common royalty obligation. While some leases may use different words to describe the royalty obligation, for example "gross proceeds" versus "amount realized," no language permits EQT to pay based on an alter-ego sale on the BTU price for natural gas. Any lease that allowed EQT to pay in this manner was not included in the class.

---

[5] According to the Tenth Circuit, a class lease chart is the best way to evaluate lease language in a royalty underpayment class action. *See, e.g.*, *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 795 (10th Cir. 2019).

Variations as to how gas or the product is defined similarly do not destroy commonality or predominance. EQT conceded in its ████████████████ ████████████████████████ and has otherwise not contested its duty to pay NGL royalties. JA4675-4676. Other textual variations, including those relating to well quality or value location, may affect the amount of royalty, but not the underlying obligation to pay that royalty. Even so, any such variable has also been accounted for in Plaintiffs' common damage model. JA4692-4696.

What is more, by not differentiating between class leases in how it paid NGL royalties, EQT has shown it never viewed as material any of the variations upon which it now relies to argue against certification. In this regard, the district court appropriately found that EQT's argument rings hollow:

> At the same time EQT postulates that textual variations in the Class Leases preclude commonality and predominance, it continues to pay Plaintiffs and proposed Class Members using a common method irrespective of these alleged variations. In its March 9, 2021 letter, EQT made clear that during the Class Period it made none of the distinctions it now argues to this Court.

JA4298-4299.

**Third**, Plaintiffs neither conceded, nor did the district court find, that the class leases were ambiguous. JA6783-6814, JA4302-4305, JA4432-4433. Plaintiffs' primary argument, with which the district court agreed, was that the class leases unambiguously and as a matter of law required EQT to pay based upon NGL sales

11

to third parties. JA6869, JA4432-4433, JA4302-4303. Merely because Plaintiffs also argued that certain lease provisions were, at a minimum, ambiguous, which required them to be strictly construed against EQT if so found, does not mean Plaintiffs abandoned their primary argument of unambiguity.

The district court found that even if the leases were ambiguous, it could construe the leases without having to resort to an individualized lease examination of parol evidence. JA4303. This is because EQT admitted NGL royalties could be paid in only two ways under all class leases, the way it did during the class period and the way it has done since 2021. JA4303. Construing the leases strictly against EQT and in favor of the class members as it was required under West Virginia law, the district court determined, in the event of an ambiguity, the lease must be interpreted to require EQT to pay NGL royalties based on third party sales. JA4303. This is consistent with West Virginia precedent regarding construction of oil and gas leases.

**_Fourth_**, the class is ascertainable. Because Plaintiffs have identified all royalty payments made during the class period as well as the lease number associated with each class lease, class membership can be determined by matching each royalty payment to a lease under which it was made. JA4486-4499, JA4541-4543. This can be done using objective criteria and through an administratively feasible method. Indeed, EQT is in possession of all information and means needed to match each

royalty payment to a lease (as it must be since it had to know the royalty owner and the respective lease pursuant to which the payment was made to ensure that the proper person was receiving the proper royalty amount when paid); EQT has the ability to match royalty payments to leases; and EQT matches royalty payments to leases as part of it regular business operations. JA0533-0535, JA0578, JA4291, JA4481-4485. Further, the district court compelled EQT to provide this information by supplemental Interrogatory answer and found that upon EQT's compliance, all class members will be readily identified. JA610-617, JA635-639. EQT was required to produce this information by August 24, 2023, but has failed to do so. JA4473-4485, JA4486-4499. EQT should not be allowed here to use its non-compliance as a shield against certification.

*Fifth*, Plaintiffs have sufficiently demonstrated standing and that individual class member's damages are capable of being determined using a common method. Plaintiffs have put forth a detailed damage model which can reliably determine damages for each class member by calculating the difference between what each class member was paid and what each class member should have been paid. JA6822-6847. This model can be applied across the class using the same methodology and has been used to calculate the Glover Plaintiffs' damages. JA6822-6847. Through this model, Plaintiffs have also sufficiently established that all class members have suffered an actual injury by showing they received lower royalty payments during

the class period than what they would have received had EQT paid based on third party sales. JA4692-4695. EQT's criticisms of Plaintiffs' damage model as to its alleged inaccuracies or failure to account for certain variables are merits arguments.

*Sixth*, individual issues about the calculation of damages generally do not defeat certification, and do not here. Any individual damages issues do not predominate over the central issue of whether EQT's common conduct breached the class leases, particularly considering the common application of Plaintiffs' damage model.

*Seventh*, the district court did not abuse its discretion by certifying Plaintiffs' fraudulent concealment claims because EQT's uniform fraudulent conduct renders Plaintiffs' claims certifiable under West Virginia law.

## IV.    ARGUMENT

### STANDARD OF REVIEW

Because of "the considerable advantages that [a] district court possess in managing complex litigation and the need to afford [it] some latitude in bringing that expertise to bear," and recognizing that district courts retain "broad discretion in deciding whether to allow the maintenance of a class action," decisions regarding certification are reviewed for an abuse of discretion. *In re Marriott Int'l, Inc.*, 78 F.4th 677, 685 (4th Cir. 2023); *Skipper v. Giant Food Inc.*, 68 F. App'x 393, 396

(4th Cir. 2003). Review of Article III jurisdiction is de novo. *See Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240 (4th Cir. 2019).

## DISCUSSION

**A. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CERTIFYING THE CLASS BECAUSE SUBSTANTIAL ISSUES OF FACT AND LAW PREDOMINATE IN THAT EQT OWED A COMMON ROYALTY OBLIGATION UNDER ALL CLASS LEASES AND IS ALLEGED TO HAVE BEACHED THAT OBLIGATION BY ITS STANDARDIZED ROYALTY METHODOLOGY AND UNIFORM TREATMENT OF ALL CLASS LEASES.**

    1)    <u>Under West Virginia law, an Oil and Gas Company Cannot Base Royalties on a Sale Between Alter Ego Companies at the Wellhead When it Later Sells to Third Parties in the Open Market for a Higher Price</u>.

In West Virginia, an alter ego intra-company sale cannot be the basis for calculating royalty under an oil and gas lease. This is clear from well settled oil and gas precedent in West Virginia.

In *Wellman v. Energy Resources, Inc.*, 557 S.E.2d 254 (W. Va. 2001), the West Virginia Supreme Court held "[i]f an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provide otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale." *Id.* at 256. In so holding the *Wellman* Court recognized this is "consistent with the long-established expectation of lessors in this State, that they would receive one-eighth of the sale price received by the lessor." *Id*. The West Virginia Supreme Court expanded upon *Wellman* in *Estate of Tawney v. Columbia Natural Resources, L.L.C.*, 633 S.E.2d 22, 27 (W. Va. 2006). While

*Tawney* addressed the lessee's duty to bear costs between the wellhead and the point of sale, the Court again recognized that "traditionally in this State the landowner has received a royalty based on the sale price of the gas received by the lessee." *Id*. at 27.

In *Kellam*, 875 S.E.2d at 216, the West Virginia Supreme Court held that *Tawney* and *Wellman* remain valid law and "are the result of a reasonable and justifiable interpretation of [West Virginia's] common law." *Id*. at 226. The *Kellam* Court further cited *Tawney* and *Wellman* for the proposition that the lessee is required to bear all costs incurred between the wellhead and the point of sale. *Id*. at 221, 223. In *Corder v. Antero Resources Corporation*, 57 F.4th 384 (4th Cir. 2023), this Court held *Wellman*, *Tawney*, and *Kellam* apply equally to both proceeds and market value leases through the point of sale. *Corder*, 57 F.4th at 397.

The decisions in *Wellman*, *Tawney*, *Kellam*, and *Corder* hold that royalty owners are to be paid royalties based upon the proceeds from sales received by the lessee. These cases, together with holdings from district courts throughout West Virginia, further confirm that a "sale" for purposes of royalty calculation is the first point of sale to an unaffiliated third party in an arm's length transaction. As Justice Hutchinson stated in his concurring opinion in *Kellam*:

> Another corollary, default guideline implied into every oil and gas lease is just as clear: the lessor/owner of oil and gas rights is entitled to royalties, that is, a share of the profit gained from the oil and gas the lessee delivers to

> market. In West Virginia, those royalties are, by default …
> based on the gross proceeds received by the lessee at the
> first point of sale to an unaffiliated third-party purchaser
> in an arm's length transaction …

*Kellam*, 875 S.E.2d at 229 (Hutchinson, J. concurring).

In *W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790 (S.D.W. Va. 2013), *opinion clarified* (Jan. 21, 2014)., the district court similarly held that EQT could not calculate royalties based on a sale between subsidiaries at the wellhead where EQT later sold the gas in an open market at a higher price. *Id.* at 804. The district court reasoned that if this were not the rule, gas producers "could easily reduce royalties by spinning off portions of their business and making nominal sales at the wellhead" and avoid the principals underlying West Virginia's oil and gas precedent by "simply reorganizing their businesses and making intra-company wellhead sales." *Id.* In *Kay Co., LLC v. EQT Prod. Co.*, No. 1:13-CV-151, 2017 WL 10436074, at *23 (N.D. W. Va. Sept. 6, 2017), the district court adopted the reasoning from *W.W. McDonald* to reject EQT's argument that *W.W. McDonald* should not apply to its affiliate and alter-ego transactions. *Id.* at *18-19 (The EQT Defendants "utilize the fallacy that these [affiliated] transactions are arms-length transactions among independent entities.").

Thus, the district court's finding that a gas company may not base royalties on an alter-ego sale at the wellhead when it later sells the NGLs to third parties at higher

prices is neither novel nor an erroneous expansion of common law. Rather, this finding is firmly rooted in established precedent and common sense.[6]

This finding is also consistent with West Virginia public policy. In amending W. Va. Code § 22-6-8 (a)(4) (2018) to overrule *Leggett v. EQT Prod. Co.*, 800 S.E.2d 850 (W. Va. 2017),[7] the West Virginia legislature enacted laws requiring royalties on flat rate leases to be paid "on the *gross proceeds* free from any deductions for post-production expenses, *received at the first point of sale to an unaffiliated third-party purchaser in an arm's length transaction . . .*" *Id.* (emphasis added). The statute states these amendments were made "in furtherance of the welfare of its citizens," evidencing a strong public policy[8] in West Virginia to compensate royalty owners

---

[6] While this is the law in West Virginia, even if EQT were correct that it is an unsettled area because the West Virginia Supreme Court has not addressed the specific facts here, the district court still did not abuse its discretion. Appellants' Br. 39 n.14, ECF No. 29. If the law of a state is unclear, a federal judge must predict how the state's highest court would rule. *Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir. 1999). Based upon how the West Virginia Supreme Court has interpreted and applied West Virginia precedent governing oil and gas lease construction, it is clear the West Virginia Supreme Court would find as the district court did. *See, e.g.*, *Kellam*, 875 S.E.2d 216; *Tawney*, 633 S.E.2d 22; *Wellman*, 557 S.E.2d 254.

[7] The *Leggett* Court did not "bless[] [EQT's] affiliate sale." Appellants' Br. 39 n.14, ECF No. 29. Rather, it cautioned against affiliate sales by citing *Tara Petroleum Corp. v. Hughey*, 630 P.2d 1269, 1275 (Okla. 1981) which held: "Whenever a lessee or assignee is paying royalty on one price, but on resale a related entity is obtaining a higher price, the lessors are entitled to their royalty share of the higher price." *Leggett*, 800 S.E.2d at 868.

[8] *See Cordle v. Gen. Hugh Mercer Corp.*, 325 S.E.2d 111, 114 (W. Va. 1984) (explaining sources determinative of public policy include public statutes).

based upon unaffiliated transactions. *Id.* Finally, as Justice Hutchison noted in *Kellam*, this rule is also rooted in principles of common sense and fairness as it protects against "gamesmanship," as well as the unjust result of a gas company selling gas to an affiliate at artificially lower prices and still complying with the terms of the lease. *Kellam*, 875 S.E.2d at 232 (Hutchinson, J., concurring).

2)     <u>As Interpreted in West Virginia, the Class Leases Impose a Common Royalty Obligation on EQT to Pay NGL Royalties Based Upon the Proceeds Received from the Sale of NGLs to Third Parties in an Arm's Length Transaction</u>.

The district court correctly determined that EQT owed a common obligation to pay royalties based on the proceeds received from the sale of the NGLs at the first point of sale to third parties. This interpretation is required under the plain and unambiguous language of the leases. Even more, in practice, EQT agrees with this interpretation. Today, EQT pays royalties in the same manner the district court found it was required to do during the class period under the same class leases. JA4675-4676, JA4692-4695. EQT has also never proffered any legally supported interpretation of the royalty provisions different from what the district court found,[9] nor attempted to articulate its position. JA3821-3849. EQT's own expert further admitted that the class leases did not permit EQT to pay how it did during the class period. JA4696-4706.

---

[9] Nor can it because it pays in this manner now.

Plaintiffs' Class Lease Chart contains seventy categories of leases, which have been further grouped into thirty-three equivalent categories of royalty provisions among the approximately 3,700 class leases. JA4585-4592, JA6853. The leases fall into two categories: "proceeds" or "market value."[10] JA683, JA4603-4605. As to "proceeds" leases, whether they call for royalties to be paid, for example on "gross proceeds" or "sales price," all require royalties to be paid based on proceeds received by EQT from a sale. None of these provisions state that the sale upon which the royalty is calculated can be a sale between affiliates or alter egos, nor do they permit royalties to be paid on a BTU basis.[11] West Virginia law, then, requires these leases to be interpreted to require royalties to be paid on the first point of sale to an unaffiliated third-party. *See Kellam*, 875 S.E.2d 216; *W.W. McDonald*, 983 F. Supp. 2d 790.

As to "market value" leases, "market value" means "the price that would be paid by a willing buyer to a willing seller in a free market." 3 Eugene Kuntz, *Treatise on the Law of Oil and Gas* § 40.4, at 329 (1989). "Market value" is determined by

---

[10] These categories are set forth in Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment Regarding Lease Language. JA4585-4599.

[11] Lease Category G does not permit affiliate sales as claimed by EQT. Affiliate sales are only permitted under this category if the affiliate sale price is *higher* than the price received in a third-party sale, which it is not the situation here. JA4585-4586, JA6853, JA6822-6847.

the prices paid by third parties in the open market and not a sale at the wellhead to an alter ego. *Kellam*, 875 S.E.2d at 232 ("[N]o owner of mineral rights signs a lease anticipating the term 'market price' will be an opportunity for gamesmanship; [it] means the price garnered in a sale to an unaffiliated third-party purchaser in an arm's length transaction."). The price obtained in an open and competitive market establishes the market value, which can never be a sale between affiliates or alter egos for a price lower than what is received when that same company later sells to third parties on the open market. 3 Eugene Kuntz, *Treatise on the Law of Oil and Gas* § 40.4, at 332 (1989).

Here, there are only two potential measurements of market value: (1) the sale of NGLs to unaffiliated third parties after EQT brought them to market and sold them their liquid marketable form, or (2) the alter-ego sale of the wet gas at the wellhead which utilized the BTU price of residue gas and not a price associated with NGLs. JA4675-4676. Under these facts, the only true measure of market value is the proceeds EQT received when it sold the NGLs in the open market to third party purchasers; market value cannot be the proceeds received in an alter-ego sale.

EQT could have included lease language permitting NGL royalties to be paid on the BTU content of wet gas at the wellhead, but it did not. This is shown by other EQT leases which were specifically not included in the class, including:

JA5128. Here, none of the class leases contain this or any other similar language. Simply stated, if EQT wanted to pay in the manner it did during the class period, it had the ability and knowledge to do so, but chose not to.

Additionally, before certification, the district court determined as a matter of law the EQT Defendants were alter egos of each other. JA4242-4278. The district court's class certification ruling was therefore made within the context of this prior determination and the law of the case. Because the sale upon which EQT based NGL royalties during the class period was between EQT alter ego companies, it must be disregarded for purposes of royalty calculation. JA4252-4253; Syl. Pt. 2, *Laya v. Erin Homes*, Inc., 352 S.E.2d 93 (W. Va. 1986). Further, because this alter-ego transaction was one of only two potential transactions upon which royalties could be paid, the district court was correct in interpreting the class leases to require royalties to be paid based on the sale of NGLs to third parties.

Contrary to EQT's claims, Plaintiffs have never admitted the class leases are ambiguous. JA6795-6796. Rather, Plaintiffs argued that, at a minimum, if certain provisions were ambiguous, they would require the application of rules of

construction favorable to Plaintiffs.[12] JA6795-6796. But the district found the leases were not ambiguous and their interpretation "is a matter of law for the Court to determine based upon well-settled West Virginia oil and gas law." JA4303. Thus, the district court interpreted the class leases based upon their plain and unambiguous language. What Plaintiffs argued to the district court in the event of an ambiguity does not alter the court's finding. JA4303.

The district court also correctly found that even in the presence of an ambiguity, a lease-by-lease parol evidence analysis was not necessary. JA4303. West Virginia requires oil and gas leases to be "liberally construed in favor of the lessor, and strictly as against the lessee." Syl. Pt. 7, *Tawney*, 633 S.E.2d at 24. Because there are only two ways which NGL royalties can be paid, application of this longstanding rule in the event of an ambiguity requires the lease to be interpreted in the manner most favorable to the lessor. That is what the district court did here, correctly finding that the class leases required royalties to be paid on third party sales

---

[12] For example, Plaintiffs stated that "at a minimum, the proceeds Class Leases that do not expressly define a sale as between unaffiliated parties are ambiguous," and that any royalty provision relating to proceeds received from the sale of NGLs "at the well" or "at the wellhead" was also ambiguous based upon prior judicial determinations. JA4590-4591. *See, e.g.*, *Corder*, 57 F.4th at 394 (finding the phrase "value at the well" was "ambiguous . . . [because] . . . [i]t *could* refer to the downstream sale price minus post-production costs, but it just as easily could refer to the prevailing price of gas sold at the wellhead"); *Tawney*, 633 S.E.2d at 29 (finding that "market price at the wellhead" is ambiguous because "it contemplates the actual sale of gas at the physical location of the wellhead, although the gas generally is not sold at the wellhead").

if ambiguous. JA6824-6829. This was a proper question of law for the district court to decide and a correct application of West Virginia law.[13] *Tawney*, 633 S.E.2d 22, 29 (2006) (finding that the court could interpret ambiguous oil and gas leases as a matter of law by applying traditional rule of construction that oil and gas leases are to be strictly construed against lessee).

EQT's uniform treatment and construction of all class leases also allowed the district court to interpret the leases in the event of an ambiguity. Considering that EQT has always treated its royalty obligations under the class leases in a common way, and EQT's expert admits the class leases do not contain language permitting EQT to pay royalties in the manner it did during the class period, the district court found that any potential ambiguity should be resolved by interpreting the leases to require EQT to pay in the common manner it does today. JA4293. In effect, the district court applied principles of practical construction to interpret the leases consistent with West Virginia law and common-sense. *Bruce McDonald Holding Co. v. Addington, Inc.*, 825 S.E.2d 779, 785 (W. Va. 2019) (finding that the court "will adopt the construction which the parties to an ambiguous contract, by their conduct and express agreements during performance, have placed upon it").

---

[13] Contrary to EQT's arguments, this rule of construction applies to all oil and gas leases and is not negated if the lease is later acquired by another gas company, or if the lessors engaged in negotiations on some terms. *See, e.g.*, Syl. Pt.1, *Martin v. Consolidated Coal & Oil Corp.*, 133 S.E. 626 (W. Va. 1926).

The district court's determinations are consistent with *Kellam*, wherein the West Virginia Supreme Court held that "oil and gas lease agreements are simply contracts and are to be construed as such" and, thus, whether a lease meets those requirements is a question of contract interpretation guided by principles of contract law. *Kellam*, 875 S.E.2d at 227. *Kellam* reiterated that fundamental principles of West Virginia contract law apply to the interpretation of oil and gas leases. *Kellam* did not hold, as EQT suggests, that the interpretation of a lease requires an individualized factual inquiry with extrinsic evidence. *Id*.; Appellants' Br. 21, ECF No. 29 at 34. Nor did it hold that an oil and gas lease cannot be interpreted as a matter of law. *Kellam*, 875 S.E.2d at 227. Indeed, the *Kellam* court expressly recognized that interpretation of a lease "is a matter left in the capable hands of the *court* and fact-finder, as appropriate." *Id* (emphasis added).

3)    <u>The District Court Did Not Abuse Its Discretion by Certifying the Class Because EQT's Common Royalty Obligation and Uniform Treatment of Class Members Generate Common Questions of Fact and Law That Can Be Resolved Using Common Proof and Uniform Legal Analysis</u>.

To satisfy commonality and predominance,[14] common questions must have a significant "bearing on the central issue in the litigation" with the focus being on whether issues are subject to common proof or require individualized and fact-

---

[14] The "commonality" requirement of Rule 23(a)(2) is generally subsumed under, or superseded by, the predominance inquiry. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001).

intensive determinations. *EQT Production Co. v. Adair*, 764 F .3d 347, 366 (4th Cir. 2014). The predominance requirement does not require that every issue be subject to classwide proof, but only that common questions predominate over questions affecting only individual class members. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013). If the "qualitatively overarching issue" in the litigation is common, a class may be certified notwithstanding the need to resolve individualized issues. *See Ealy v. Pinkerton Government Services, Inc.*, 514 F. App'x. 299, 305 (4th Cir. 2013). When common questions predominate regarding liability, "then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." *Stillmock v. Weis Markets, Inc.*, 385 F. App'x. 267, 273 (4th Cir. 2010).

Here, the district court determined the core issue in this litigation is whether EQT's standardized royalty payment breached the class leases. JA4302, JA4312-4313. The district court further found that the resolution of this issue can be accomplished by using classwide proof and uniform legal analysis because EQT treated all class members identically irrespective of lease language. JA4294-4295. The resolution of this key issue will also dispose of liability "in one stroke" for all class members, thereby significantly advancing the litigation for all. *Wal-Mart Stores, Inc. v Dukes*, 564 U.S. 338, 350 (2011). The district court's findings

regarding commonality and predominance, then, are firmly supported by applicable law and do not constitute an abuse of discretion.

And while the predominance of the common issues relating to liability should end the inquiry,[15] Plaintiffs have also satisfied predominance as to damages. To satisfy this requirement, Plaintiffs must sufficiently show that damages are "capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). There is no requirement, however, that Plaintiffs' damages "must be *calculated* on a class-wide basis," and damages at class certification "need not be exact." 4 *Newberg on Class Actions* § 12:5; *Comcast*, 569 U.S. at 35. Instead, "where the case is complex and certified for both liability and damages, class proponents can demonstrate that they have a common, classwide *method* for determining individual damages." *Id.* at § 12:4 (emphasis added).

Plaintiffs have sufficiently demonstrated that damages are capable of being calculated for all individual class members using a common, classwide method. As detailed by the expert report of Plaintiffs' oil and gas accounting expert, Donald Phend, CPA, dated January 11, 2023 (JA6822-6847); the deposition of Donald Phend taken by EQT on June 13, 2023 (JA4014-4021, JA6676-6677); and Donald Phend's affidavit submitted in connection with the class certification proceedings

---

[15] *See Stillmock*, 385 F. App'x at 274.

(JA4692-4695),[16] Plaintiffs' damage model can be used to calculate each class member's individualized damages by calculating the amount of loss sustained by each royalty owner on a month by month basis by comparing what the class member received to what the class member should have received if EQT had paid on third party sales. Generally, to perform these calculations:

- First, determine the proper total NGL royalty payments to the royalty owners and/or lessors without deductions;

- Second, the gross Residue Gas value is calculated by multiplying each month's Residue Gas volume in MMBTUs by the price per MMBTU for residue gas;

- Third, NGLs gross value is calculated by multiplying each month's volume of each natural gas liquid in gallons by the price per gallon;

- Fourth, the actual amount received in royalty payments is then subtracted from the total of the first three calculations ("what should have been paid"); and

- Fifth, this amount is the total royalty underpayment.

JA6822-6847, JA4692-4695, ATT13-ATT14.

This model uses the same information and variables for each class member, including EQT's common royalty accounting data produced, EQT's Royalty Payment Detail, and plant processing statements, and does not require any

---

[16] Plaintiffs disclosed Donald Phend's Rule 26(a)(2) Report on October 18, 2023 and Donald Phend's Supplement Report on November 3, 2023, which provided additional detail to his prior opinions based upon new data provided by EQT after his initial report. ATT1-ATT24.

individualized information from any of the class members.[17] JA6822-6847, JA4692-4695. This same methodology can be applied in a common manner across the class to calculate each class member's individualized damages to a reasonable degree of certainty. JA6822-6847, JA4692-4695. Using this methodology, Plaintiffs' expert has performed a preliminary calculation of damages for the Glover Plaintiffs and determined they have been underpaid NGL royalties in the amount of $50,214.22. JA4046-4051, JA4692-4695. Thus, as with liability, predominance for damages exists here too.

4)    Textual Variations in the Class Leases Do Not Destroy Commonality or Predominance Because, As Evidenced by EQT's Uniform Treatment of the Class Leases, Any Such Variation Does Not Affect EQT's Common Royalty Obligation or the Resolution of Predominate Classwide Issues.

The district court correctly recognized that textual variations across the class leases are merely distinctions without a difference. JA4302. None of the variations affect EQT's common royalty obligation or prevent the resolution of significant common questions of liability on a classwide basis. While the royalty provisions may use different words, their meaning and effect are the same. All require NGL

---

[17] EQT utilized standardized accounting software and "pooled accounting" which allows for efficient calculation of royalty underpayments to a reasonable degree of certainty for all potential class members given that the nature of pooled accounting, and the format of the data, allows calculations to be accurately and efficiently made for large numbers of wells and lessors, particularly where the data is in spreadsheet format, as in this case. JA6835.

royalties to be paid based upon the proceeds received from the sale of the NGLs to unaffiliated third parties. To negate this common obligation, a class lease must contain language that permitted EQT to pay royalties based on alter-ego sales or the BTU value of gas. But no class lease contains any such language and, as noted, any lease that does include this language is not part of the class. Additionally, while EQT argues that language variations preclude certification, it has not identified or explained how any variation permits it to pay differently. Thus, while the class leases are not identical in their language, they are the same in their substance and effect, yielding the same legal result for the purpose of class certification.

Because the variations in the lease language do not change the method by which EQT was required to pay, the district court did not abuse its discretion in certifying a class whose members had leases with non-material variances in their lease language. Central to the district court's finding on commonality and predominance was the determination that because EQT owed a common royalty obligation and treated all class leases the same, liability could be determined on a classwide basis. JA4293-4304, JA4310-4313. This is a proper finding supported by applicable law, and the resolution of this issue is unaffected by any textual variation in the class leases. JA4310-4311 No language in the class leases alter EQT's common royalty obligation or change the analysis of whether EQT breached the class leases by its standardized royalty payment method.

Nor do any variations as to how gas or the product is defined preclude certification. Appellants' Br. 6, ECF No. 29. EQT has never contested that it owes a royalty on NGLs or that the term "gas" does not include NGLs. Indeed, EQT conceded to all class members in its ████████████████████████████ ████████████████████████████████████████████████████ JA3821-3849, JA4675-4676, JA4692-4695. Any suggestion by EQT that royalties are not owed on NGLs is undermined by its position in *EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, 768 F. App'x 459 (6th Cir. 2019), where EQT brought suit alleging it was underpaid NGL royalties and argued that NGLs are included within the definition of "oil and gas." *See* Brief of Plaintiff-Appellant/Cross-Appellee at 23-25, *EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, 768 F. App'x 459 (6th Cir. 2019) (No. 18-5372 & 18-5388), 2018 WL 3311431, ECF No. 30 ("[T]he only logical, reasonable interpretation of the [lease] is that NGLs are 'oil and/or gas' produced from the [subject] wells.")

EQT further argues in a general fashion that other variations, such as those with respect to valuation location or quality of gas, preclude certification. Appellants' Br. 21, ECF No. 29. EQT's position is misplaced. Any variable of this nature relates to how much royalty is owed—not what EQT's royalty obligation is. Thus, these variables do not predominate over the core common issue of whether EQT's common payment methodology breached the common royalty obligation

owed under the class leases. Additionally, Plaintiffs' common damage model considers all variables affecting the royalty amount. JA6822-6847.

EQT's arguments also fail for yet another reason. While EQT claims that variations across the class leases destroy commonality and predominance, it treated all class leases the same irrespective any variations during the entire class period. To that end, EQT's actions not only show it views any alleged variation as immaterial to its royalty obligation, but also that its arguments are divorced from reality. The district court agreed, recognizing the contradictory and inherently inconsistent nature of EQT's arguments. JA4298-4299. Thus, EQT cannot credibly claim the district court abused its discretion when it pays royalties in a common manner across all leases without regard to any of the alleged variations upon which it now relies.

The district court's finding is also consistent with rulings from other courts who similarly found that variations in lease language do not preclude certification where royalty owners were treated identically regardless of varying lease language. *See Fankhouser v. XTO Energy, Inc.*, No. CIV-07-798-L, 2010 WL 5256807 (W.D. Okla. Dec. 16, 2010) (finding defendants' argument that commonality was defeated because of varying lease language "disingenuous" given defendants uniform treatment of the leases and that "variations in [BTU] content of the wells and lease language are immaterial given defendant's identical treatment of all class members for royalty purposes."); *Slamon v. Carrizo (Marcellus) LLC*, No. 3:16-CV-2187,

32

2020 WL 2525961, at *20 (M.D. Pa. May 18, 2020) (finding variations in lease language did not preclude commonality or predominance because the defendant used the same royalty calculation method for all leases regardless of contract language); *Freebird, Inc. v. Merit Energy Co.*, No. 10-1154-KHV-JPO, 2011 WL 13638, at *3-4 (D. Kan. Jan 4, 2011) (rejecting arguments against certification on grounds that "each lease is unique and must be individually construed based on the language" where defendant "calculated royalty payments for plaintiff and [] class members the same way"); *Eaton v. Ascent Res. - Utica, LLC*, No. 2:19-CV-3412, 2021 WL 3398975, at *10 (S.D. Ohio Aug. 4, 2021) ("The trouble with [defendant's] argument is that by grouping these leases together and treating them the same, [defendant's] conduct reveals that it views the variations in language as distinctions without a difference."); *Beer v. XTO Energy, Inc*., No. CIV-07-798-L, 2009 WL 764500, at *7 (W.D. Okla. Mar. 20, 2009) (finding predominance given the identical treatment by defendant in not differentiating how royalties are paid to class members based on lease language). The reasoning and logic of these cases apply equally here.

At bottom, language in the royalty clauses need not be verbatim for a lease class to be properly certified. Rather, the language need only be such that common issues predominate. Here, whether EQT's common method of paying royalties for NGLs breached its common obligation under the class leases is the predominant issue at the heart of every class member's claim. No variation in any of the leases

33

affects the ability for this issue to be determined on a classwide basis, nor does any difference in language otherwise eliminate commonality or predominance.

*Adair* does not compel a different conclusion. *Adair*, 764 F.3d at 347. Although EQT cites *Adair* for the proposition that a class cannot be certified when there is varying royalty language, Appellants' Br. 19, ECF No. 29, *Adair*'s holding is not so limited. The district court correctly recognized that *Adair* did not hold that variations in lease or deed language renders a class uncertifiable. Instead, *Adair* requires the district court to consider how variations in leases or defendants' conduct with respect to those variations relate to the overall litigation, including the assessment of the defendants' liability. JA4300. *See also Adair*, 764 F.3d at 363, 366-367. The district court properly conducted those evaluations and considerations here.

Unlike in *Adair*, where neither the plaintiffs nor the district court conducted a substantive analysis of the deeds at issue or even identified the number of deed variations, here, Plaintiffs categorized all class lease variations and demonstrated commonality among them in connection with the payment of NGL royalties. JA4301. This enabled the district court to evaluate and consider the common issues among class leases and whether those common issues predominate over any individual issues caused by the alleged variations. JA4301-4302. The district court further found that, unlike in *Adair* where commonality and predominance rested

solely on a quantitative inquiry of the number of common practices, these two elements existed here because of the qualitative effect of EQT's common conduct on the broader litigation. JA4302. This is because all class member's breach of contract claims are predicated upon the same theory of liability that EQT's uniform royalty payment method constituted a breach of the class leases, which permits the resolution of liability on a classwide basis notwithstanding any lease language variation. JA4303. Moreover, *Adair* lacked key common elements that are present here including a common royalty obligation, common and identical treatment of all leases, and standardized treatment across all leases irrespective of lease language. *Adair*, 764 F.3d at 366) ("EQT notes that it calculates royalties in different ways for different class members …").

5) The District Court Did Not Abuse Its Discretion in Finding Typicality and Adequacy Are Satisfied Because the Class Representatives Have Leases That Are Materially the Same as the Class Leases and Impose the Same Common Obligation on EQT.

EQT's argument that the class representative's leases are materially different is misplaced. While the Goshorn Ridge lease contains the word "dekatherm" when describing gas, the inclusion of that word in the lease does not defeat the lease's requirement that royalties are to be based upon "gross proceeds" "paid by third parties" and not on a sale "to a related entity of the Lessee." JA4714-4725. Specifically:

> Lessee covenants and agrees to deliver to the credit of the Lessor, its heirs and assigns, a royalty of {Royalty %} market value of oil (in barrels) and gas (as defined in dekatherms (1000 btu per mcf)) as measured at the wellhead **and other hydrocarbon substances** produced and saved from the leased premises and **paid by third parties**… **The royalty paid hereunder shall be based on gross proceeds received by Lessee** without deduction for expenses incurred by Lessee … Lessee shall attempt to sell at or above market price the production of all wells on such terms and conditions as Lessee, in its sole discretion may deem appropriate. **Such sale shall not be to a related entity of the Lessee . . .**

JA4714-4725. In this regard, EQT owes the same common royalty obligation to Goshorn Ridge as it does under the class leases.

EQT's assertion that Plaintiffs' expert and counsel admitted that the Goshorn lease requires payments on a BTU basis is not true. EQT takes these statements out of context to create an issue where none exists. Appellants' Br. 36, ECF No. 29. The statements cited by EQT are general statements, not specific to Goshorn Ridge, and the term "Goshorn Ridge" does not appear anywhere in the question or answer relied upon by EQT. JA4021, JA3942, JA3949-3950, JA549-550. Nonetheless, Plaintiffs have been true to their word and did not include any lease that allows for payment on a BTU basis in the class.

Nor is the Glover lease substantively different from the class leases because of any purported notice-and-cure provision. The district court previously ruled when it rejected EQT's Motion to Dismiss that notice was not a condition precedent to a

lawsuit under the Glover Lease. JA0119-0121. This ruling has not been appealed or overturned and remains the law of the case.

To the extent EQT is arguing that the possibility of other notice-and-cure provisions beyond that contained in the Glovers' lease preclude certification, this argument also fails. EQT has not identified any notice of default provision in any of the other class leases which it alleges is materially different from the notice of default provision in the Glover Lease. Nor has EQT offered any evidence to show how many class leases supposedly have any type of notice of default provision. And, as correctly found by the district court, the common issue of whether EQT breached the class leases by its common royalty method predominates the mere presence of any notice-and-cure provision in a class lease. JA4313-434; *see also Slamon*, 2020 WL 2525961, at *21 ("The presence of a notice and cure provision will not predominate over the common issues in this case as these terms do not alter the underlying claims."). The district further found that, even if notice was required, Plaintiffs' counsel's Notice of Default to EQT sent on behalf of the named Plaintiffs' and the class members satisfied any notice obligations. JA4313.

6)      The District Court Did Not Abuse its Discretion by Creating Sub-classes.

EQT's arguments regarding the sub-classes are completely misplaced. ***First***, as noted, the Goshorn Ridge Lease expressly requires royalties based on proceeds from third parties and prohibits royalties based on affiliate sales. Thus, the Goshorn

37

Lease contains the same common royalty obligation as all other class leases. The creation of this sub-class was also not error or an "inexplicable about-face." Appellants' Br. 36, ECF No. 29. EQT's citation to the statements of the district court and counsel are taken out of context as the court was asking what would occur *if* it found the Goshorn Lease allowed royalties to be paid on a BTU basis, and counsel's comments merely confirmed the fact that Plaintiffs class leases had excluded those EQT leases which expressly allowed for the payment of royalties based upon BTUs at the wellhead, instead of sales to third parties. Appellants' Br. 36, ECF No. 29. *Second*, the district court did not abuse its discretion by creating other sub-classes because, just as with the Goshorn Ridge Lease, the royalty obligation of the leases in the other sub-classes all contain the same royalty obligation, and the determination of liability and damages will be predicated on the common issue of whether EQT breached that obligation by its uniform conduct.

## B. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT THE CLASS WAS ASCERTAINABLE.

Plaintiffs class consists of royalty owners who: (1) received a royalty payment from EQT during the class period, (2) received that royalty payment pursuant to a lease relating to a well located in one of five West Virginia counties, and (3) have a lease with language identified in Plaintiffs' Class Lease Chart. JA4283-4284, JA4290-4291. These are objective facts and criteria.

38

Additionally, because Plaintiffs have already identified all class leases by lease number, identification of class members is a simple matter of linking each EQT royalty payment made during the class period to the EQT lease pursuant to which it was made, and then determining if the lease number matches one of the class leases. JA4486-4499, JA4541-4543. This linking is based on objective facts as EQT had to have determined that the royalty owner was being paid what was owed under each respective lease when EQT made each monthly royalty payment.

It is also administratively feasible for the court to determine whether a particular individual is a class member, and doing so will not require "extensive and individualized fact-finding or mini-trials." *Adair*, 764 F.3d at 358. All class members can be reliably identified from EQT's own business records, with any gaps in those records being completed by a reasonable matching of EQT's records with other readily available information. Indeed, EQT must possess the documents or means to identify the class members because this information was necessary for EQT to determine the amount and recipient for each royalty payment it made during the class period. JA4290-4291. From EQT's documents, the identification of all royalty payments made during the class period is readily known, and some of these royalty payments have already been linked to class leases. JA4481-4485. EQT was compelled to provide sworn Interrogatory answers linking the remaining royalty payments to a specific lease, but has not yet complied. JA339-355. EQT's eventual

39

compliance with the Discovery Order, as found by the district court, will enable the objective identification of all class members. JA4290-4291.

EQT should not be permitted to use its own failure to comply with the Discovery Order as a shield to argue that the class is not ascertainable. EQT was compelled to provide this information by May 10, 2023. JA610-617. On May 12, 2023, EQT then assured Plaintiffs it would provide this information within 30 days. JA4540. When EQT still did not provide the information, the district court extended the deadline August 24, 2023. JA1131-1135. But despite its obligations, EQT has neither complied with the Discovery Order nor given any indication it intends to do so. JA4473-4485.

The issue of whether EQT is required to provide, by Interrogatory answer, information linking EQT's royalty payments to leases has already been litigated and that decision is the law of this case. JA610-617, JA635-639. The Magistrate Judge found, and the district court upheld the finding, that EQT could—and should— provide Plaintiffs with the linking information via supplemental Interrogatory answers. JA610-617, JA635-639. EQT's arguments now concerning the feasibility and equities of complying with the Discovery Order are improper attempts to collaterally attack the Discovery Order, which has not been appealed and is not a proper subject of this appeal.

Identifying the class members here will not require "extensive and individualized fact-finding or mini-trials." *Adair*, 764 F.3d at 358. Linking royalty payments to leases is an everyday business activity of EQT. JA0533-535, JA0578, JA4481-4485. Indeed, EQT must ensure that each royalty payment is being made to the correct royalty owner and at the proper royalty percentage. JA0533-535, JA0578, JA4481-4485. All royalty payments have been associated with an owner identification and some have been linked to a class lease. JA4481-4485. Information necessary to link the remaining royalty payments, and thus determine class membership, is within EQT's business records and other readily available information.

The Magistrate Judge determined that EQT has the ability to provide this information, and after considering the parties extensive argument and evidence on the issue, found it was not burdensome. The unrefuted record here also establishes: (1) EQT is in possession of the information from which these links can be determined, particularly since EQT was the entity who made the royalty payments (JA4291, JA0533-535, JA0578); (2) EQT has admitted it has the ability and capability of providing this information and, in fact, has done so for some leases already (JA0533-535, JA0578, JA4481-4485); and (3) EQT has admitted it links royalty payments to leases as part of its ordinary course of business (JA0533-535, JA0578, JA4481-4485).

41

Given the above, there exists a reliable and administratively feasible method for determining class membership. As such, district court's finding of ascertainability was not an abuse of discretion. *See Kelly v. RealPage Inc.*, 47 F.4th 202, 224 (3d Cir. 2022) ("[A] straightforward "yes-or-no" review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources."); *Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 136 (S.D.N.Y. 2003) ("Even if MetLife is unable to run the database on the older statistical information, the class can be identified through an examination of the individual files of each of the participants. The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement.")

Just because this process may require review of individual files or be time-consuming is not a sufficient reason to find the class is not ascertainable. "There is no requirement that a class can be deemed ascertainable only if it can be perfectly generated at the touch of a button." *Yates v. NewRez LLC*, No. CV TDC-21-3044, 2023 WL 5108803, at *5 (D. Md. Aug. 9, 2023). "[T]he need to review individual files to identify its members" is also not a reason to deny class certification. *Byrd v. Aaron's Inc.*, 784 F.3d 154, 171 (3d Cir. 2015). Indeed, the ascertainability requirement "does not suggest that *no* level of inquiry as to the identity of class members can ever be undertaken" because "[i]f that were the case, no Rule 23(b)(3)

class could ever be certified." *Id*. If the need to manually review files or time considerations were dispositive of the issue, large corporations would effectively be immune from class actions "solely to the size of their businesses or the manner in which their business records were maintained." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 540 (6th Cir. 2012).

EQT's reliance on *Adair* is again misplaced. In *Adair*, this Court found ascertainability lacking, not because a manual review was needed to identify the full range of the class, but because there was not "even a rough estimate of the number of potential successors-in-interest" or "even a rough outline of the class['s] size and composition." *Adair*, 764 F.3d at 360. Here, all royalty payments with corresponding owner identification and all class leases have been identified. JA4481-4485 The only issue left is whether the royalty payment was paid pursuant to a class lease, which will be determined upon EQT's compliance with the Discovery Order. In *Adair*, the identification of the class members was also dependent upon a complicated process of resolving ownership based on land records over time which involved numerous complicating factors such as multiple heirships, intestacy, and title-defect issues. *Id*. at 359-60. Not so here. Here, the identification of all class members requires only the singular matter of EQT complying with the Discovery Order to provide information which it is both capable of doing and does in its regular course of business. JA0533-535, JA0578, JA4481-4485.

EQT's other arguments against ascertainability also fail. Plaintiffs have never admitted the class was not ascertainable, only that EQT's failure to comply with the Discovery Order made the class not yet fully ascertained. And, at class certification, Plaintiffs need not identify every class member. *Adair*, 764 F.3d at 358.

Nor do variations in the class leases render the class unascertainable. The class definition adopts and incorporates Plaintiffs' Class Lease Chart so membership can be objectively determined by a simple comparison of a potential class member's lease with the Class Lease Chart. As to the sub-classes, the district court identified which category of leases are included under each sub-class and, therefore, there is no subjective determination required to decide what lease falls under what sub-class.

Finally, EQT's argument that the exclusion of class members from the *Kay Company* case renders the class unascertainable likewise fails. As with other arguments, this is a manufactured issue searching for a problem where none exists. EQT has represented that the *Kay* leases were excluded from the royalty accounting data and datasets provided to Plaintiffs. JA1118-1120.

## C. PLAINTIFFS HAVE ARTICLE III STANDING AND ISSUES CONCERNING THE CALCULATION OF INDIVIDUAL DAMAGES DO NOT PREDOMINATE OVER THE CENTRAL, COMMON ISSUES IN THIS CASE.

EQT's standing arguments are legally and factually flawed. At class certification, standing is analyzed based on the allegations of the named plaintiffs. *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020). To establish

standing, a named plaintiff must have (1) "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," (2) "fairly traceable to the challenged action of the defendant," and (3) "likely . . . [to] be redressed by a favorable decision." *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009). Plaintiffs have met that standard.

Plaintiffs have not only plausibly alleged[18] an injury in fact (lower royalty payments) that is "fairly traceable" to EQT's breach of contract and sought relief that will address their injuries, but have also sufficiently established an injury in fact with reliable proof. Here, as discussed, Plaintiffs have submitted a preliminary calculation of the Glover Plaintiffs' damages in the amount of $50,214.22. JA4694. In response to Plaintiffs' Notice of Default, EQT also offered the Glover Plaintiffs $37,542.95, which EQT admitted represented the difference between what the Glover Plaintiffs were paid and what they would have been paid if EQT had paid royalties based on third party sales. JA3853.

---

[18] Courts in this district have found that at class certification standing is evaluated under the pleading-stage burden. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 141 (D. Md. 2022), *vacated and remanded sub nom In re Marriott Int'l, Inc.*, 78 F.4th 677 (4th Cir. 2023), and *reinstated by In re Marriott Int'l Customer Data Sec. Breach Litig.*, No. 19-MD-2879, 2023 WL 8247865 (D. Md. Nov. 29, 2023); *Wilson v. Eagle Nat'l Bank*, No. 8:20-CV-01344-JRR, 2023 WL 2478933, at *5 (D. Md. Mar. 13, 2023).

This evidence demonstrates an injury in fact and is dipositive of the standing issue. At this stage, Plaintiffs need only establish standing for the named Plaintiffs and are not required to show that every class member suffered concrete harm: "Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court [and] there is no further, separate 'class action standing' requirement." *Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770, 779 (4th Cir. 2023).[19]

Even if the Named Plaintiffs were required to show that every, or at least the vast majority of, class members had standing at this stage, they have done so.[20] As discussed, Plaintiffs have presented a common damage model demonstrating that the unnamed class members all sustained actual and comparable injuries. Using this

---

[19] EQT's reliance on *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) is misguided as *TransUnion* addresses Article III standing at trial, not at class certification, and further does not address the "distinct question" of whether each member of the class must demonstrate standing during class certification. *Id.* at 431 n.4.

[20] In *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 658-59 (4th Cir. 2019), this Court stated the existence of uninjured class members should not preclude certification where there was "not a large number of uninjured persons included within the plaintiffs' class." Here, Plaintiffs have sufficiently established that the class members suffered an actual injury and Defendants have failed to establish that any class member has not been injured, let alone that there is a large number of uninjured class members. Moreover, under West Virginia law, "bare infringement of a right, or the bare breach of a contract, though not accompanied by actual damage, gives a right to recovery of nominal damages . . ." *Beatty Lumber Co. v. W. Union Tel. Co.*, 44 S.E. 309, 312 (W. Va. 1903).

model, Plaintiffs' expert has attested that had EQT not breached the leases and instead paid royalties based on the sale to unaffiliated third parties, "royalties paid to royalty owners would have been much higher than what the EQT Defendants actually paid the royalty owners." JA4693, ATT1-24.

EQT's contention that Plaintiffs' damage model is flawed is misplaced. At class certification, Plaintiffs need only establish that damages are "*capable* of measurement on a classwide basis" through "a common, classwide *method* for determining individual damages," which, for the reasons previously discussed, they have done. *Comcast*, 569 U.S. at 34. Additionally, Plaintiffs' damage model considers all variables affecting the royalty amount in its common methodology. JA4692-4695, JA6822-6847. EQT's criticism of Plaintiffs' damage model that it does not do so is a merits issue beyond the scope of Rule 23. *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 47 (S.D.N.Y. 2018) (holding that the argument that "Plaintiffs' model fails to account for factual evidence of varied inflation . . . is an argument that goes to the merits of whether Plaintiffs can accurately demonstrate price impact and goes beyond the Rule 23 inquiry"). While EQT never moved to strike or limit Plaintiffs' damage expert before certification, if EQT contends that Plaintiffs' damage model is inaccurate, it is always free to cross-examine Plaintiffs' experts on these matters or move to exclude these opinions.

Nor did the district court abuse its discretion in finding that individual damage issues, if any, do not defeat predominance. Individual damage calculations generally do not defeat a finding that common issues predominate, particularly where, as here, liability can be disposed of on a classwide basis. *Comcast* 569 U.S. at 42 (Ginsburg, J., dissenting) ("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal."); *see also Stillmock*, 385 F. App'x at 274 ("Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."). In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations. *Gunnells v. Healthplan Servs., Inc*., 348 F.3d 417, 428 (4th Cir. 2003).

Any need for individualized inquiry into damages here does not preclude predominance. At issue are breach of contract damages which are not wrapped into individualized causation or liability issues. Each class member will also be able to use the same class-wide damage model to calculate their individual damages based upon EQT's records and information, which obviates the need for individualized discovery on each class member. The district court was also within its discretion to find that bifurcation could address individualized damage issues, if necessary, because liability can be determined independent of damages. JA4315.

## D.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CERTIFYING PLAINTIFFS' FRAUDULENT CONCEALMENT CLAIMS

Despite generalized concern about the individual nature of misrepresentations and/or reliance, there are at least three recurring situations where courts have found common issues predominant: (1) where reliance is common across the class; (2) where courts have excused a showing of individual reliance; and (3) where the underlying law does not require a showing of individual reliance. 2 Newberg and Rubenstein on Class Actions § 4:58 (6th ed).

The district court correctly concluded that West Virginia law does not require a showing of individual reliance in fraudulent omission cases.[21] In West Virginia, where fraud is based on concealment, it is the concealment of material facts inducing nonaction that constitutes fraud. *Kessel v. Leavitt*, 511 S.E.2d 720, 752–53 (W. Va. 1998). In *Kessel*, the West Virginia Supreme Court acknowledged that where concealment is at issue, it is "the active concealment of information from a party with the intent to thwart that party's efforts to conduct an investigation, relating to such information, [that] constitutes actionable fraudulent concealment." *Id.* at 753. It found more instructive the elements set forth in Restatement (Second) of Torts § 550 and case law in accord with those elements. *Id.*

---

[21] *Horace Mann Ins. Co. v. Gen. Star Nat. Ins. Co.*, 514 F.3d 327, 329 (4th Cir. 2008) ("[W]here there is West Virginia law addressing a particular question, we will follow it.").

In *Pocahontas Mining Co. Ltd. Partnership v. Oxy USA, Inc.*, 503 S.E.2d 258, 264 (W. Va. 1998), Justice Workman, concurring and citing West Virginia law, as stated in *Kessel*, Restatement (Second) of Torts § 550, and other supporting law, explained: "Obviously, one who is defrauded in this manner cannot possibly take any affirmative action to indicate reliance, since he knows nothing of the deception. Yet, it would be ludicrous to reward a fraudulent actor for his skill in perpetrating such a deception." *Id.* Her opinion correctly cites West Virginia law and is in accord with other courts. *See, e.g., Edens v. Goodyear Tire & Rubber Co.*, 858 F.2d 198, 206–07 (4th Cir. 1988).

Furthermore, Plaintiffs' fraudulent concealment claims do not raise material issues that preclude certification. The critical question is whether the omissions or reliance will vary materially across the class. Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment (39 F.R.D. 69, 103). When one or more of the central issues in the action are common and predominate, the action may be proper under Rule 23(b)(3) despite other important matters having to be tried separately, such as affirmative defenses peculiar to some individual class members. 7AA Wright & Miller Fed. Prac. & Proc. Civ. § 1778 (3d ed.). Courts in most circuits have adopted this approach despite some individualized affirmative defenses. 2 Newberg and Rubenstein on Class Actions § 4:55 (6th ed.).[22]

---

[22] *See, e.g., Skochin v. Genworth Fin., Inc.*, 2020 WL 6532833, at *24 (E.D. Va. Nov. 5, 2020) (collecting cases).

Here, neither EQT's omissions nor Plaintiffs' reliance vary materially. EQT owes a duty to each of its royalty owners to account for their royalties fully, accurately, and transparently that arises from the nature of and basis for their agreements, the relationship of the parties, and common and statutory law.[23] Each class member has a legal right to and must rely on EQT to fully and accurately report royalties. EQT holds all the information related to its royalty accounting and Plaintiffs must rely on EQT's honesty in its remittance statements. It is undisputed that EQT owed this duty. JA4318, JA6681-6682, JA6707-6708. It is also undisputed that EQT uniformly omitted all information relating to the production and sale of NGLs extracted from Plaintiffs' properties during the class period. EQT also concealed its scheme to sell Plaintiffs' NGLs at the well to itself, in an effort to hide from the class the production and sale of the extracted NGLs to avoid paying proper royalties. EQT engaged in this common scheme and pattern of omission as to all leases and all class members.

The authority cited by EQT does not impede certification. The holding in *Adair*, 764 F.3d 347, was not that fraudulent concealment claims can never be

---

[23] *Lopinsky v. Hurvitz*, 105 S.E.2d 593, 594-595 (W. Va. 1920); *Swearingen v. Steers*, 38 S.E. 510 (W. Va. 1901); W. Va. Code § 37C-1-1; 37 Am. Jur. 2d Fraud and Deceit § 199; Restatement (Second) of Torts § 551 (Am. L. Inst. 1977); J. Thomas Lane, *et al.*, *Grounds for an "Accounting" and Application to Specific Relationships*, 27 E. Min. L. Found. § 8.05 (2007).

determined on a classwide basis. Rather, citing *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311 (4th Cir. 2006), this Court explained that a plaintiff's knowledge under Virginia law "typically" requires individual evidence, which will "frequently" defeat Rule 23's requirement. *Id.* at 370. Unlike the class members in *Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331 (4th Cir. 1998),[24] the class members here were treated the same regardless of lease language. EQT omitted all information relating to NGLs from each class member's remittance statement, and every class member had to necessarily rely on EQT for transparency and to fully and accurately account for royalties. Unlike the class in *Zimmerman v. Bell*, 800 F.2d 386 (4th Cir. 1986), the class here has no alternative means of information for EQT's royalty accounting.

At bottom, common issues predominate particularly in relation to whether EQT had a duty to disclose and, if so, whether its royalty statements, which were the same in form and substance, were materially misleading by omission. It is also unlikely that material individual reliance issues will be raised. The focus is and should remain on predominance because even if a few class members might have discovered EQT's omissions, individual issues would still not predominate.[25] The district court correctly concluded that individual reliance issues and EQT's

---

[24] *See Gunnels*, 348 F.3d at 437 n.12 (4th Cir. 2003) (noting individual issues need not overwhelm the common issues in every case).

[25] *See, e.g., Torres v. S.G.E. Mgt., LLC*, 838 F.3d 629, 645-46 (5th Cir. 2016).

affirmative defenses did not impede certification. Finally, the district court's award of summary judgment on the merits, after certification, against the named Plaintiffs who were astute enough to discover EQT's omissions (JA4434-4451, JA4452-4472), should not defeat predominance where EQT's fraudulent omissions as to the remaining class members was common in both form and substance.

## V.     CONCLUSION

Because the district court did not abuse its discretion, its Certification Order should be affirmed, and EQT's appeal should be denied.

Dated:  February 7, 2024

*/s/ Clayton J. Fitzsimmons*
Robert P. Fitzsimmons
Mark A. Colantonio
Clayton J. Fitzsimmons
Robert J. Fitzsimmons
Christine Pill Fisher
FITZSIMMONS LAW FIRM PLLC
1609 Warwood Avenue
Wheeling, WV  26003
(304) 277-1700

*/s/ Marvin W. Masters*
Marvin W. Masters
April D. Ferrebee
MASTERS LAW FIRM, LC
181 Summers Street, 4th Floor
Charleston, WV  25301
(304) 342-3106

*Counsel for Appellees*

## VI.    CERTIFICATE OF COMPLIANCE

1.     This document complies with type-volume limits because excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

this document contains <u>12,980</u> words.

2.     This document complies with the typeface requirements because:

this document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14-point Times New Roman</u>

Dated:  February 7, 2024

<i>/s/ Clayton J. Fitzsimmons</i><br>
Robert P. Fitzsimmons<br>
Mark A. Colantonio<br>
Clayton J. Fitzsimmons<br>
Robert J. Fitzsimmons<br>
Christine Pill Fisher<br>
Fitzsimmons Law Firm PLLC<br>
1609 Warwood Avenue<br>
Wheeling, WV  26003<br>
(304) 277-1700

<i>/s/ Marvin W. Masters</i><br>
Marvin W. Masters<br>
April D. Ferrebee<br>
Masters Law Firm, LC<br>
181 Summers Street, 4th Floor<br>
Charleston, WV  25301<br>
(304) 342-3106

<i>Counsel for Appellees</i>

## VII.   CERTIFICATE OF FILING AND SERVICE

I hereby certify that on February 7, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

*/s/ Clayton J. Fitzsimmons*
Robert P. Fitzsimmons
Mark A. Colantonio
Clayton J. Fitzsimmons
Robert J. Fitzsimmons
Christine Pill Fisher
FITZSIMMONS LAW FIRM PLLC
1609 Warwood Avenue
Wheeling, WV  26003
(304) 277-1700

*/s/ Marvin W. Masters*
Marvin W. Masters
April D. Ferrebee
MASTERS LAW FIRM, LC
181 Summers Street, 4th Floor
Charleston, WV  25301
(304) 342-3106

*Counsel for Appellees*