No. 23-2204

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

WILLIAM D. GLOVER, LINDA K. GLOVER, his wife, RICHARD A. GLOVER, CHRISTY L. GLOVER, his wife; GOSHORN RIDGE, LLC, Individually, and on Behalf of All Others Similarly Situated,

*Plaintiffs-Appellees*

v.

EQT CORPORATION, a Pennsylvania corporation, EQT PRODUCTION COMPANY, a Pennsylvania corporation, EQT ENERGY, LLC, a Delaware limited liability company,

*Defendants-Appellants*

On Appeal
from the United States District Court for the Northern District of West Virginia,
No. 5:19-cv-223 (Bailey, J.)

## REPLY BRIEF OF DEFENDANTS-APPELLANTS
## EQT CORPORATION, EQT PRODUCTION COMPANY,
## AND EQT ENERGY, LLC

Lauren W. Varnado
**Michelman & Robinson, LLP**
717 Texas Avenue, 31st Floor
Houston, Texas 77002
(713) 422-2121

Jennifer J. Hicks
**Babst, Calland, Clements and Zomnir, P.C.**
300 Summers Street, Suite 1000
Charleston, West Virginia 25301
(681) 205-8888

*Counsel for Defendants-Appellants*

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................1

ARGUMENT ................................................................................1

I.    There Is No "Common Royalty Obligation" in the Over 3,700 Class Leases, and Lease Differences Prove a Lack of Commonality and Predominance.....1

    A.    The Class Leases Are Not Uniform. ....................................3

    B.    The District Court Cannot Ignore Class Lease Language....................8

    C.    A Uniform Payment Methodology Is Not Uniform Breach of Contract. ............................................................15

II.    The Class Has Not Been and Cannot Be Ascertained.................................16

III.    Certification of the Fraudulent Concealment Claim Must Be Reversed.......19

CONCLUSION ...........................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bear Brand Hosiery Co. v. Tights, Inc.*,
  605 F.2d 723 (4th Cir. 1979) .............................................................13

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
  155 F.3d 331 (4th Cir. 1998) ....................................................8, 9, 11

*Cram v. Sun Ins. Office, Ltd.*,
  375 F.2d 670 (4th Cir. 1967) .............................................................14

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) ....................................................*passim*

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) ..............................................................19

*SWN Prod. Co. v. Kellam*,
  875 S.E.2d 216 (W. Va. 2022)................................................11, 12, 13

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...........................................................................1

**Other Authorities**

Federal Rule of Civil Procedure 23 ................................................1, 8, 10

## **INTRODUCTION**

This Court should reverse the district court's certification order based on four fundamental class certification requirements: (1) a district court must perform a "rigorous analysis" before certifying a class under *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); (2) plaintiffs must ***affirmatively prove*** that class certification is appropriate; (3) there must be common answers to questions that will materially advance the litigation; and (4) claims must be capable of resolution on a classwide basis because of commonality, typicality, and predominance.

Instead of reckoning with these requirements, the Response Brief of Appellees (the "Response") tries to mask the district court's failure to conduct a rigorous analysis of Rule 23's requirements by simply pointing to conclusory statements in the certification order itself. It is not enough simply to recite conclusory findings from the district court's order and then conclude that the requirements of Rule 23 are met. Appellees must demonstrate specifically ***how*** their claims fit within Rule 23. Here, they cannot and do not.

## **ARGUMENT**

### I.    **There Is No "Common Royalty Obligation" in the Over 3,700 Class Leases, and Lease Differences Prove a Lack of Commonality and Predominance.**

The district court certified Appellees' breach of contract claim, in which Appellees allege that EQT underpaid NGL royalties due under the Class Leases. Appellees' argument in defense of certification rests entirely on the notion that EQT

owes a "common royalty obligation" under more than 3,700 Class Leases. According to Appellees, EQT was required to pay NGL royalties based on the gross sales price received from a downstream unaffiliated[1] third-party sale for refined NGL products, "irrespective of lease language[.]" Response at 2.

Without ever specifically addressing Class Lease Language, the district court strictly construed each Class Lease against EQT and summarily ruled that the Class Leases "required royalties to be paid on third party sales[,]" somehow transforming countless variations in express lease language into one uniform implied obligation to pay NGL royalties as Appellees demand. Response at 23-24; *see* JA4297. The district court also never discussed Class Lease language regarding the deduction of post-production costs but designated two subclasses based on whether the Class Leases "do not provide for any post production deductions" or "do provide for post production deductions, but do not meet the requirements of *Tawney*[.]" JA4430. And thus, EQT is said to have a "common royalty obligation" under each of the over 3,700 Class Leases, irrespective of lease language.[2]

---

[1]      Appellees spend much time arguing that affiliate transactions are never permitted. Response at 15-19. Not only are Appellees incorrect as to the state of the law in West Virginia, *see* Opening Brief of Appellants ("Brief") at 38-39, Appellees conveniently ignore Class Lease language that expressly contemplates affiliate transactions. *See* JA6853-JA6855 (forms BBB3, C15, G, G-1, PPPP, Y_C15, U-27, and Y); *see also id.* (forms C15, C1.5A, C1.5B, C2, C5, I, and C1, which refer to a "bona fide third-party purchaser").

[2]      Both the district court and Appellees ignore important provisions in the Class Leases that are fatal to class certification, including notice and cure provisions.

### A.      The Class Leases Are Not Uniform.

Appellees acknowledge that the Class includes more than 3,700 leases, which Appellees inexplicably state have been divided into seventy categories, "which have been further grouped into thirty-three equivalent categories of royalty provisions" but actually "fall into two categories: 'proceeds' or 'market value.'" Response at 19. However, the evidence is clear that the Class Leases are far from uniform. The Class includes thousands of individual leases with thousands of lessors. The Class Leases were entered into at different times. Some were negotiated and drafted by EQT more

---

Specifically, as to the notice and cure provision in the Glover Lease and notice provisions in other Class Leases, Appellees do not pretend to have analyzed whether each lease in the Class contains a notice provision, waving the issue off as irrelevant because the vague notice provided by the Glovers—after they filed the underlying lawsuit—was sufficient to provide pre-suit notice on behalf of the entire Class. Response at 36-37; JA0120-JA0121.

In a last-ditch effort to sell this argument, Appellees claim that "EQT has not identified any notice of default provision" in any other Class Lease that is "materially different from the notice of default provision in the Glover Lease." Response at 37. Again, Appellees misstate the facts. EQT provided a summary of different notice and cure provisions in the Class Leases in Exhibit 20 to Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification. The notice provisions in the Class Leases contain materially different terms with different specificity requirements for notice and the time for EQT to cure. *See, e.g.*, JA4023-JA4024. Some leases require the lessor to provide written notice by registered mail; other leases do not. *Id.* The notice provisions also vary in terms of the time allowed for EQT to cure any alleged default, ranging between ten and ninety days. *Id.* Importantly, none of the notice provisions in the Class Leases say that the required notice may be provided to EQT *after* a lawsuit is filed, which is what the Glovers did here. If the district court had analyzed the effect of the contractual notice provisions in the Glover Lease and other Class Leases, it would have concluded that differences in notice requirements are individual issues that make certification inappropriate.

than a decade ago. Some were negotiated and drafted by other operators and recently acquired by EQT. *See* Brief at 7-9. Despite Appellees' misleading lease chart, the Class Leases are not of a certain form, nor do the leases fall within discernable categories.[3] Indeed, many "categories" include only one or two leases, negating Appellees' contentions that these are "form" leases.[4] The leases are different contracts, made at different times, with different people.

One example of a material variation in the Class Leases is the basis of valuation (*i.e.*, pricing) and the point of valuation for royalties, which, as demonstrated below, varies significantly in the leases:[5]

- RRR: "field market price for …gas"

- BB1: "proceeds of all natural gas liquids"

- N1: "proceeds […] actually received by the working interest owner"

- LL1: "market price for […] gas […] sold off the premises [and

---

[3]      One of many examples of this is form N, which purportedly requires royalties based on "proceeds" meaning "the sums actually received by the working interest owners of the well […] from the purchaser […] of Oil and Gas at the wellhead[,]" but some individual leases within this category cap royalties, while others expressly reference NGLs but do not require a separate NGL royalty, and still others separately reference "gas and gaseous substances" and all of the leases expressly disclaim the application of implied covenants. Notably, forms N2, N2.5, and N3 also contain variations of the above. *See* JA6923-JA6924.

[4]      *See* JA6853-JA6855 (forms BB, BB1, BBB3, C5, DD1, F, I, II3, III, III1, J, N2A, PPPP (4), S5, TT1, TT Variant, TT5, LL, XXX, KK, U-27, L1.75B).

[5]      The list is not comprehensive; there are additional variations in pricing in other Class Lease forms.

marketed] in Hope Natural Gas Company pipe line"

- TT1: "if measured and sold at the well […] price received by the Lessee" or "if not sold at the well, then at the time gas is first marketed from each well […] the royalty price for such well shall be established as [%] of the wellhead price then being paid by Lessee to producers in the general producing area of the leased premises for like gas from the same geological formation"

- UU: "value at the well of the gas […], the product from which is marketed and used off the premises, said gas to be measured at a meter set on the farm"

- Y: "market price at the well shall not exceed the amount realized by Lessee for such gas computed at the well. Payment for royalties in accordance herewith shall constitute full compensation for the gas and all of its components."

- BBB3: "market value" "at the specified location and by reference to the gross heating value [measured in BTU] and quality of the gas"

- KK1: "wholesale market value which is based on the average current price paid by the Lessee to independent operators in this general area, computed at a 10 ounce pressure basis above 14.7 lbs. atmospheric pressure."

- YY1 and YY: "wholesale market value [of gas] at the well based on the usual price paid therefor in the general locality of the leased premises"

- A and A1: various individual leases contain different variations including "gross sales price" for "Oil and Gas" versus "market value as herein described at the wellhead" for "gas and gaseous substances."

- AAA: requires "wellhead price" for "gas marketed and used off the premises" but also on "the field market price paid at the wellhead by the principal utility company operating in the general area of the leased premises for gas of like kind and quality, and on the same basis that such utility company would pay for such gas, including any escalation in price that such utility company would pay for such gas if a contract for the sale of the same had been entered into at the time of initial production" for any gas that the lessee does not sell "to others[.]"[6]

Additionally, other Class Leases evidence that the parties negotiated revisions to the point of valuation.[7]

Other variations ultimately destroy Appellees' "uniform" damages

---

[6]    JA6853-JA6855; JA6909-JA6935.

[7]    *See* JA6855 (form C5 requires royalties on "gross production ***at the wellhead***"); JA6921 (some form L1.75 leases require royalties be based on "comparable arm's length sales in terms of quality and quantity and ***in closest proximity to the leased premises***"); JA6854 (form BBB3 requires royalties on market value of gas or processed liquids "***at the inlet to the processing plant***").

calculation methodology, to the extent that the leases expressly allow for the deduction of post-production costs[8] or taxes[9] or otherwise contain express terms that make Appellees' damages model impossible to uniformly apply to all class members.[10] Contrary to Appellees' unsupported argument in the Response that variations relating to "well quality or value location" only affect "the amount of royalty," these variations destroy commonality and predominance.[11]

---

[8]      *See* JA6853-JA6855 (forms G, G-1, PPPP); JA4430-JA4431 (all Subclass B in the Clarifying Order). *See also* JA6853-JA6855 (forms KK1, L1.5, P1, PPPP, RRR, S1, TT1, WW, and S, none of which are "at the well" leases).

[9]      *See* JA6853-JA6855 and JA6910-JA6935 (forms A, A1, AAA, C15, C2, DD1, G, G1, J, N2A, V, Y_C15, N, N2, N2.5, N3, PPPP).

[10]      For example, forms BB1, C5, II(1), N2A, S1, and S require individualized analysis regarding when and where certain hydrocarbons become marketable; N2A and S1 tie deductions to marketability; S1 caps royalties; and C1.5B disclaims any payments before December 1, 2013. JA6910- JA6935. Notably, if any costs or taxes may be deducted or if any unique pricing, caps, or other payment analysis must take place, Appellee's purported uniform damages calculation methodology is immediately rendered unworkable. This is in addition to the issues raised by EQT's expert, Lesa Adair, regarding individualized issues related to gas quality for each well, the flow paths of the gas, processing plants' differing efficiency levels, bypass and storage practices, sold volumes, and costs, including used gas, which will vary over time and for each owner, and not only goes to damages, but also to the interpretation and EQT's compliance with class leases, defeating predominance and precluding class certification. JA4974-JA4976. Nor does it include the fact that the deduction of any NGL related costs may ultimately mean that individual class members may be harmed by Appellees' claims. JA3936; JA4757.

[11]      Appellees argue that these "other textual variations" in the leases do not preclude certification, but the only "evidence" cited by Appellees in support is the district court's conclusory finding that "there are few if any differences as claimed by EQT." Response at 10 (quoting district court's certification order). Notably, the district court does not identify the "few" differences in lease language or otherwise explain or analyze why these differences did not "negate EQT's common royalty obligation" in either of its certification orders.

**B.**     ***The District Court Cannot Ignore Class Lease Language.***

Normally, these many variations in lease language would be fatal to class certification—a court cannot certify a contract claim based on materially different contracts. *See Broussard v. Meineke Disc. Muffler Shops, Inc*., 155 F.3d 331, 340 (4th Cir. 1998) (plaintiff must show defendant has same contractual obligation to every member of the class to satisfy Rule 23 requirements for certification of breach of contract claim). Appellees know this. That is why at the district court, Appellees

---

Nonetheless, for each of the wells and leases in the Class, the following individualized evidence, at minimum, would be required: (1) Does the Class Lease contain NGL royalty language? (2) Does the Class Lease contain any other language about NGLs or plant products? (3) Does the Class Lease require pre-suit notice? If so, what is the time-period for EQT to cure any alleged default? (4) Does the Class Lease contain language allocating post-production costs? (5) Does the Class Lease prohibit affiliate transactions? (6) Does the Class Lease define "gas" or other produced hydrocarbons? (7) What is the point of valuation (*e.g.,* at the well, at the point of sale, at the interconnection of the interstate pipeline, etc.) of the gas royalty? (8) Does the Class Lease include a provision waiving implied duties and/or the implied duty to market? (9) Does the Class Lease contain a provision with an express duty to market? (10) Did the NGL content of the gas produced under the Class Lease exceed 4.9 GPM in each month of production from 2010 to January 1, 2021? (11) Does the owner of the Class Lease own an interest in any well(s) that was part of the prior class litigation settlement in *Kay Co.*? (12) Has ownership in the well remained the same since EQT acquired it? (13) How are any gaps in ownership of the well from the time EQT acquired the Class Lease to January 1, 2021 going to be resolved? (14) Is the Class Lease "*Tawney*-compliant"? (15) Is the Class Lease a "dekatherm" lease? (16) What is the basis of valuation (*e.g.*, gross proceeds, market value, amount realized, etc.) of the gas royalty? (17) Did the owner(s) have individual communications with EQT about their royalty payments? (18) Did the owner(s) have individual communications with an attorney(s) about their lease and/or royalty payments? (19) Did the owner(s) review and rely on their royalty remittance statements? (20) Did the owner(s) receive notice of class settlement in the prior class litigation *Kay Co.* that explained how EQT calculated and paid NGL royalties?

-8-

argued that Class Leases are "ambiguous" so the district court would "interpret" all 3,700 leases with one broad stroke. Now realizing their blunder in light of *Kellam's* directives, Appellees change course and argue that unidentified "plain and unambiguous language" in every Class Lease imposes a "common royalty obligation" to pay NGL royalties in the particular manner demanded by Appellees. *See* Response at 19 ("[T]he Class Leases impose a common royalty obligation on EQT to pay NGL royalties based upon the proceeds received from the sale of NGLs to third parties in an arm's length transaction.").

The Response postures, on the one hand, that the district court did not "hav[e] to resort to an individualized lease examination," yet, on the other hand, that the "plain and unambiguous" Class Lease language requires the NGL royalty payments they demand. Response at 12, 19. Regardless, neither the district court nor Appellees identify what "plain and unambiguous" Class Lease language is contained in every Class Lease that purportedly imposes a common obligation on EQT to separately pay royalties based on a gross downstream third-party sales price for refined NGL products.

Where, as here, the underlying contracts contain materially different terms, a class cannot be certified. "[P]laintiffs simply cannot advance a single collective breach of contract on the basis of multiple different contracts." *Broussard*, 155 F.3d at 340. Appellees had the burden of proving that all the Class Leases require NGL

-9-

royalties to be paid the same way and, more specifically, the way demanded by Appellees. Although Appellees asked for and received all the leases in discovery, they made no attempt to show all the leases impose the same obligation[12] to pay NGL royalties.

Notably, as explained in Appellants' Brief, Appellees' theory of uniform interpretation necessarily depends, either explicitly or implicitly, on the existence of an implied duty to market. Brief at 12, 23-26. To determine whether the requirements of Rule 23 are met, the Court must consider the merits of Appellees' claim of an

---

[12]     Appellees' lease chart is riddled with errors. By way of example, Appellees claim in the Response that they removed all leases from the Class that require payment on a BTU basis. Response at 36. That is not true. Multiple lease forms provide for payment of royalties on gas on a BTU or dekatherm basis. *See, e.g.*, JA6919 (form JJ: royalties due on "natural gas and natural gas constituents" based on "the first of the month index price for natural gas applicable to the first interstate pipeline into which the natural gas is delivered"); JA6920 (form L1: royalties due on "market value of oil and gas (as defined in dekatherms ((1,000 btu per mcf)) at the wellhead"); JA6921 (form L1.5: royalties due on "market value of oil and gas (as defined in dekatherms ((1,000 btu per mcf))).

Other categories, including all of TT Variant, XXX, and KK are entirely excluded because the leases included in those categories were all amended to expressly excluded royalty language. Others like Q, R, TT5, Y1.75A, Y1.25, V1, LL, OOO, C4, and CA are excluded in their entirety because those leases all contain arbitration or venue clauses. *See* JA6853-JA6855.

Appellees argue that EQT has never put forth arguments regarding individual lease language and the basis for Defendants' position that it properly paid NGL royalties. *See* Response at 19. Again, this is not true. Appellees moved the district court to compel EQT to review the leases and prepare a comprehensive lease review chart for Class Counsel, which contains argument regarding each of Plaintiffs' lease categories (and others that Plaintiffs ultimately removed from the class). *See* JA6910-JA6935. Defendants' Class Lease Language List, JA6910-JA6935, is much more accurate and comprehensive than Plaintiffs' List, JA6853-JA6855.

implied duty to market. *Broussard,* 155 F.3d at 340. Not only do Appellees place the merits of the implied duty to market in issue when they try to use *Wellman* and *Tawney* to avoid the individual lease analysis that would bar certification of their breach of contract claim, *see* Response at 15-16, the district court specifically cited case law on the implied duty of marketability as the basis for certifying the breach of contract claim. *See, e.g.*, JA4297-JA4298 (citing *Naylor Farms, Inc. v. Chaparral Energy, LLC*, No. Civ-11-0634-HE, 2017 WL 187542 (W.D. Okla. Jan. 17, 2017) as support for certification of breach of contract claim).

However, the implied duty to market provides no basis for certification of contract claims where, as here, the leases (1) expressly waive/negate the existence of implied duties, including the implied duty to market,[13] (2) include contractual provisions expressly addressing pricing or the point of valuation or the allocation of post-production costs such that "the implied covenant of marketability is clearly inapplicable,"[14] and/or (3) depend upon statutory construction to determine the

---

[13]  *See, e.g.*, JA5068-JA5071 (EQT's expert, Kris Terry, discusses Class Lease forms that contain market enhancement clauses and waivers of implied duty to market); JA6855 (form KK provides "[t]he time and method of marketing gas produced from any well or wells on the leased premises . . . and the amount thereof that shall be used or marketed within any period of time *shall be entirely at the discretion of the Lessee*"). The Glover Lease also expressly "waives any implied covenant to drill, prevent drainage, further develop or market production during the Primary Term that maybe imposed on Lessee." JA0715.

[14]  *See supra* at 4-6; *see also SWN Prod. Co. v. Kellam,* 875 S.E.2d 216, 226 (W. Va. 2022); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 367 (4th Cir. 2014) (noting that "an express lease term—e.g., authorizing a particular postproduction charge—

-11-

royalty owed.[15]

Appellees assert that the district court did not "hav[e] to resort to an individualized lease examination," Response at 12, but certainly the district court was required to analyze the breach of contract claim it was certifying. The district court's certification order fails to analyze or even discuss how any of the claims for breach of contract could be tried on a classwide basis.

Appellees rely on and cite to Justice Hutchison's concurring opinion in *Kellam*, virtually ignoring the majority opinion and its directives regarding lease interpretation. Appellees' repeated citations to the concurrence, without qualification or reservation, are not only misleading but also unhelpful to Appellees, as *Kellam* makes clear that the district court erred in ignoring lease language generally and in certifying subclasses with "*Tawney*-compliant" limitations, which compel the individualized lease review that Appellees have desperately tried to avoid.

Appellees do not, and cannot, cite any case that stands for the proposition that when interpreting a contract, the court may entirely disregard the language of that contract. Indeed, *Kellam* generally directs that, in interpreting oil and gas lease

---

supersedes any implied duty under the rule").

[15]     *See, e.g.*, JA6855 (form U-27). "[T]he implied covenant to market does not append itself to statutes[.]" *Kellam*, 875 S.E.2d at 224 (quoting *Leggett v. EQT Prod. Co.*, 800 S.E.2d 850, 861 (W. Va. 2017)).

-12-

provisions, the court must look to the individual lease at issue and other relevant evidence. 875 S.E.2d at 226. Analysis as to "whether a lease is 'particular' enough in listing the costs to be deducted will necessarily be different with regard to each contract[,]" as the question "is tied directly to the specific language of the lease and, if ambiguous, the parties' intent in contracting." *Id.* at 228. Thus, even assuming *arguendo* that the Class Leases are ambiguous,[16] the Court must consider extrinsic evidence to determine the intent of the parties. Intention of contracting parties is a question of fact, and "[i]f there is more than one permissible inference as to intent to be drawn from the language employed, the question of the parties' actual intention is a triable issue of fact." *Bear Brand Hosiery Co. v. Tights, Inc.*, 605 F.2d 723, 726

---

[16]    Recognizing that ambiguity in the Class Leases is fatal to certification of their breach of contract claim, Appellees claim that they "have never admitted the class leases are ambiguous." Response at 22. This is not true. Appellees moved for summary judgment on class lease language based entirely on their contention that the Class Leases are ambiguous and require extrinsic evidence. Indeed, Plaintiffs represented to the district court: (1) "[T]here is no clear and unambiguous language in any Class Lease" about the meaning of the term "sale"; (2) "There is no clear and unambiguous language in any of the Proceeds Class Leases" that prohibits affiliate transactions; (3) "Any royalty provision relating to proceeds received from the sale of NGLs 'at the well' or 'at the wellhead' is also ambiguous"; (4) "[T]he market value Class Leases are ambiguous. . . . EQT's conduct [further] renders these leases ambiguous"; (5) "Class lease categories A, L1.75, NN, UU, UU3 Variant, YY, II(1) Variant, II(2), II(2) A Variant and N2A Variant are also ambiguous in their use of the phrases 'at the wellhead'"; (6) The phrase "market value" in Class Lease categories KK and KK1 "is ambiguous too"; (7) Lease categories N, N2, N3, and N2.5 are "ambiguous because they state that the 'proceeds' shall not include any sums deducted by said purchaser or purchasers"; and (8) Lease category C1 is "conflicting and ambiguous regarding deductions from royalties on NGLs[.]" JA4588- JA4597.

(4th Cir. 1979); *see also Cram v. Sun Ins. Office, Ltd*., 375 F.2d 670, 674 (4th Cir. 1967) ("[T]he intent of the parties to an ambiguous contract is a question of fact[.]").

Accordingly, regardless of Appellees' flip-flop about whether the "plain language" of the leases requires a higher royalty or whether the leases are ambiguous, Appellees cannot avoid the fact that leases must be examined on an individual basis, taking the entire contract into account. Either the Class Leases are not ambiguous and each and every lease must be examined to determine the royalty required by its "plain language" or the Class Leases are ambiguous and each and every lease must be examined to determine the parties' intent, based on the individual lease language and potentially other extrinsic evidence. Under no circumstance can individual lease language be ignored.

Here, there is no commonality given the differences in the operative provisions of the Class Leases and there is no common implied duty of marketability under the Class Leases. Neither Appellees in the Response nor the district court in certifying the Class engaged in any substantive analysis of the lease terms, much less the express disclaimers of implied duties in many of the leases, to determine whether language variations destroy the possibility of resolving the alleged common question of breach on a classwide basis.

Appellees' breach of contract claims cannot be tried under theoretical obligations under West Virginia "oil and gas law," as they contend in the Response.

The claims must be tried on the negotiated terms contained in the individual Class Leases. The Response fails to provide any justification for Appellees' persistent ignorance of the language in the Class Leases that plainly defeats their breach of contract claim. All other issues aside, Appellees' failure to prove that each Class Lease imposes the same obligation to pay NGL royalties in the manner demanded by Appellees precludes class certification of the breach of contract claim. *Adair*, 764 F.3d at 367 ("It [i]s the plaintiffs' burden to demonstrate commonality on the implied duty of marketability. . . . Yet they have made no attempt to do so.").

### C. *A Uniform Payment Methodology Is Not Uniform Breach of Contract.*

As expected, Appellees also try to avoid the problem of lease variation by arguing that EQT employed a "uniform payment method" for NGL royalties. Response at 3. According to Appellees, this "uniform methodology" is more important than "textual variations in the class leases." *Id.* at 10. Appellees equate "uniform payment method" to ***uniform breach of contract***, arguing that they are somehow relieved of their burden to prove that each Class Lease was breached. Appellees do not cite any legal authority to support their contention that lease language does not matter because there is no such case. Appellees contend that EQT owed a "common royalty obligation" based on the "plain and unambiguous language" of the Class Leases, but they failed to identify language in any Class Leases that allegedly imposes a uniform obligation on EQT to calculate and pay

-15-

NGL royalties as Appellees demand.

As explained in Appellants' Brief, this Court has previously explained that a common royalty payment method is not enough to satisfy the requirements for class certification where there is varying lease language – common practices do not result in common liability when differing contractual language is at issue. *See Adair*, 764 F.3d at 367; Brief at 29-35. Appellees' reliance on an alleged uniform payment methodology to avoid review of the 3,700 individual Class Leases and prove breach of contract in one fell swoop is simply a red herring.

## II.    <u>The Class Has Not Been and Cannot Be Ascertained</u>.

Appellees admit that they have not ascertained and cannot ascertain the Class, but nonetheless, argue that the Class is ascertainable because the district court ordered EQT to review county land records to ascertain it. Response at 39-40. The Response ignores the district court's clear error in ordering EQT to create records to try to ascertain the Class for Class Counsel. Appellees apparently fail to understand that it was their burden—not EQT's burden—to prove that the district court "can readily identify the class members in reference to objective criteria." *Adair*, 764 F.3d at 358.

Appellees do not even attempt to explain in the Response how the district court will determine Class membership, including how the court will resolve gaps in lease ownership over time, much less did Appellees put forth any evidence to

support that making these determinations is administratively feasible.[17] In fact, the record evidence proves that it is not administratively feasible using EQT's records. *See generally* JA0532-JA0535; JA4481-JA4483. EQT submitted evidence that determining ownership of the Class Leases over time is "a manual process that requires cross-referencing multiple records and conducting independent research." JA0534. The process to connect each royalty payment to a specific well to a specific lease to a specific owner from 2012 to date—which is what the magistrate judge ordered EQT to do—requires step-by-step research on an individualized owner-by-owner basis that is extremely time-consuming and expensive. JA0533-JA0535; JA4482-JA4483. Not only this, but EQT cannot perform this work using only its own records, as it acquired many of the leases and wells at issue from other operators and, therefore, must necessarily resort to review of county land records to create the linkage requested by Appellees. JA4483; JA0534.

Appellees flatly ignore the record in arguing that none of the complicating factors in determining ownership over time in *Adair* exist in this case. Response at

---

[17]    Appellees submitted an alleged "damages model" with the Response from their expert Donald Phend that only provides further proof that the Class is not ascertainable. In his original report, Mr. Phend says that he is "unable to determine (for many payment items) whether that payment is in the class or excluded from the class." ATT0016. But, according to Mr. Phend, the problem will be resolved when "EQT provides this [additional linking] information[.]" *Id.* In his Supplemental Report, Mr. Phend admits that he still cannot calculate "Category II Payments" until EQT provides the so-called "linking information." ATT0022.

43. But just like in *Adair*, "ownership of the gas estate has not been static" since EQT acquired each Class Lease. 764 F.3d at 359. Some of the records "have not been updated to account for changes in ownership." *Id.* The district court, here, also "largely glossed over this problem," *id.*, but the court went one step further than the district court in *Adair* and ordered EQT to reference local land records and update its records to account for changes in ownership in violation of the federal rules.[18] To be sure, ordering EQT to ascertain the Class for Appellees did nothing to resolve the same complications that posed a significant administrative barrier to ascertaining the Class in *Adair* in this case, including "heirship, intestacy, and title-defect issues [that] plague many of the potential class members' claims[.]" *Id.*

In the Response, Appellees also try to gloss over the impact of prior class litigation on ascertainability. All members of the class litigation settlement in *Kay Co.* are excluded from the Class, but Appellees offer no reliable means to identify which of the owners and leases in the Class are excluded because of their involvement in the *Kay Co.* settlement. *See* Brief at 46-47. While EQT identified the class wells that were included in the settlement and removed data related to those wells from the accounting data and other datasets, no one has performed the manual process of identifying owners who were *Kay Co.* settlement participants and,

---

[18]     Appellees moved to compel EQT to ascertain the Class because, contrary to Appellees' argument in the Response, all Class members cannot be "reliably identified from EQT's own business records." Response at 39.

therefore excluded from the Class, but whose other leases, wells, and data are still included in the datasets in this case, including the accounting data upon which Appellees' expert relies. Again, Appellees suggest it is EQT's burden to identify the leases, owners, and wells that were included in the *Kay Co.* settlement and, thus, are excluded from the Class, but that is not the law. It was Appellees' burden to ascertain the Class and, as demonstrated by their Response, they fell woefully short.

## III.    Certification of the Fraudulent Concealment Claim Must Be Reversed.

Contrary to logic and any reasonable interpretation of the law, Appellees refuse to concede the certification of their meritless and time-barred fraud claim. Appellees intentionally fail to mention in the Response that the district court dismissed the fraud claims of the named Class Representatives, the Glovers and Goshorn Ridge, on summary judgment. In dismissing Appellees' fraud claims, the district court held that the claims are barred by the statute of limitations and fail on the merits. More specifically, the court found that Appellees ***"failed to adduce evidence of reliance, causation and damages" to support a claim for fraud against EQT***. *See* JA4449; JA4469.

Each element of each cause of action asserted by Appellees must be provable through evidence that is common to the class. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008) (plaintiff must demonstrate each element is "capable of proof at trial through evidence that is common to the class rather than

individual to its members"). Appellees were required but failed to demonstrate that each element of their fraud claim is provable through evidence.

Appellees lack all credibility—failing to discuss or even mention the district court's summary judgment on their fraud claim in the Response. Because Appellees cannot prove the elements of causation, reliance, and damages for their own clients, which require "individualized proof," they undoubtedly cannot prove the elements of the certified fraud claim on behalf of the Class either. *Adair*, 764 F.3d at 369-70 (noting the "individualized nature" of "course of performance evidence," including lessor's individual communications with EQT about royalty payments). Accordingly, certification of Appellees' fraud claim must be reversed.

## **<u>CONCLUSION</u>**

For the above reasons, EQT respectfully requests that this Court reverse the district court's class certification order.

Dated: February 28, 2024

Respectfully submitted,

*/s/ Lauren W. Varnado*
Lauren W. Varnado
Michelman & Robinson, LLP
717 Texas Avenue, 31st Floor
Houston, Texas 77002
(713) 422-2121

Jennifer J. Hicks
Babst, Calland, Clements and Zomnir, P.C.
300 Summers Street, Suite 1000
Charleston, West Virginia 25301
(681) 205-8888

*Counsel for Defendants-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limits because, excluding the parts of the document exempted by Rule 32(f) of the Federal Rules of Appellate Procedure. This brief contains 5,628 words.

This brief complies with the typeface and type style requirements because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.

*/s/ Lauren W. Varnado*

## **CERTIFICATE OF SERVICE**

This is to certify that on February 28, 2024, I have electronically filed the foregoing Reply Brief of Defendants-Appellants EQT Corporation, EQT Production Company, and EQT Energy, LLC with the Clerk of Court using the CM/ECF system, and I have emailed a true and correct copy of the Reply Brief and all supporting documents to counsel listed below to the following recipients:

Bob Fitzsimmons, Esquire
Robert J. Fitzsimmons, Esquire
Mark A. Colantonio, Esquire
Clayton Fitzsimmons, Esquire
Fitzsimmons Law Firm PLLC
1609 Warwood Avenue
Wheeling, West Virginia 26003
bob@fitzsimmonsfirm.com
rocky@fitzsimmonsfirm.com
mark@fitzsimmonsfirm.com
clayton@fitzsimmonsfirm.com

Marvin W. Masters, Esquire
The Masters Law Firm LC
181 Summers Street
Charleston, West Virginia 25301
mwm@themasterslawfirm.com

*/s/ Lauren W. Varnado*

-23-