# In the United States Court of Appeals
## for the Fourth Circuit

---

WILLIAM D. GLOVER, ET AL.,
*Plaintiffs-Appellees,*

v.

EQT CORPORATION, ET AL.,
*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Northern District of West Virginia
No. 5:19-cv-223 (Bailey, J.)

---

## PETITION FOR REHEARING EN BANC

---

Jennifer J. Hicks
BABST, CALLAND, CLEMENTS
AND ZOMNIR, P.C.
300 Summers Street, Suite 1000
Charleston, West Virginia 25301
(681) 205-8888

Lauren W. Varnado
BROWN RUDNICK LLP
609 Main Street, Suite 3550
Houston, Texas 77002
(281) 815-0511

Elbert Lin
*Counsel of Record*
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
(804) 788-8200
elin@hunton.com

Erica N. Peterson
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500

*Counsel for Defendants-Appellants*

## TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS.......................................................................... ii

INTRODUCTION AND RULE 40(B) STATEMENT OF PURPOSE .....................1

BACKGROUND ...........................................................................................3

I.     Factual background.........................................................................3

II.    The proceedings below ...................................................................4

III.   The panel opinions.........................................................................5

ARGUMENT .................................................................................................8

I.     In upholding the district court's ascertainability ruling, the panel majority departed from Circuit precedent and created an end-run around Rule 23's ascertainability requirement. ...............................8

II.    Rehearing is also necessary because the panel majority's ruling on predominance conflicts with this Court's precedent, dilutes the requirement, and conflicts with precedent of the West Virginia Supreme Court of Appeals..........................................................11

CONCLUSION ............................................................................................17

i

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) .............................................................1, 12, 13, 16

*Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*,
    91 F.4th 202 (4th Cir. 2024) ......................................................................8

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)........................................................................................8

*Cruson v. Jackson Nat'l Life Ins. Co.*,
    954 F.3d 240 (5th Cir. 2020) ...................................................................16, 17

*EQT Production Co. v. Adair*,
    764 F.3d 347 (4th Cir. 2014) ...............................................................*passim*

*Freeman v. Progressive Direct Insurance Co.*,
    No. 24-1684, 2025 WL 2435366 (4th Cir. Aug. 25, 2025).....................2, 14, 15

*Gariety v. Grant Thornton, LLP*,
    368 F.3d 356 (4th Cir. 2004) ................................................................8

*Gillis v. Respond Power, LLC*,
    677 F. App'x 752 (3d Cir. 2017) ...........................................................17

*Hammond v. Powell*,
    462 F.3d 1053 (4th Cir. 1972) ...............................................................8

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012) .................................................................10

*Mr. Dee's Inc. v. Inmar, Inc.*,
    127 F.4th 925 (4th Cir. 2025) ...............................................................14

*Nicholas v. Wyndham Int'l, Inc.*,
    373 F.3d 537 (4th Cir. 2004) ................................................................11

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) .................................................................14

*Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs.,
   Inc.*,
   601 F.3d 1159 (11th Cir. 2010) ...........................................................17

*Sneberger v. Morrison*,
   235 W. Va. 654, 776 S.E.2d 156 (2015)...............................................14

*Trump v. CASA*,
   145 S. Ct. 2540 (2025)..........................................................................2

*Williams v. Martorello*,
   59 F.4th 68 (4th Cir. 2023) ...................................................................11

**Other Authorities**

Federal Rule of Civil Procedure 23 ......................................................4, 5, 8, 10, 11

# INTRODUCTION AND RULE 40(B) STATEMENT OF PURPOSE

This petition for rehearing *en banc* presents two class certification issues—concerning ascertainability and predominance—on which the panel majority departed from Circuit precedent in affirming the certification of a breach-of-contract class. The class includes former and current owners of more than 3,800 gas leases in West Virginia that, even when grouped in the most general terms, fall into at least 70 different categories. As Judge Niemeyer explained in dissent, this Court's decisions in *EQT Production Co. v. Adair*, 764 F.3d 347 (4th Cir. 2014), and *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998), "unmistakably indicate that a class should not have been certified in the circumstances presented." Panel Op. 35.

Start with ascertainability. The panel majority affirmed the district court's conclusion that the putative class became ascertainable following a discovery order requiring *defendants* to undertake "independent research" and create a document identifying every class member and linking each to their respective lease and well. That holding conflicts with *Adair*, which recognized both that it is the *plaintiff's* burden to produce evidence of ascertainability, and that ascertainability exists only if class members are "readily identifiable" without "extensive fact-finding." If allowed to stand, the majority's opinion threatens to effectively eliminate the ascertainability requirement within this Circuit.

1

Next, predominance.  *Adair* and *Broussard* make clear that class actions involving many different contracts should rarely, if ever, satisfy the predominance inquiry.  In *Adair*, for example, this Court explained that "variable terms [across numerous contracts] make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis."  764 F.3d at 368.  Yet the panel majority affirmed the district court's finding that this class— and its at least 70 different lease types—satisfies predominance.  This obvious outlier, and the flawed reasoning that led to it, will lead to widespread confusion if not corrected.  Indeed, as described further below, the predominance analysis issued just last week in *Freeman v. Progressive Direct Insurance Co.*, No. 24-1684, 2025 WL 2435366 (4th Cir. Aug. 25, 2025), already conflicts with the panel majority's opinion here.

To say the very least, the majority opinion "blurs what have been clearly established criteria for satisfying the class action requirements."  Panel Op. 39 (Niemeyer, J., dissenting).  As class actions play an increasing role in the legal system, *see Trump v. CASA*, 145 S. Ct. 2540 (2025), rehearing en banc is necessary not only to restore consistency and coherence to this Court's precedents on both ascertainability and predominance, but also to ensure that both remain the critical guardrails on class certification that they are intended to be.

# BACKGROUND

## I.   Factual background

Natural gas can be sold and priced in a variety of ways.  The raw gas produced from wells can itself be sold and may be priced, for example, based on the gas's value in British thermal units (BTUs) or at some specific market price.  Alternatively, if the raw gas is entrained with (*i.e.*, contains) natural gas liquids (NGLs), the gas can be separated into the NGLs and "residue gas" (the latter of which, as a result, has a lower BTU content than the original raw or "wet" gas).  NGLs, in turn, can be further refined into valuable products like butane, propane, pentane, and isobutane.

EQT Production explores for and produces natural gas in West Virginia.  To that end, it has for decades entered into and acquired leases with landowners, drills wells, obtains gas from those wells, and pays royalties to leaseholders.  Some leases were entered into by EQT Production itself, using various lease forms that have changed over time, as well as individually negotiated contract language.  Other leases were acquired from other lessees who negotiated their own lease language.  The leases, therefore, vary substantially and in many material respects, including how and where and on what products royalties must be calculated and paid.  *See* Opening Br. 7-8.  In addition, the leaseholders have not remained static.  Over the years, the original landowners often conveyed to others their interests in the leases (and royalties), with or without the land.

## II.  The proceedings below

Plaintiffs, who hold various such leases, brought this case alleging, among other things, breach of contract and fraudulent concealment in the payment of royalties.  They purported to represent a class of "[a]ll royalty owners who were paid royalties by EQT between January 1, 2012 and February 28, 2021 pursuant to leases for wells located in West Virginia in Marshall County, Wetzel County, Tyler County, Doddridge County, or Ritchie County which contain the lease language set forth in Exhibit 1."  JA4283-84; JA4672-74.  It is undisputed that the putative class action involves roughly 3,843 different leases that, even under Plaintiffs' own grouping, fall into at least 70 different categories with lease language that varies widely, both across *and within* categories.

On Plaintiffs' motion, the district court granted class certification under Federal Rule of Civil Procedure 23(b)(3) as to both the contract and fraudulent concealment claims.  Only its rulings on ascertainability and predominance in certifying the contract claim are relevant to this petition.  *See infra* note 1.

As to ascertainability, the district court concluded that "the members of the Class in this case are readily identifiable."  JA4291.  Though it acknowledged that *Plaintiffs* bear the burden of satisfying the requirements of Rule 23, the district court found the class ascertainable solely because it had "compelled" *defendants* through a discovery order to attempt the extensive work of "reconstruct[ing] a Class Lease

accounting connecting all royalty payments to owners to Class Leases over time." *Id.* In fact, that order had been entered after Plaintiffs complained that "determin[ing] who is linked to what language in the leases" is "time-consuming and expensive … research" that they could not complete. JA557.

As to the predominance of common questions, the district court focused on its conclusion that EQT Production "utilized a common and standardized method to calculate and pay royalties under all Class Leases." JA4312. In its view, this single "common issue of whether EQT breached the Class Leases by its common method of paying NGL royalties clearly predominates." JA4313.

## III. The panel opinions

On a permissive appeal under Federal Rule of Civil Procedure 23(f), a panel of this Court affirmed, 2 to 1, the district court's certification of the class on the contract claim.[1]

The majority first upheld the district court's ascertainability holding. Pointing to this Court's decision in *Adair*, EQT Production argued (at Opening Br. 44) that the class was not ascertainable because the class members cannot be identified "'without extensive and individualized fact-finding'"—something Plaintiffs

---

[1] The panel unanimously and correctly reversed the district court's certification of a class on the fraudulent concealment claim, and that ruling should not be disturbed if this Court grants rehearing en banc.

themselves admitted in seeking the discovery order.  But the panel majority rejected this argument "out of hand," agreeing with the district court that the discovery order somehow "obviate[d] this problem."  Panel Op. 14.

In dissent, Judge Niemeyer disagreed for several, independent reasons.  To begin with, he objected that the district court had "issued an unauthorized discovery order," exceeding the scope of Federal Rule of Civil Procedure 34.  Panel Op. 38.  But in addition, the district court had "also improperly shifted the burden of establishing class ascertainability to EQT."  *Id.* at 38.  And in all events, "the [district] court failed to recognize that the complexity of creating such a document violated the fundamental principles of ascertainability."  *Id.* at 38-39.  Even setting aside the issue of which party was required to undertake the task, the more basic problem remained that "the class cannot be ascertained without 'extensive and individualized fact-finding.'"  *Id.* at 39 (quoting *Adair*, 764 F.3d at 358).

The majority next upheld the district court's ruling that a common question predominates over any individual issues.  In its view, "Plaintiffs have shown how [an] alleged common payment scheme is central to EQT's liability."  Panel Op. 17.  Specifically, "Plaintiffs put forth evidence to support their argument that EQT's payment of royalties based on the BTU value of the wet gas produced at the wellhead violated *each* Class Lease. . . ."  *Id.* at 23 (emphasis added); *see also id.* at 17.  And at the same time, the majority reasoned, "Plaintiffs put forth evidence that the textual

variations in the Class Leases' valuation provisions are likely immaterial to th[at] common question of EQT's ultimate liability." *Id.* at 24. Accordingly, the majority concluded, a single "common question (and common answer)" predominates. *Id.*

On this, too, Judge Niemeyer disagreed. He believed that the majority "fail[ed] to require a rigorous analysis into whether common questions of law or fact *predominate*" and "dance[d] around" this Court's decisions in *Adair* and *Broussard*, "which unmistakably indicate that a class should not have been certified in the circumstances presented." Panel Op. 30, 35 (Niemeyer, J., dissenting). In particular, Judge Niemeyer explained that "[r]egardless of EQT's uniform method of calculation, the court would still have to compare EQT's royalty payments with what the leases provided to find a breach, and doing so would require individual assessment of the leases' terms." *Id.* at 34-35. And because "the record shows that there is no one lease form or type of royalty provision common to the [P]laintiffs' claims," "individual claims in this case overwhelm any consideration common to the class." *Id.* at 31. But instead of recognizing as much, the majority "perpetuate[d] the district court's error" by simply "assum[ing] that the 'variations in the Class Leases' valuation language are immaterial.'" *Id.* at 35-36.

**ARGUMENT**

I.      **In upholding the district court's ascertainability ruling, the panel majority departed from Circuit precedent and created an end-run around Rule 23's ascertainability requirement.**

This Court's cases have long established that "[t]he plaintiffs who propose to represent the class bear the burden of demonstrating that the requirements of Rule 23 are satisfied." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004). That burden requires "do[ing] more than plead[ing] compliance." *Adair*, 764 F.3d at 357. "Rather, the party must present evidence that the putative class complies with Rule 23." *Id.* (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).

Those obligations include the "burden of demonstrating the ascertainability of the class." *Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*, 91 F.4th 202, 212 (4th Cir. 2024). Ascertainability is "an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *Adair*, 764 F.3d at 358 (quoting *Hammond v. Powell*, 462 F.3d 1053, 1055 (4th Cir. 1972)). That means "[a] class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.* So "'[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate.'" *Id.* (citation omitted). In *Adair*, this Court recognized that tracing ownership for a putative class including those *formerly* entitled to

royalties—as is necessary here—is precisely the type of "complicated and individualized process" that poses a "barrier" to ascertainability. *Id.* at 359.

The panel majority's ruling on ascertainability conflicts with these precedents in two ways.

First, as Judge Niemeyer observed, the majority's reliance on the discovery order "improperly shifted the burden of establishing class ascertainability to EQT." Panel Op. 38. As the record plainly shows, Plaintiffs sought the discovery order because they admittedly could not present evidence of ascertainability, even after "reviewing thousands of lease files and transactions" produced by EQT Production. JA341. In particular, they couldn't "link[] the [royalty] payments to an owner ID, to a lease, and a well." JA557. So they persuaded the district court to force EQT Production to do that, recognizing that the process would be "time-consuming and expensive," *id.*, because EQT would have to "create a new document" that did not previously exist, JA616. Indeed, EQT submitted an affidavit averring that "[a] link between every royalty owner to its underlying lease over time does not exist within EQT Production's electronic records and systems," and that establishing all such links would be "a manual process" requiring "independent research" of records outside EQT's records. JA533; JA534. That approach to satisfying ascertainability simply cannot be squared with the requirement that *the party seeking certification*

"must present evidence that the putative class complies with Rule 23." *Adair*, 764 F.3d at 357.[2]

Second, as Judge Niemeyer also observed, the conceded "complexity of creating such a document violated the fundamental principles of ascertainability" in any event. Panel Op. 38-39. Even setting aside the improper shift in burden, the problem remains that "the class cannot be ascertained without 'extensive and individualized fact-finding'" by EQT Production. *Id.* at 39 (quoting *Adair*, 764 F.3d at 358). Both Plaintiffs and the district court expressly acknowledged as much. JA557; JA616. But as this Court made clear in *Adair*, where such efforts are required, "'a class action is inappropriate.'" 764 F.3d at 358.

The panel majority's only response to these objections is that EQT Production did not appeal the discovery order, so "its propriety is not before us." Panel Op. 23. That misses the point. As Judge Niemeyer recognized, the discovery order may well be "unauthorized" in the sense that it violates Federal Rule of Civil Procedure 34. Panel Op. 38. But it is a separate question whether the discovery order—even assuming it is proper—may be relied upon to satisfy ascertainability. *Id.* at 38-39. This latter question *was* squarely before the panel, *see* Opening Br. 41-44, and as

---

[2] *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (noting that "[s]ome courts have held that where nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails").

described above, should have been resolved in EQT's favor under this Court's precedents. Whether the discovery order violates Rule 34 is an issue EQT can, and may, still appeal in the future.[3]

If left in place, the panel majority's opinion threatens to effectively eviscerate the ascertainability requirement within this Circuit. By endorsing the district court's reliance on the discovery order, the panel majority has charted a path for plaintiffs to end-run the ascertainability requirement by simply arguing to the district court that "[t]he documents and information at issue are complicated and difficult to understand" and that defendants are "in a better position" to identify the class. JA616. This Court should grant rehearing at least to address this issue.

## II. Rehearing is also necessary because the panel majority's ruling on predominance conflicts with this Court's precedent, dilutes the requirement, and conflicts with precedent of the West Virginia Supreme Court of Appeals.

This Court has said that the predominance requirement of Rule 23(b)(3) requires giving "'careful scrutiny to the relation between common and individual questions in the case.'" *Williams v. Martorello*, 59 F.4th 68, 86 (4th Cir. 2023). The inquiry is "more demanding" than the commonality requirement of Rule 23(a)(2), as it "focuses not only on the existence of common questions, but also on how those

---

[3] *Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 541 (4th Cir. 2004) ("[d]iscovery orders are 'inherently interlocutory'" and may be challenged after final judgment).

questions relate to the controversy at the heart of the litigation." *Adair*, 764 F.3d at 366. Thus, while "[a] single common question will suffice," it "must be of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* at 360.

Of relevance here, this Court's decisions in *Adair* and *Broussard* make clear that class actions involving many different contracts should rarely, if ever, satisfy the predominance inquiry. In *Adair*, this Court expressly rejected the district court's conclusion that "lease language variation" was "not … a barrier to class certification." *Id.* at 367. Instead, this Court explained that "variable terms [across numerous contracts] make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis." *Id.* at 368. And in *Broussard*, this Court rejected class certification under the less demanding commonality and typicality requirements, holding that "plaintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts." 155 F.3d at 340.

The panel majority's decision to affirm the district court's predominance ruling conflicts with these precedents. This case involves more than 3,800 leases that, even by Plaintiffs' own (generous) organization, fall into at least 70 different categories with widely varying lease language. As Judge Niemeyer noted, *Adair* and *Broussard* "involv[ed] far fewer contractual differences." Panel Op. 30.

In response, the panel majority contended that, unlike in those cases, this case does not present "the 'distinct possibility that there was a breach of contract with some class members, but not with other class members.'" Panel Op. 24 (quoting *Broussard*, 155 F.3d at 340). It premised this conclusion on the following logic from the district court: (a) "Plaintiffs put forward expert testimony that none of the Class Leases permitted EQT to pay royalties based on their wet gas' BTU content"; (b) "Plaintiffs also put forward evidence—EQT's letter to all lessors—that EQT paid Plaintiffs in just such a way"; and therefore (c) "Plaintiffs put forth evidence that EQT paid royalites in a manner that violated *every* Class Lease." *Id.* at 17. In the majority's view, this logic gave a "common answer" to "EQT's ultimate liability" without having to consider any of "the textual variations in the Class Leases' valuation provisions." *Id.* at 24. This actually *complies* with *Adair*, the majority insisted, because it shows how a "common payment scheme" dictates "'*ultimate liability*.'" *Id.* at 17 (quoting *Adair*, 764 F.3d at 366 (emphasis added)).

But as Judge Niemeyer explained, there are at least two problems with this logic.

The first is that, contrary to the majority's assertion, the logic does not establish "EQT's ultimate liability." At most, it demonstrates that EQT Production failed to comply with one or more lease terms. But under West Virginia law, "ultimate liability" requires determining not just that EQT violated a lease term, but

also that what EQT did actually resulted in harm. "A claim for breach of contract requires proof of the formation of a contract, a breach of the terms of that contract, *and* resulting damages." *Sneberger v. Morrison*, 235 W. Va. 654, 669, 776 S.E.2d 156, 171 (2015) (emphasis added). That necessitates reviewing the leases, calculating what EQT was *supposed* to have paid under each, and comparing that number to EQT's *actual* payment under each. Or as Judge Niemeyer put it, "[r]egardless of EQT's uniform method of calculation, the court would still have to compare EQT's royalty payments with what the leases provided to find a breach, and doing so would require individualized assessment of the leases' terms." Panel Op. 34-35). In short, though the district court and panel majority purported "to consider the significance of th[e] common conduct [within] the broader litigation," *Adair*, 764 F.3d at 366, they failed to take into account *all* the elements of a breach of contract claim.[4]

Notably, that is the exact same basis on which this Court, just last week, found no predominance in *Freeman v. Progressive Direct Insurance Co.*, No. 24-1684,

---

[4] Instead, the district court effectively conducted (and the panel majority approved) a predominance analysis that *presumed* all class members suffered injury. But that is not how the class is defined, and for good reason. A class "that is defined to include only those individuals who were injured" is known as a "'fail safe' class." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022). And the propriety of fail-safe classes has been questioned in this Circuit and rejected in many others. *See Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 931 & n.1 (4th Cir. 2025).

2025 WL 2435366 (4th Cir. Aug. 25, 2025). As here, the plaintiff's claim there was for breach of contract, and focused on the alleged use of a common payment methodology (the "Projected Sold Adjustment"). But as this Court explained, the "predominance analysis must … begin with the elements of th[e] [breach] claim to see whether class members 'will prevail or fail in unison.'" Slip Op. 11; 2025 WL 2435366, at *5. And just like West Virginia law here, South Carolina law there required proving damages as an element of liability, *id.*, and that could not be done on a classwide basis because it necessitates an individualized comparison of what was actually paid to what should have been paid, *id.* at 12-13; 2025 WL 2435366, at *6.

The second, independent problem with the district court's logic is the premise that "none of the Class Leases permitted EQT to pay royalties based on their wet gas' BTU content." Panel Op. 17; *see also id.* at 8, 9, 16. As Judge Niemeyer explained, that is an assumption that conflicts with the "rigorous analysis" required by this Court's precedents. Panel Op. 30, 35. The majority claimed that EQT's expert admitted as much. Panel Op. 17. But as the majority itself recounted at one point (and then seemingly disregarded everywhere else), of the at least 70 different lease types, the chosen excerpt of the expert's testimony refers only to about "15 representative lease types." *Id.* at 23. The majority also relied on West Virginia case law that imposes certain default terms on oil-and-gas leases. *Id.* at 17-18, 25. But

as Judge Niemeyer pointed out, those cases all say that their presumptions may be "*negated by individual lease language*," yet neither the district court nor the majority purported to have examined every lease with different language to assess whether the relevant presumptions are overcome. Panel Op. 37. Instead, the majority "assume[d] way … th[ose] stated exceptions." *Id.* When faced with similar state law and circumstances in *Adair*, this Court reversed the district court for doing just that. *Adair*, 764 F.3d at 368.

Like the majority's ruling on ascertainability, its predominance analysis "blurs what have been clearly established criteria" and will usher in, at minimum, widespread confusion in this Circuit over the certification of classes involving multiple different contracts. Panel Op. 39 (Niemeyer, J., dissenting). Until now, this Court was clear that "plaintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts." *Broussard*, 155 F.3d at 340. But if the panel majority's opinion stands, this Court will have permitted precisely such an action. Rehearing en banc is necessary to restore consistency and coherence to this Court's precedents and to reestablish that predominance, if nothing else, will generally bar certification of classes involving multiple different contracts.

Of course, breach of contract claims can and sometimes should be certified as classes. Indeed, "cases involving form contracts are often prime candidates for class certification because of the common interpretive questions at stake." *Cruson v.*

*Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 252 (5th Cir. 2020); *see also Gillis v. Respond Power, LLC*, 677 F. App'x 752, 756-57 (3d Cir. 2017) ("claims involving the interpretation of standard form contracts are particularly well-suited for class treatment"). But the same is not true where, as here, "the relevant terms vary in substance among the contracts." *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th Cir. 2010). In such cases, "common questions rarely will predominate." *Id.*

## CONCLUSION

The Court should grant rehearing en banc.

September 3, 2025

Respectfully submitted,

s/ Elbert Lin

Elbert Lin
   *Counsel of Record*
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
elin@hunton.com

Erica N. Peterson
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500

Jennifer J. Hicks
BABST, CALLAND, CLEMENTS
AND ZOMNIR, P.C.

300 Summers Street, Suite 1000
Charleston, West Virginia 25301
(681) 205-8888

Lauren W. Varnado
BROWN RUDNICK LLP
609 Main Street, Suite 3550
Houston, Texas 77002
(281) 815-0511

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

This petition complies with Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

I further certify that the petition complies with Federal Rule of Appellate Procedure 40(d)(3) because it contains 3,897 words, excluding the portions of the document exempted by Rule 32(f).

September 3, 2025

s/ Elbert Lin
Elbert Lin

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2025, I caused the foregoing to be filed electronically with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit. The petition will be served on all registered counsel through the Court's CM/ECF system.

s/ Elbert Lin
Elbert Lin